23-10459

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

ANDREW H. WARREN,

*Plaintiff-Appellant,*

—v.—

RON DESANTIS, individually and
in his Official Capacity as Governor of the State of Florida,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

## PLAINTIFF-APPELLANT'S OPENING BRIEF

DAVID A. O'NEIL
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.,
Suite 500
Washington, DC 20004
(202) 383-8000
daoneil@debevoise.com

ALEXANDRA P. SWAIN
DEBEVOISE & PLIMPTON, LLP
650 California Street
San Francisco, California 94108
(415) 738-5700
apswain@debevoise.com

ANAGHA SUNDARARAJAN
SAMANTHA B. SINGH
MARISA L. PAGÁN-FIGUEROA
JANE TIEN
DEBEVOISE & PLIMPTON, LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
asundararajan@debevoise.com
sbsingh@debevoise.com
mlpaganfigueroa@debeovise.com
jtien@debevoise.com

DAVID B. SINGER
MATTHEW T. NEWTON
OLDER LUNDY KOCH & MARTINO
1000 West Cass Street
Tampa, Florida 33606
(813) 254-8998
dsinger@olderlundylaw.com
mnewton@olderlundylaw.com

JEAN-JACQUES CABOU
ALEXIS E. DANNEMAN
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 351-8000
jcabou@perkinscoie.com
adanneman@perkinscoie.com

*Attorneys for Plaintiff-Appellant*

## STATEMENT OF INTERESTED PARTIES

Plaintiff-Appellant certifies that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1.  Aaron, Jeffrey M., *Attorney for Defendant-Appellee*

2.  Cabou, Jean-Jacques, *Attorney for Plaintiff-Appellant*

3.  Casselman, Margo R., *Attorney for Plaintiff-Appellant*

4.  Christmas, Natalie, *Attorney for Defendant-Appellee*

5.  Costello, David M., *Attorney for Defendant-Appellee*

6.  Danneman, Alexis, *Attorney for Plaintiff-Appellant*

7.  Debevoise & Plimpton, LLP, *Attorneys for Plaintiff-Appellant*

8.  DeSantis, Ron, *Defendant-Appellee*

9.  DeSousa, Jeffrey P., *Attorney for Defendant-Appellee*

10. Florida Office of the Attorney General, *Attorneys for Defendant-Appellee*

11. Gray Robinson, P.A., *Attorneys for Defendant-Appellee*

12. Grouev, Zachary, *Attorney for Defendant-Appellee*

13. Hinkle, Robert L., *District Court Judge*

14. Levesque, George T., *Attorney for Defendant-Appellee*

15. Lopez, Susan, *Interested Party*

16.    Moody, Ashley, *Attorney for Defendant-Appellee*

17.    Newton, Matthew T., *Attorney for Plaintiff-Appellant*

18.    Older, Lundy, Koch & Martino, *Attorneys for Plaintiff-Appellant*

19.    O'Neil, David A., *Attorney for Plaintiff-Appellant*

20.    Pagan-Figueroa, Marisa L., *Attorney for Plaintiff-Appellant*

21.    Percival, James H., *Attorney for Defendant-Appellee*

22.    Perkins Coie LLP, *Attorneys for Plaintiff-Appellant*

23.    Schenck, Robert S., *Attorney for Defendant-Appellee*

24.    Singer, David B., *Attorney for Plaintiff-Appellant*

25.    Singh, Samantha B., *Attorney for Plaintiff-Appellant*

26.    Sundararajan, Anagha, *Attorney for Plaintiff-Appellant*

27.    Swain, Alexandra P., *Attorney for Plaintiff-Appellant*

28.    Tien, Jane, *Attorney for Plaintiff-Appellant*

29.    Warren, Andrew, *Plaintiff-Appellant*

30.    Whitaker, Henry C., *Attorney for Defendant-Appellee*

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

Dated: March 13, 2023

**DEBEVOISE & PLIMPTON LLP**

*/s/ David A. O'Neil*

David A. O'Neil
801 Pennsylvania Ave. NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

*Counsel for Plaintiff-Appellant*
*Andrew Warren*

## STATEMENT REGARDING ORAL ARGUMENT

This Court expedited consideration of this case and scheduled oral argument for May 2, 2023.  Plaintiff-Appellant Andrew Warren respectfully submits that oral argument is appropriate in light of the significant implications of the case and the ongoing public interest in the resolution of the issues it presents.  Mr. Warren believes that oral argument will assist the Court in fully evaluating the claims before it and effectively resolving the appeal.

## TABLE OF CONTENTS

STATEMENT OF INTERESTED PARTIES ......................................................... 1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

JURISDICTIONAL STATEMENT ................................................................. viii

ISSUES PRESENTED ..................................................................................... 1

PRELIMINARY STATEMENT ....................................................................... 3

STATEMENT OF THE CASE ......................................................................... 6

    I.        Factual Background ....................................................................... 6

        A.      Mr. Warren Advocated for Criminal Justice Reform as a
              Candidate and an Elected Official ......................................... 6

        B.      As a Prosecutor, Mr. Warren Implemented Policies Requiring
              Individualized Discretion in Every Case .............................. 8

        C.      Governor DeSantis Instructed His Staff to Find Prosecutors
              Who Advocated "Woke" Viewpoints ................................. 10

        D.      The Governor's Office Targeted Mr. Warren for Suspension
              Because of His Speech and Associations ............................. 12

        E.      The Governor Announced the Suspension by Focusing on Mr.
              Warren's Speech and Associations ..................................... 16

        F.      The Governor Has Continued to Justify the Suspension on the
              Basis of Mr. Warren's Speech and Associations .................... 19

    II.      Procedural History ..................................................................... 20

        A.      Pretrial Proceedings .......................................................... 21

        B.      The Trial ............................................................................ 23

        C.      The District Court's Decision ............................................. 24

III.    Standard of Review ...................................................................... 27

SUMMARY OF THE ARGUMENT ................................................................ 27

ARGUMENT ...................................................................................................... 30

I.    The District Court Erred In Holding that the Eleventh
       Amendment Barred It from Ordering Reinstatement ........................... 31

II.    The District Court Misapplied the Legal Framework for
       Adjudicating First Amendment Retaliation Claims ............................... 33

   A.    Mr. Warren Proved his First Amendment Retaliation Case ................ 34

   B.    The Governor Was Required Affirmatively To Plead a
          Legitimate, Non-Discriminatory Reason for the Suspension and
          Then to Prove That Reason .............................................................. 35

   C.    Governor DeSantis Failed to Prove the Motivation He Pled ............. 37

   D.    The Governor Specifically Disavowed the Motivation the
          District Court Adopted .................................................................... 40

   E.    The Motivation the Court Attributed to the Governor was
          Unlawful for Other Reasons .............................................................. 42

   F.    The Motivation the Court Attributed to the Governor Itself
          Violates the First Amendment ........................................................... 44

CONCLUSION ................................................................................................... 52

CERTIFICATE OF SERVICE ......................................................................... 54

# TABLE OF AUTHORITIES

**Cases**

*Acevedo-Diaz v. Aponte*, 1 F.3d 62 (1st Cir. 1993) ................................................. 35

*Akers v. Caperton*, 998 F.2d 220 (4th Cir. 1993) .....................................................45

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ...............................................34

*Bond v. Floyd*, 385 U.S. 116 (1966) ........................................................................34

*Branti v. Finkel*, 445 U.S. 507 (1980) .....................................................................45

*Caterpillar, Inc. v. Williams*, 482 U.S. 386 (1987) .................................................38

*Circle Schs. v. Pappert*, 381 F.3d 172 (3d Cir. 2004) ............................................ 51

*Collier v. Turpin*, 177 F.3d 1184 (11th Cir. 1999) ................................................. 27

*Crutcher v. MultiPlan, Inc.,* 22 F.4th 756 (8th Cir. 2022) .......................................39

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ............................7

*Edelman v. Jordan*, 415 U.S. 651 (1974) ................................................................ 31

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................45

*Ex Parte Young*, 209 U.S. 123 (1908) ............................................................... 31, 32

*Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909 (6th Cir. 1991) ............... 46

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978) ...........................................42

*Gomez v. Bird Auto*., LLC, 411 F. Supp. 3d 1332 (S.D. Fla. 2019) ................. 36, 38

*Greenlaw v. United States*, 554 U.S. 237 (2008) .................................................... 39

*Harrell v. University of Montevallo*, 673 F. Supp. 430 (N.D. Ala. 1987), *aff'd*, 861 F.2d 725 (11th Cir. 1988) ...................................................... 36

*Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991) .....................................................27

*Houston Cmty. Coll. Sys. v. Wilson,* 142 S. Ct. 1253 (2022) ...........................34, 35

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997) ........................................ 31, 32

*Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276 (11th Cir. 2005) ................................................................................................ 42

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ................................................................................................ 51

*McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir. 1994) .................................................36

*McCarthy v. Hawkins*, 381 F.3d 407 (5th Cir. 2004) ...............................................31

*Messer v. City of Douglasville*, 975 F.2d 1505 (11th Cir. 1992) ............................51

*Morrison v. Exec. Aircraft Refinishing, Inc.,* 434 F. Supp. 2d 1314 (S.D. Fla. 2005) ................................................................................................38

\* *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ............................................................................................... *passim*

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) ................................6, 51

*Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 69 (1st Cir. 2000) ................... 36

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ........................ 31

*Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968) ........................................................21

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) .....................................35

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............... 47

*Rutan v. Republican Party*, 497 U.S. 62 (1990) ......................................................45

\* *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280 (11th Cir. 2000) ......................*passim*

*Thomas v. Sec'y, Fla. Dep't of Corr.*, 644 F. App'x 887 (11th Cir. 2016) ...............................................................................................................11

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002) ................................................................................................ 32

*Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011) ........................ 32

*West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ......................51

v

*Wollschlaeger v. Governor, Fla*., 848 F.3d 1293, 1308 (11th Cir. 2017) .......................................................................................49

*Williams v. City of River Rouge*, 909 F.2d 151 (6th Cir. 1990) ............................ 46

*Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381 (1998) ................................... 33

*Wood v. Georgia*, 370 U.S. 375 (1962) ................................................................34

**Statutes**

42 U.S.C. § 1983 ...................................................................................................21

Fla. Const. art. IV, § 7(a) ......................................................................................36

U.S. Const. amend. I ......................................................................................*passim*

U.S. Const. amend. XI ...................................................................................*passim*

**Other Sources**

Charlie Kirk*, Live Now: Unite and Win Rally in PHX AZ -powered by Turning Point ACTION*, YouTube (Aug. 14, 2022), https://www.youtube.com/watch?v=-b1W-C9PIVw&t=4578s .................19, 47

*DeSantis Says He Won't Reinstate Suspended Hillsborough Prosecutor Andrew Warren*, WUSF Public Media (Jan. 26, 2023, 6:55 AM), https://wusfnews.wusf.usf.edu/politics-issues/2023-01-26/desantis-says-he-wont-reinstate-suspended-hillsborough-prosecutor-andrew-warren ...............................................................42

WPTV News – PL Palm Beaches and Treasure Coast, *Florida Gov. Ron DeSantis Speaks in Hialeah*, YouTube (Aug. 23, 2022). https://www.youtube.com/watch?v=Fn0Uo5MWW5Q ...................................19

Jenavieve Hatch, *Florida Gov. Ron DeSantis Bring the War on 'Woke Mind Virus' Ideology to California*, Sacramento Bee (Mar. 6, 2023), https://www.sacbee.com/news/politics-government/capitol-alert/article272774740.html ...............................................................19

Ron DeSantis, *The Courage to Be Free: Florida's Blueprint for America's Revival* (2023) ............................................................*passim*

Alexandra Berzon and Ken Bensinger, *Inside Ron DeSantis's Politicized Removal of an Elected Prosecutor*, N.Y. Times (Mar. 11, 2023), https://www.nytimes.com/2023/03/11/us/politics/desantis-andrew-warren-liberal-prosecutor.html ..........................................................................19

Maggie Haberman, *DeSantis Hits the Trail. Just Don't Call it a Campaign.*, N.Y. Times (Feb. 28, 2023), https://www.nytimes.com/2023/02/28/us/politics/desantis-primary-states.html ............................................................................................20

## JURISDICTIONAL STATEMENT

The District Court has jurisdiction of the case below pursuant to 28 U.S.C. § 1331, which gives federal district courts original jurisdiction over all civil actions "arising under the Constitution, laws, or treaties of the United States." This appeal was taken from a final judgment in the case below, entered on January 20, 2023, R.A. Vol. VII at 1221, and was filed on February 14, 2023. Dkt. No. 1. This Court therefore has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

Plaintiff-Appellant Andrew H. Warren appeals from the Order on the Merits and Judgment of the U.S. District Court for the Northern District of Florida (Hinkle, J.) (Appendix ("R.A.") Vol. VII at 1221), granting judgment in favor of Florida Governor Ron DeSantis, Defendant-Appellee, on January 20, 2023. Because the District Court misapplied governing law, Mr. Warren respectfully requests that this Court reverse the judgment below and remand with instructions to enter a permanent injunction reinstating him to his constitutional office.

## ISSUES PRESENTED

1.     Whether the District Court erred in holding that the Eleventh Amendment bars injunctive relief to remedy an identified federal constitutional violation because the same conduct also violates state law.

2.     In the alternative, whether the District Court misapplied *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), by excusing the defendant from liability on the ground that he would have made the same decision regardless of the plaintiff's protected activity when:

   a. The court specifically rejected the proffered facts and motivation the defendant pleaded as a basis for the affirmative "same-decision" defense, and the defendant specifically disavowed the facts and motivation the court attributed to him;

b.  The reason that the court concluded that the defendant would have made the same decision was illegal for other reasons; and

c.  The motivation the court attributed to the defendant itself constituted politically motivated viewpoint discrimination in violation of the First Amendment.

## PRELIMINARY STATEMENT

This case concerns the illegal attempt by Governor DeSantis to nullify the results of two elections and retaliate for core political speech in violation of the First Amendment. On August 4, 2022, the Governor announced that he was suspending Appellant, Andrew Warren, from his constitutional office as the twice-elected State Attorney for Hillsborough County, Florida, because Mr. Warren had expressed viewpoints that, according to Governor DeSantis, displayed "neglect of duty" and "incompetence." Following a bench trial, the District Court rejected that conclusion, ruling that Governor DeSantis' action violated both Florida law and the First Amendment. The District Court declined, however, to reinstate Mr. Warren to his post on the ground that it could not legally do so.

The District Court correctly identified the violation of Mr. Warren's federal constitutional rights, but it erred in holding that it lacked power to provide a remedy. The court appeared to reason that the Eleventh Amendment barred federal-court relief because the Governor's conduct also violated state law. The District Court cited no support for that proposition, which fundamentally misapprehends the function of the Eleventh Amendment. Once the District Court correctly concluded that the "Governor violated the First Amendment," it had the authority to issue prospective relief by ordering Mr. Warren reinstated.

The District Court's decision is equally erroneous if it is interpreted as an effort to apply the framework of *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977), which governs First Amendment retaliation claims. Under that framework, the Governor was required to plead, and then bore the burden to prove, that he would have made the same decision for reasons that were legitimate and unrelated to Mr. Warren's protected activity. The Governor failed to carry that burden for three separate reasons.

First, the Governor failed to prove the facts he pleaded. He asserted in his answer and argued at trial that he suspended Mr. Warren solely for his purported "expressed blanket refusal" to prosecute certain cases. The District Court squarely rejected every aspect of that rationale: It found that Mr. Warren had no such blanket policies and that, in any event, the Governor was not motivated by a genuine belief to the contrary. Having rejected the facts on which the Governor staked his affirmative defense, the District Court should have entered judgment for Mr. Warren. Instead, the court cast about for possible alternative motivations and adopted one that the Governor not only never advanced but affirmatively *disavowed*. The District Court erred in effectively holding that the Governor "proved" his affirmative defense on the basis of facts he did not plead and a rationale he sought to refute.

Second, the motivation the District Court attributed to the Governor was independently unlawful. *Mount Healthy* requires the defendant to prove that he would have taken the same action for a "*legitimate* reason." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1293 (11th Cir. 2000) (emphasis added) (citation omitted). But as the District Court correctly concluded, the Governor's motivation was not legitimate; it was illegal because it "violated the Florida Constitution." Counsel is unaware of any previous reported case in which a court excused a First Amendment violation when the defendant's purported reasons for acting were illegal on other grounds. By permitting the Governor to prevail on such a rationale, and to do so without notice to Mr. Warren, the District Court fundamentally misapplied *Mount Healthy*.

These errors alone would warrant reversal. But there is a third, even more fundamental reason that the District Court's *Mount Healthy* analysis fails. The motivation the District Court attributed to the Governor itself clearly violates the First Amendment. As the District Court's findings correctly reflect, the Governor suspended Mr. Warren in order to amplify his trademark "anti-woke" political platform. The District Court found that the Governor suspended Mr. Warren because of "the anticipated political benefits" he would reap if he "took down" a "woke" prosecutor. In the District Court's view, "the First Amendment does not speak to" such a political motivation. That conclusion is incorrect. The *reason* the

Governor saw political advantage in suspending Mr. Warren is that doing so allowed him to promote "anti-woke" ideas over the "progressive," "Soros-backed" "world view" that he sought to eradicate and that, he is fond of telling voters, "goes to Florida to die."  That political motivation is not the kind of *non-discriminatory* reason that *Mount Healthy* requires.  It is instead a textbook example of viewpoint discrimination—the promotion of preferred ideas and the punishment of disfavored ones—that this Court has described as an "egregious" form of censorship.  *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020).

This Court should reverse the decision below and remand with instructions to enter a permanent injunction reinstating Mr. Warren to the elected office from which the Governor unconstitutionally removed him.

## STATEMENT OF THE CASE[1]

### I.    Factual Background

#### A.    Mr. Warren Advocated for Criminal Justice Reform as a Candidate and an Elected Official

Andrew Warren is an experienced prosecutor who has dedicated his professional life to protecting public safety.  R.A. Vol. I at 38 ¶¶ 22-23.  At the end of a decorated career with the Department of Justice, Mr. Warren returned to his home state of Florida and ran for State Attorney for the 13th Judicial Circuit ("SAO13") in Hillsborough County.  *Id.*  He campaigned on a platform of

---

[1]    Citations to "R.A. at __" refer to the Record Appendix.

criminal justice reform, urging voters to choose him because of his views on how prosecutors can further the fair and efficient use of law enforcement resources. *See* R.A. Vol. IV at 631:7-20, 648:8-650:13, 725:23-726:9. Voters narrowly elected Mr. Warren over the longtime incumbent in 2016 and, after a successful first term, reelected him by a much wider margin in 2020. *See* R.A. Vol. I at 38 ¶¶ 22-23; R.A. Vol. IV at 607:17-608:7; R.A. Vol. VII at 1228-89. Between the two elections, Mr. Warren received nearly 700,000 votes. R.A. Vol. 1 at 38 ¶ 23; R.A. Vol. IV at 607:18.

Mr. Warren has remained a vocal advocate for criminal justice during his time in office, sharing his viewpoints with constituents and speaking out on subjects of public concern. R.A. Vol. IV at 607:6-14, 612:19-24, 622:6-9. As part of that advocacy, Mr. Warren agreed to join opinion letters written and published by an organization called Fair and Just Prosecution ("FJP") on a wide range of topics, including the death penalty, election security, and reproductive rights. *See* R.A. Vol. IV at 653:8-14, R.A. Vol. V 749:7-8, R.A. Vol. II at 390-98.

In June 2021, Mr. Warren joined over 70 prosecutors across the country in signing a letter authored and published by FJP expressing concern over the restrictions in various states on gender-affirming care for transgender individuals (the "Transgender Statement"). R.A. Vol. II at 381-88. Similarly, in June 2022, in the wake of the Supreme Court's decision in *Dobbs v. Jackson Women's Health*

*Org.*, 142 S. Ct. 2228 (2022), Mr. Warren joined a letter signed by more than 90 prosecutors expressing disagreement with efforts across the country to criminalize abortion care (the "Abortion Statement"). R.A. Vol. II at 390-398. The signatories voiced their opinion that efforts to punish abortion were misguided, counterproductive, and unjust. *Id.* They also stated their view that law enforcement resources are better directed towards "protect[ing] the well-being and safety of *all* members of [their] community," and therefore that "[they] commit to exercise [their] well-settled discretion and refrain from prosecuting those who seek, provide, or support abortions." *Id.* at 390.

Neither of these FJP Statements referenced any Florida statute. R.A. Vol. VII at 1259. Indeed, Florida has never had any law criminalizing gender-affirming care, and the Abortion Statement refers to measures that do not exist in Florida. The Statements also were not official policies of SAO13. *Id.* at 1259-1260. Instead, they were political speech by elected officials on important matters of public concern. *See id.* at 1260.

### B.    As a Prosecutor, Mr. Warren Implemented Policies Requiring Individualized Discretion in Every Case

While Mr. Warren's public advocacy reflected his political opinions and viewpoints as an elected official, his formal policies for SAO13 constituted his instructions to the prosecutors whom he supervised. The formulation of such policies followed a rigorous and established process involving research, drafting,

8

vetting, discussion with law enforcement partners, and formalized training.  R.A. Vol. IV at 613:19-615:5.

Mr. Warren's central and overriding direction to his office was set forth in a memo entitled "Prosecutorial Discretion and the Mission of Criminal Justice," which he personally authored and provided to every prosecutor in the office.  *Id.* at 622:18; R.A. Vol. II at 447.  That memo instructed that because "[c]ase-specific review is a hallmark of our criminal justice system," "[i]n every case, [prosecutors] must exercise discretion based on the facts of that case."  *Id.* at 448.  Mr. Warren emphasized to his office that the need to exercise individualized discretion—an instruction his memo repeats eleven times—was his North Star, applicable to every case, every offense, and every stage of the criminal process.  *See generally id.*; *see also* R.A. Vol. IV at 620:25-621:4.

Other policies reinforced Mr. Warren's emphasis on case-specific discretion.  For example, based on research about the disproportionate racial impact of bicycle stops, Mr. Warren issued a policy that provided guidance on when such stops should give rise to charges ("Bike Stop Policy").  *See* R.A. Vol. IV at 634:13-635:20; R.A. Vol. III at 511-512.  That policy set forth certain presumptions but explained that they could be overcome "[i]f, based on the facts and circumstances of the case, the public safety needs of the community outweigh[ed]" the general guidance.  R.A. Vol. III at 512.  Similarly, in response to the backlog of cases that

piled up during the Covid-19 pandemic, Mr. Warren (like many other prosecutors confronting the same challenge) implemented a policy instructing prosecutors how to approach decisions about whether to charge certain low-level offenses ("LLOP"). R.A., Vol. III at 514; R.A. Vol. IV at 627:18-629:6. As with the Bike Stop Policy, the Low-Level Offense Policy made clear that any presumption could be "overcome by significant public safety concerns" in the individual case. R.A. Vol. III at 514. And in July 2022, just weeks before his suspension, Mr. Warren issued a policy on firearms offenses instructing that charging decisions should be guided by certain presumptions but that, as always, such decisions ultimately "depend[] on the particular facts of the case." R.A. Vol. II at 324.

### C.    Governor DeSantis Instructed His Staff to Find Prosecutors Who Advocated "Woke" Viewpoints

In December 2021, amid intense national debate about social and criminal justice viewpoints, the Governor instructed his "Public Safety Czar," Larry Keefe, to identify any prosecutors in Florida who "had Soros support" for their campaigns and espoused "so-called progressive" ideas. *See* Ron DeSantis, *The Courage to Be Free: Florida's Blueprint for America's Revival* 238 (2023) (hereinafter "DeSantis Memoir");[2] *see also* R.A. Vol. V at 737:18-738:4. While the Governor has

---

[2] This Court may take judicial notice of facts that are not in "reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned," including the few news articles and the Governor's statements that Plaintiff-Appellant cites throughout.

repeatedly asserted that he commissioned a "thorough review" of "the performance" of Florida's State Attorneys,[3] Mr. Keefe conducted no such "performance" review, much less a "thorough" one.  R.A. Vol. V at 741:6-743:8.  Instead, he called his like-minded friends in law enforcement and asked for their "impressions" about whether anyone had a "reputation" for advocating the kind of "views," "approach," "mindset," or "world view" that Mr. Keefe associated with the progressive movement. *Id.* at 755:7, 744:1, 753:11-21, 826:18-19. By his own admission, Mr. Keefe "did not conduct an investigation."  *Id.* at 739:15.  He "paid no attention to the details and took not a single note," spoke to no one he did not already know, and recalled no specifics of what he was told in the phone calls during his "look around."  *See* R.A. Vol. VII at 1235-37; R.A. Vol. V at 753:7-10, 738:10-19.

Mr. Keefe concluded from these phone calls with his friends that Mr. Warren had "taken [up] th[e] mantle" of progressive ideas in Florida. R.A. Vol. VII at 1236; R.A. Vol. V at 744:15. In Mr. Keefe's view, Mr. Warren was "an expresser or a conduit for Mr. Soros's world views on criminal prosecution."  R.A. Vol. V at 826:18-19.

---

*Thomas v. Sec'y, Fla. Dep't of Corr.*, 644 F. App'x 887, 888 (11th Cir. 2016). The Court has the broad power to do so at any stage in the proceedings.  *Id.*

[3] *See, e.g.,* DeSantis Memoir at 238; *see also* R.A. Vol. I at 459 1:27-1:30.

On that basis, Mr. Keefe took two additional steps.  First, he obtained from Hillsborough County Sheriff Chad Chronister a self-selected and incomplete set of SAO policies as well as some news articles concerning SAO13.  R.A. Vol. VI at 1064:2-22; R.A. Vol. V at 759:16-22; R.A. Vol. VII at 1237.  Second, Mr. Keefe browsed the internet for information about Mr. Warren and found FJP letters he had joined about the death penalty, election security, and gender-affirming care.  R.A. Vol. V at 750:17-20, 765:16-22, 766:1-5, 767:7-12.

## D.    The Governor's Office Targeted Mr. Warren for Suspension Because of His Speech and Associations

Mr. Keefe's "look around" lay dormant until June 2022, when he learned that Mr. Warren had signed the Abortion Statement.  *Id.* at 766:13-22.  At that point, Keefe took his impressions from friends, the Chronister materials, his internet search results, and the FJP letters and began "beating down [the] door" of the General Counsel's Office insisting that the Governor's lawyers move to suspend Mr. Warren.  R.A. Vol. VII at 1242; R.A. Vol. V at 769:11-16; R.A. Vol. VII at 1087:9-10.

After meeting with the Governor to confirm he wished to proceed, the lawyers asked Mr. Keefe to draft an executive order explaining the motivation for the suspension.  R.A. Vol. VII at 1240-42; *see generally* R.A. Vol. III at 464-75; R.A., Vol. III at 477-87; R.A. Vol. III at 527-59.  The drafts Mr. Keefe prepared did not cite a single SAO13 policy, charging decision, or any other information

concerning Mr. Warren's actual performance as State Attorney. Instead, they relied only on Mr. Warren's speech, his political associations, and the speech of those associates. *See id.* In particular, the draft cited as grounds for suspension four FJP advocacy letters concerning the death penalty, election security, abortion rights, and transgender care. R.A. Vol. III at 464-75. It then recited that:

- FJP "is affiliated with entities associated with activist George Soros";

- "Warren has publicly acknowledged that activist George Soros affiliated entities have funded Warren's political activities";

- "Soros has supported Warren and other 'progressive prosecutors' through a series of shell organizations, affiliates and pass-through entities, including the Democratic Party";

- "FJP is affiliated with Soros through an organization named 'The Tides Center,' which represents itself publicly as an 'incubator' that helps stand up progressive groups"; and

- "The Tides Center receives funding from Soros' 'Open Society' network of entities."

R.A. Vol. III at 472-73.

The draft of the Executive Order then went to the Governor's lawyers, who viewed their role not as deciding whether or why to suspend Mr. Warren—that decision had been made by Mr. Keefe and the Governor—but instead as sanitizing

13

the document so that it could survive a proceeding in the Florida Senate and would not create legal liability. *See* R.A. Vol. VI at 948:12-949:12. They therefore removed Mr. Keefe's references to two of the FJP letters and excised his language about Mr. Warren's political associations and campaign support. R.A. Vol. II at 342-51; R.A. Vol. III at 523. They added references to the Bike Stop and Low-Level Offense policies and highlighted one excerpt from the FJP Abortion Statement. R.A. Vol. VI at 1012:21-1013:10; R.A. Vol. II at 342-51. But the lawyers ignored facts or mischaracterized documents when necessary to advance their narrative. They falsely described the SAO13 policies as "categorical" or "blanket" non-enforcement directives even though both policies on their face permitted individualized discretion based on public safety concerns and even though the lawyers knew that Mr. Warren had since continued to bring cases covered by those policies. *See* R.A. Vol. II at 319-20, Warren Letter to Sheriff Chronister Obtained by the General Counsel's Office; *see also* R.A. Vol. VI at 973:20-974:19. Similarly, the lawyers falsely characterized the Abortion Statement as reflecting Mr. Warren's "ignorance" of the need to exercise "case-by-case, fact-specific" discretion, when in fact they knew about (and abandoned an attempt to discredit) Mr. Warren's subsequent public statement that he would "consider the facts and circumstances of every case before making a decision" about any abortion prosecution. R.A. Vol. IV at 664:13-15.

The Governor's lawyers made no effort to determine what Mr. Warren's actual policies or practices were. R.A. Vol. VII at 1238; R.A. Vol. V at 751:8-10. They did not contact Mr. Warren or anyone else in SAO13 to ask for fear that doing so would "tip him off" and diminish the political impact of the suspension announcement. R.A. Vol. VII at 1276; R.A. Vol. V at 748:9-11, 751:6-10, 751:16-21, 752:14-22; R.A. Vol. VII at. 1138:25-1139:3, 1143:18-24, 1176:22-1177:6. The Governor's office "made no effort" to determine Mr. Warren's actual performance as a prosecutor because they "did not wish to know." R.A. Vol. VII at 1275. Indeed, the lawyers initially added information about the crime statistics under Mr. Warren but removed them because the numbers did not support suspension. R.A. Vol. III at 507; R.A. Vol. VI at 1022:7-25. The first time the lawyers requested any information from SAO13 about Mr. Warren's performance as State Attorney was after the suspension. R.A. Vol. VI at 944:12-23.

While the lawyers recognized that it was legally unwise to include Mr. Keefe's explicit references to Mr. Warren's speech and associations in the Executive Order itself, they also understood that Mr. Keefe's motivations for suspension were "valuable for the larger political narrative." R.A. Vol. III at 523; R.A. Vol. VI at 1016:2-7. They therefore saved the language Mr. Keefe had drafted and included it in talking points they prepared for the Governor when he made the announcement. R.A. Vol. III at 583-86. Before the order was finalized,

the Governor himself edited the document to describe in graphic terms how partial-birth abortions were performed.  R.A. Vol. III at 503; R.A. Vol. VII at 1110:25-1111:10.

### E.    The Governor Announced the Suspension by Focusing on Mr. Warren's Speech and Associations

Once the lawyers made Mr. Keefe's draft of the Executive Order presentable, the Governor's team prepared to announce the suspension.  They circulated talking points among senior officials, including the Governor, that described Mr. Warren as "a woke ideologue masquerading as a prosecutor" in bolded text and declaring that Mr. Warren had engaged in "woke activism." R.A. Vol. III at 584.  The talking points included, nearly verbatim, the reasons Mr. Keefe had included in his original draft.  R.A. Vol. III at 583-86; R.A. Vol. III at 484-85.  The front pocket of the briefing binder for the announcement included a single document: A six-page memo entitled "The Soros Plan," which described how Soros delivers "radical change through his web of advocates," characterized FJP as "an advocacy arm of the progressive prosecution movement," and tied Mr. Warren to Soros campaign contributions.  R.A. Vol. II at 298-99; R.A. Vol. V at 887:11-13.

Armed with that messaging, the Governor announced the suspension on August 4, 2022, at a campaign- style event with an audience of cheering supporters and a backdrop of uniformed law enforcement officials who praised him as "the

greatest Governor in America." R.A. Vol. II at 457 17:10-17:20. Just before the announcement, Mr. Keefe led a contingent of armed officers to SAO13 and abruptly escorted Mr. Warren from his office without giving him an opportunity even to read the Executive Order. R.A. at 138, Vol. IV at 669:25-670:24. That encounter was the first time that anyone from the Governor's Office had contacted anyone in SAO13 about the suspension. *Id.* at 671:6-9; R.A. Vol. V at 751:12.

Meanwhile, the Governor's communications team hammered the "political narrative" that the suspension was intended to achieve. On the eve of the suspension, Christina Pushaw announced that there would be a "MAJOR announcement," stating that "[e]veryone [should] get some rest tonight" and "[p]repare for the liberal media meltdown of the year." R.A. Vol. III at 588. The next day, Pushaw tweeted an "equally partisan, unprofessional message" celebrating an article that recounted Mr. Warren's removal from his office by armed officers. R.A. Vol. III at 564; R.A. Vol. VII at 1244-45. Behind the scenes, the Governor's staff was working to "let the press sensationalize" the announcement, generate "buzz," "up the engagement" on social media, feed information to "[f]riendly[]" outlets, and "amplify" the political impact. R.A. Vol. II at 410-11, 418, 422-23. In the words of the Governor and his staff, he "pulled the trigger" on Mr. Warren, and his communications aides "put the nail in the coffin." *Id.* at 421; DeSantis Memoir, *supra*, at 238.

17

The night of the suspension, the Governor appeared on Tucker Carlson's show to promote the suspension. When Carlson asked him, "why did you do it," the Governor immediately referred to "Soros prosecutors around the country" who, he argued, do not have a proper view of the prosecutorial function. R.A. Vol. II at 459 0:10-0:36. The Governor highlighted Warren's decision to join the FJP Statements about "laws against transgender surgeries . . . laws protecting the right to life." He then continued:

> Here is what Soros is doing, it's actually smart on his part. They can't get these things enacted in the legislature . . . [s]o what they do, he will get involved in these Democrat primaries in a Democrat area, he'll flush a million dollars to get some radical to win the primary . . . .

*Id.* at 1:46-2:06. The Governor's justification for suspending Mr. Warren—one battle in the political war against "Soros" beliefs—closely tracked Mr. Keefe's original draft of the order. *See e.g.*, R.A. Vol. III at 495. All told, the Governor's office calculated that the suspension had secured $2.4 million worth of free media coverage promoting that narrative. R.A. Vol. II at 307-08.

When he suspended Mr. Warren, the Governor appointed as interim State Attorney one of his staunch political supporters, who immediately began rescinding Mr. Warren's policies and repudiating his viewpoints. R.A. Vol. I at 48-49 ¶¶ 70, 72, 74, 75. Thus, because of the Governor's action, an individual for

whom no one has ever voted currently occupies the constitutional office for which hundreds of thousands of Floridians chose Mr. Warren in two separate elections.

### F.    The Governor Has Continued to Justify the Suspension on the Basis of Mr. Warren's Speech and Associations

Governor DeSantis used Mr. Warren's suspension as the springboard for a speaking tour in which he features the action as a key example of his fight against "the woke mind virus."[4]    Ten days after the announcement, he told a crowd in Phoenix that Mr. Warren was a "leftist politician" and "Soros-backed prosecutor[]."[5]    The following week, he again described Mr. Warren as a "leftist politician[]" and bragged that "I removed him from office."[6]

More recently, the suspension has become part of the "anti-woke" platform in the Governor's presumed Presidential campaign.[7]    Raising money in Staten

---

[4] *See, e.g.*, Jenavieve Hatch, *Florida Gov. Ron DeSantis Bring the War on 'Woke Mind Virus' Ideology to California*, Sacramento Bee (Mar. 6, 2023), https://www.sacbee.com/news/politics-government/capitol-alert/article272774740.html.

[5] Charlie Kirk, *Live Now: Unite and Win Rally in PHX AZ -powered By Turning Point ACTION*, YouTube (Aug. 14, 2022), https://www.youtube.com/watch?v=-b1W-C9PIVw&t=4578s at 2:12:44-2:13:13, 2:23:00-2:23:36.

[6] WPTV News – PL Palm Beaches and Treasure Coast, *Florida Gov. Ron DeSantis Speaks in Hialeah*, YouTube (Aug. 23, 2022). https://www.youtube.com/watch?v=Fn0Uo5MWW5Q at 5:13-5:47.

[7] *See, e.g.,* Alexandra Berzon and Ken Bensinger, *Inside Ron DeSantis's Politicized Removal of an Elected Prosecutor*, N.Y. Times (Mar. 11, 2023),

Island in February 2023, the Governor stated that he suspended Mr. Warren because he is a "woke prosecutor who happen[ed] to get elected with George Soros' campaign contributions[.]"[8]  The Governor even devoted three pages to the suspension in his memoir, which has served as the soft launch for his 2024 Presidential campaign.[9]  The book acknowledges that the suspension was intended to punish and to suppress an ideology the Governor dislikes.  According to the Governor, Mr. Warren's suspension "sent a clear signal to other prosecutors around Florida that the Soros model . . . was not going to fly in the Sunshine State." DeSantis Memoir, *supra*, at 239.

## II.    Procedural History

Mr. Warren sued the Governor in the Northern District of Florida on August 17, 2022, alleging that his suspension violated the First Amendment and the Florida Constitution.  R.A. Vol. I at 34-109. He sought injunctive and declaratory relief on his federal claim pursuant to 42 U.S.C. § 1983.  *Id.*

---

https://www.nytimes.com/2023/03/11/us/politics/desantis-andrew-warren-liberal-prosecutor.html.

[8]  *See* Declaration of David O'Neil in Support of Plaintiff-Appellant's Reply to Motion to Expedite Appeal Exhibit 2, Amber Jo Cooper, *Desantis to Meet with Law Enforcement Officers in New York City, Philadelphia, Chicago*, Florida's Voice (Feb. 20, 2023), https://flvoicenews.com/desantis-staten-island/.

[9] *See* Maggie Haberman, *DeSantis Hits the Trail. Just Don't Call it a Campaign.*, N.Y. Times (Feb. 28, 2023), https://www.nytimes.com/2023/02/28/us/politics/desantis-primary-states.html.

### A.    Pretrial Proceedings

Simultaneously with his complaint, Mr. Warren filed a motion for preliminary injunction requesting that the court order the Governor to rescind the Executive Order and reinstate Mr. Warren to his constitutional office.  *See* R.A. Vol. I at 4. The Governor moved to dismiss, and the District Court held a combined argument on the motions.  *See generally id.* at 111-49.

On September 29, 2022, the District Court issued a written ruling denying the motion to dismiss the federal claim, granting it as to the state-law claim, and denying a preliminary injunction.  R.A. Vol. I at 151-79. On the federal claim, the District Court reasoned that Mr. Warren had engaged in "core political speech" and that, as an elected official, he was entitled to First Amendment protection that is "at least as great" as that applicable to a typical plaintiff.  *Id.* at 160, 171.  The District Court rejected the Governor's arguments that Mr. Warren's statements were either government speech entirely outside the First Amendment or employee speech properly assessed under a deferential framework.  *Id.* at 162-163 (rejecting Governor's reliance on *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968)); R.A. Vol. 1 at 119-25.  The District Court further reasoned that the record would "support a finding that protected speech or activity was a motivating factor in [] Governor [DeSantis'] decision" to suspend Mr. Warren.  R.A.  Vol. I at 167.

21

Once Mr. Warren made that showing, the District Court explained, the Governor could attempt to prove the affirmative defense that he would have taken the same action for legitimate, nondiscriminatory reasons. *Id.* at 168 (citing *Mount Healthy,* 429 U.S. at 287). The District Court noted that "[t]he burden of proof on the same-decision defense is on the defendant." *Id.* The District Court further observed that "the Governor has not (yet) asserted a same-decision defense" and that, while the Governor had proffered a reason for the suspension—Mr. Warren's "declared refusal to prosecute abortion cases"—the record contained indications that this proffered explanation was pretextual. *Id.* In particular, the District Court highlighted evidence showing that there was "a political motive for the suspension" that was inconsistent with the Governor's explanation. *Id.* at 169; R.A. Vol. VII at 1263, 1269-71.

Shortly thereafter, Governor DeSantis filed his Answer in which he formally pleaded the same-decision defense and articulated the factual basis on which he would seek to prove it. R.A. Vol. I at 193. According to that pleading, the Governor alleged that he had a single motivation: "[The Governor] would have suspended Plaintiff for his expressed blanket refusal to prosecute certain cases in the absence of any protected speech." R.A. Vol. I at 193¶ 135 (citing *Mount Healthy*, 429 U.S. at 287). Numerous times during discovery, the Governor disavowed any other rationale for his action and made clear that he would seek to

22

prove that his motivations were solely those contained in the four corners of the Executive Order. *See, e.g.*, R.A. Vol. I at 212, Motion for Protective Order ("Governor's motives are fully expressed within the four corners of the suspension order itself"); R.A. Vol. II at 246, Def. Motion to Bar Compelled Testimony (same); *see also* R.A. Vol. II at 261-62, Defendant's Response to Plaintiff's First set of Requests for Admissions; R.A. Vol. II at 290, PEX007 Defendant's Amended Responses and Objections to Plaintiff's First Set of Interrogatories. No. 2; R.A. Vol. II at 269. Defendant's Responses and Objections to Plaintiff's Second Set of Interrogatories No. 5.

## B.    The Trial

The case proceeded to a three-day bench trial, which included testimony from most of the Governor's senior staff, including Mr. Keefe, General Counsel Ryan Newman, Chief Deputy General Counsel Raymond Treadwell, and Communications Director Taryn Fenske. The Governor did not testify. Although he has been eager to speak publicly before and after trial about the suspension, he secured a protective order prohibiting Mr. Warren from deposing him or calling him as a witness. R.A. Vol. 1 at 199-217, R.A. Vol. I at 223-25; R.A. Vol. II at 230-54; R.A. Vol. III at 562.

Consistent with his Answer and his representations during discovery, the Governor's staff and counsel asserted at trial that his sole motivation for the

suspension was the one he had proffered in his affirmative defense and stated in the Executive Order. *See, e.g.*, R.A. Vol. VI at 1038:11 (Raymond Treadwell, the Governor's Chief Deputy General Counsel, testified that "every reason for Mr. Warren's suspension [was] set forth in the Executive Order[.]"); R.A. Vol. VII at 1116:5-12 (Ryan Newman, the Governor's General Counsel, testified that the suspension was motivated only by "the reasons set forth in the Executive Order."). The Governor's counsel and his staff rejected any suggestion that, as the District Court had posited in its pretrial ruling, there was "a political motive for the suspension." R.A. Vol. I at 169; R.A. Vol. V at 880:22-23, 902:19-23, 904:9-11, R.A. Vol. VI at 1037:21-24.

### C.    The District Court's Decision

The District Court issued its opinion on January 20, 2023. The court concluded that Mr. Warren had proved his claim under the First Amendment by establishing that his protected speech and associations were a substantial motivating factor in the suspension. The District Court explained:

> The Governor violated the First Amendment by considering Mr. Warren's speech on matters of public concern. . . as motivating factors in the decision to suspend him. The Governor violated the First Amendment by considering Mr. Warren's association with the Democratic Party and alleged association with Mr. Soros as motivating factors in the decision.

R.A. Vol. VII at 1278. The District Court thus found a violation of the First Amendment, a conclusion it repeated numerous times in its decision. *Id.* at 1221-22, 1261, 1264, 1265, 1267, 1270, 1278-79.

The District Court then concluded that, in contrast, the Governor had failed to prove the factual basis for his affirmative defense. Contrary to the Governor's proffered rationale, the District Court found that Mr. Warren "had no blanket nonprosecution policies." *Id.* at 1235, 1263, 1273. "Mr. Warren's well-established policy, followed in every case by every prosecutor in the office, was to exercise prosecutorial discretion at every stage of every case." *Id.* at 1221. Thus, the court found, Governor DeSantis' "assertion that Mr. Warren neglected his duty or was incompetent is incorrect." *Id.* at 1235. Indeed, the District Court emphasized that the record contained "no hint of misconduct" and that this question was "not close." *Id.* at 1235, 1271.

The District Court further rejected the Governor's assertion that he was actually motivated by the belief that Mr. Warren had "blanket nonprosecution policies." *Id.* at 1272, 1273 ("[The] nonprosecution policies were not the real motivation for the suspension."). The court found that the Governor's reliance on any such purported policies, including the portions of the Abortion Statement quoted in the Executive Order, was simply pretext—"a way to justify a decision already in the works on other grounds." *Id.* at 1275. "[W]hether Mr. Warren

25

actually had any blanket nonprosecution policies [] did not matter.  All that was needed was a pretext to justify the suspension under the Florida Constitution."  *Id.* at 1277-78 (noting that the purported non-prosecution policies and the "one sentence" in the FJP Abortion Statement were merely "pretext").

The District Court thus found that Mr. Warren had proved his case and established a First Amendment violation, while the Governor had failed to prove the facts supporting his affirmative defense.  But rather than entering judgment for Mr. Warren at that point, the District Court *sua sponte* embarked on its own exploration of the various possible motivations underlying the suspension.  R.A. Vol. VII at 1263.  The District Court separated the motivations it had identified into those that violated federal law and those that violated state law.  *Id.* at 1264-65, 1269-71.  It held that the Governor's "controlling motivation[s] for the suspension [was] the interest in bringing down a reform prosecutor . . . and the political benefit that would result."  *Id.* at 1277.  Because in the District Court's view that primary motivation implicated only state law, the District Court held that the Eleventh Amendment prohibited it from remedying the federal constitutional violation it had identified.[10]

_____

[10] The District Court's order noted that "[i]f the facts matter, the Governor can simply rescind the suspension," and that if he failed to do so, "it will be *doubly* clear that the nonprosecution policies were not the real motivation." R.A. at VII at 1273 (emphasis added).  After the ruling, Mr. Warren sent Governor DeSantis a letter requesting reinstatement.  Motion to Expedite, Dkt. 3 O'Neil

Mr. Warren timely appealed the District Court's decision on February 14, 2023. Notice of Appeal Dkt. No. 1. The same day, Mr. Warren moved for expedited treatment in this Court because the case "implicates interests of profound importance to the public." Motion to Expedite Appeal, Dkt. No. 3 at 9. On March 8, 2023, the Court granted Mr. Warren's motion. Order Granting Motion to Expedite Appeal, Dkt. No. 24.

### III.    Standard of Review

This Court reviews *de novo* the District Court's interpretation and application of binding precedent to questions of law. *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Collier v. Turpin*, 177 F.3d 1184, 1193 (11th Cir. 1999).

### SUMMARY OF THE ARGUMENT

The District Court erred in holding that it lacked authority to remedy the First Amendment violation it correctly identified. The legal basis for the decision below is susceptible to two different interpretations. Both are incorrect and warrant reversal.

---

Decl. Exhibit 1. Governor DeSantis responded only through a press release, declining to reinstate Mr. Warren, doubling down on his proffered "blanket non-prosecution policy" rationale, and dismissing the District Court's admonitions as "merely opinions" he "need not address." Motion to Expedite, Dkt. 3 O'Neil Decl. Exhibit 2.

27

On the first interpretation, the court held that it could not issue injunctive relief because the conduct that it deemed a First Amendment violation also violated state law. That reflects a fundamental misunderstanding of the Eleventh Amendment, which permits a federal court to provide prospective relief of the kind Mr. Warren requested when, as here, the court identifies a federal constitutional violation. That authority does not disappear because the conduct implicates state law or because the state-law violations are "controlling," dominant, or "essential to the outcome." R.A. Vol. VII at 1277, 1279.

On the second, alternative interpretation of the decision below, the court attempted to evaluate the case under the "same-decision" affirmative defense set forth in *Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Succeeding on that defense required the Governor (1) to plead and prove that he acted for a reason that was (2) otherwise legitimate and (3) did not itself violate the First Amendment. *Stanley*, 219 F.3d at 1293. None of those three elements was satisfied here.

First, the court rejected the motivation the Governor pleaded. R.A. Vol. VII at 1278. But instead of then entering judgment for Mr. Warren on the ground that the Governor had failed to prove his affirmative defense, the court launched its own search for the Governor's true motivations. *Id.* at 1226-27, 1263. That approach conflicts with the basic nature of an affirmative defense, and it deprived

28

Mr. Warren of the fair notice that the *Mount Healthy* framework is intended to provide.

The court compounded its mistake, as well as the resulting unfairness to Mr. Warren, by attributing to the Governor a motivation that the Governor consistently disavowed before, during, and after trial. The effect of the court's errors was to improperly shift the burden of proving ultimate causation to Mr. Warren, when under *Mount Healthy* the Governor bore the burden to plead facts alleging his true motivation and then to prove them. Once the Governor failed to persuade the court that his proffered explanation was credible, the case should have ended and Mr. Warren should have prevailed.

Second, the court attributed to the Governor a motivation that was illegitimate because, as the court emphasized, it violated state law. *Id.* at 1279. Counsel is unaware of any case in which a court held that a plaintiff had proved a First Amendment claim but then excused the defendant from liability on the ground that the defendant's true basis for acting was illegal for some other reason. It is both unsurprising that there are no such cases—no rational defendant would attempt to plead an affirmative defense that constitutes an admission of liability— and consistent with the purpose of *Mount Healthy*. That framework ensures that a plaintiff who would have been fired anyway for *lawful* reasons is not better off because he engaged in First Amendment-protected activity. When, as here, there

29

are no lawful grounds on which to terminate the plaintiff, reinstatement is appropriate.

Third, and most fundamental, the reason the court concluded that the Governor suspended Mr. Warren was a blatant violation of the First Amendment. The court found that the Governor was actually motivated by the desire for the "political benefit" that would accrue from "bringing down" an ideological foil. R.A. Vol. VII at 1277. In other words, the suspension was a way for the Governor to promote his defining political views against "wokeness" and "progressivism" by firing a "woke ideologue" and condemning such beliefs. R.A. Vol. III at 584. That is the textbook definition of a politically motivated, viewpoint-discriminatory termination. Indeed, the Governor himself has described it just that way, campaigning on the statement that he suspended Mr. Warren to "send a signal" that the "Soros model" was not welcome in Florida. DeSantis Memoir, *supra*, at 239. On the facts the District Court found, the suspension therefore violated the First Amendment.

## ARGUMENT

Whether read as an interpretation of the Eleventh Amendment or instead as an attempt to apply the framework applicable to First Amendment retaliation claims, the decision below was incorrect. The suspension violated Mr. Warren's federal constitutional rights, and the court had authority to reinstate him.

30

I.    **The District Court Erred In Holding that the Eleventh Amendment Barred It from Ordering Reinstatement**

The District Court fundamentally misapprehended the function of the Eleventh Amendment in evaluating the available remedies for the Governor's unconstitutional conduct.    Contrary to the court's conclusion, the Eleventh Amendment does not preclude a federal court from ordering prospective injunctive relief against a state officer for violations of the federal Constitution simply because the same conduct also, or even predominantly, violates state law.

A district court's federal question jurisdiction includes the power to enjoin a state official from acting in a manner that is contrary to the federal Constitution. *Ex Parte Young*, 209 U.S. 123, 159-60 (1908).  Although the Eleventh Amendment insulates the State itself from a damages suit, it does not prevent federal courts from "vindicat[ing] federal rights and hold[ing] state officials responsible to the supreme authority of the United States" by enjoining ongoing violations of federal law.  *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 293 (1997); *McCarthy v. Hawkins*, 381 F.3d 407, 418-19 (5th Cir. 2004) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)); *see also Edelman v. Jordan*, 415 U.S. 651, 669 (1974).  After all, as the Supreme Court has held, when a state officer's actions contradict the Constitution's protections, he is "stripped of his official or representative character" and cannot claim immunity by virtue of the office he holds.  *Young*, 209 U.S. at 159-60.

31

Thus, Eleventh Amendment immunity is a threshold question decided at the pleading stage, before consideration of the merits, because it goes directly to a federal court's power to hear the underlying claim. *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002); *see also Young*, 209 U.S. at 160-61. To determine whether the Eleventh Amendment bars suit, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md.*, 535 U.S. at 645 (quoting *Idaho*, 521 U.S. at 296); *see also Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255-56 (2011) (same).

Mr. Warren sought relief that is "properly characterized as prospective"—an injunction reinstating him to the position for which he was duly elected and a declaration that his suspension violated the federal Constitution. *Id.*; R.A. Vol. VII at 1224. The case was therefore properly within the federal court's jurisdiction. And after trial, the Court correctly concluded that the suspension in fact "violated the First Amendment." R.A. Vol. VII at 1278-79. Based on that finding, the court was empowered to issue prospective relief remedying the violation.

The District Court erred by examining the implications of the same conduct under state law. The court identified a number of possible reasons for the unconstitutional conduct and sorted them into whether they violated federal law, state law, or both. *Id.* at 1226-27. As part of that exercise, the court determined

that although the Governor "violated the First Amendment," his "controlling motivations" violated the Florida Constitution, and those state-law violations were "essential to the outcome." *Id.* at 1250, 1277-79. But the Eleventh Amendment is unconcerned with, and its application in no way turns on, whether federal or state law plays the dominant, "essential," or "controlling" role in the unconstitutional conduct. *Id.* As the Supreme Court has made clear, the Eleventh Amendment does not deprive a court of jurisdiction to hear a federal claim even if the underlying conduct would independently violate state law. *See, e.g.*, *Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 391 (1998). What matters is that, as the District Court correctly concluded here, the suspension "violated the First Amendment." R.A. Vol. VII at 1278. The District Court's contrary holding is incorrect.

## II.    The District Court Misapplied the Legal Framework for Adjudicating First Amendment Retaliation Claims

The District Court's decision could instead be construed as an effort to evaluate Mr. Warren's claim of First Amendment retaliation under the framework established by *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). To the extent the court intended to adopt the conclusion that the Governor prevailed under that framework, the court erred for several reasons, each of which alone would warrant reversal.

**A.      Mr. Warren Proved his First Amendment Retaliation Case**

The District Court correctly held that "Mr. Warren has easily carried his burden," R.A. Vol. VII at 1255-56, of showing that "his speech or act [was] constitutionally protected," that there was an "adverse action," and that there was "a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).    That conclusion was correct and placed the burden of proof squarely on the Governor.

First, the District Court concluded that the record was "chock full of core political speech." R.A. Vol. VII at 1256.  It did so by correctly recognizing that Mr. Warren's status as "an elected official, not a rank-and-file employee, does not change the result" and that, "[i]f anything, the distinction cuts the other way." *Id.* at 1257. As the Supreme Court unanimously observed last Term, "[t]he First Amendment surely promises an elected representative . . . the right to speak freely on questions of government policy." *Houston Cmty. Coll. Sys. v. Wilson,* 142 S. Ct. 1253, 1261 (2022); *Bond v. Floyd*, 385 U.S. 116, 135-36 (1966) ("The manifest function of the First Amendment in a representative government requires that [elected officials] be given the widest latitude to express their views on issues of policy"); *Wood v. Georgia*, 370 U.S. 375, 394-95 (1962) ("The petitioner was an elected official and had the right to enter the field of political controversy . . . ."). Mr. Warren's status as an elected official "makes it all the more imperative that

[he] be allowed to freely express" his viewpoints on controversial topics. *Wilson*, 142 S. Ct. at 1261 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002)).

Second, Mr. Warren's suspension without pay is an adverse action. *Id.* at 1260-61 (stating that removal from employment is an "easy to identify" adverse action). "The issue is not close." R.A. at VII at 1266.

Third, Mr. Warren's speech and associations "were substantial and motivating factors in the decision to suspend Mr. Warren." *Id.* at 1262. As the District Court explained, "[t]he Governor could hardly contend otherwise." *Id.* His speech was cited in and indeed attached to the executive order of suspension, and his associations featured prominently in the Governor's "media event announcing the suspension and in his appearance on the Carlson show touting the decision." *Id.*

### B.    The Governor Was Required Affirmatively To Plead a Legitimate, Non-Discriminatory Reason for the Suspension and Then to Prove That Reason

Under *Mount Healthy*, once a plaintiff has proved his case, as Mr. Warren did here, the case is over and the plaintiff prevails unless the defendant can prove the affirmative defense that the plaintiff's dismissal would have occurred regardless of the constitutionally protected activity. *See, e.g.*, *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 66-67 (1st Cir. 1993) ("[T]he plaintiff-employee will prevail

unless" the defendant proves that the adverse action "would have occurred in any event for nondiscriminatory reasons.") (*cited by McCabe v. Sharrett*, 12 F.3d 1558, 1565 n.8 (11th Cir.1994)); *see also Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 69, 77 n.8 (1st Cir. 2000) (same).

This so-called "same decision" defense is "an affirmative defense to liability."[11]  *Stanley*, 219 F.3d at 1296 n.27 (11th Cir. 2000).  "It is settled law that the employer bears the burden of proof where [the] defense is asserted." *Harrell v. University of Montevallo*, 673 F. Supp. 430, 436 (N.D. Ala. 1987), *aff'd*, 861 F.2d 725 (11th Cir. 1988).  The defendant must plead facts establishing that he was in fact motivated by a legitimate reason and must then prove those facts by a preponderance. *Stanley*, 219 F.3d at 1293; *see also Gomez v. Bird Auto., LLC*, 411 F. Supp. 3d 1332, 1335 (S.D. Fla. 2019).

Accordingly, after Mr. Warren carried his burden, the Governor could prevail only if he (1) proved that he was in fact motivated by the reasons he asserted, and that those reasons were (2) legitimate and (3) not themselves a

---

[11] While the broad employment framework is helpful as a comparator to Mr. Warren, it does not provide a direct analogy.  Mr. Warren was directly elected to a state constitutional office by the people of Hillsborough County.  Governor DeSantis is not Mr. Warren's employer, and as such, Governor DeSantis is limited by Art. IV § 7(a) of the Florida Constitution to specific circumstances under which he can suspend Mr. Warren.  *See* Fla. Const. art. IV, § 7(a).  Based on Governor DeSantis' allegations, Mr. Warren may only be suspended for neglect of duty and incompetence. *Id.*

violation of the First Amendment.  *Stanley*, 219 F.3d at 1293.  The Governor failed on each of those elements.

### C.  Governor DeSantis Failed to Prove the Motivation He Pled

Governor DeSantis failed at trial to prove the facts he pleaded as the basis for his affirmative defense.  That alone should have resulted in entry of judgment in favor of Mr. Warren.

In his Answer, the Governor made explicit the single basis on which he would seek to establish the *Mount Healthy* defense: that the decision to suspend Mr. Warren was motivated by Mr. Warren's "expressed blanket refusal to prosecute certain cases."   R.A. Vol. I at 193 ¶ 135.

The court squarely and completely rejected that factual assertion as well as the argument it was intended to support.  The conclusion could not have been more direct.  The court stated: "Florida Governor Ron DeSantis suspended elected State Attorney Andrew H. Warren, ostensibly on the ground that Mr. Warren had blanket policies not to prosecute certain kinds of cases. The allegation was false." R.A. Vol. VII at 1221. In particular, the court found that, contrary to the Governor's allegation, Mr. Warren "had no blanket non-prosecution policies."  *Id.* at 1221, 1247, 1263.  His "well-established policy, followed in every case by every prosecutor in the office, was to exercise prosecutorial discretion at every stage of every case." *Id.* at 1221.  And the court rejected the Governor's assertion that he

was actually motivated by any belief that Mr. Warren had such policies. *Id.* at 1272-73("[T]he . . . nonprosecution policies were not the real motivation for the suspension"). The Governor's reliance on any such purported policies or on any statements in the FJP letters, the District Court concluded, was just "a way to justify a decision already in the works on other grounds." *Id.* at 1275. According to the court, it "did not matter" to the Governor "whether Mr. Warren actually had any blanket nonprosecution policies." *Id.* at 1277-78. Their role was simply to supply "a pretext to justify the suspension under the Florida Constitution." *Id.*; *see id.* at 1278 (finding that purported nonprosecution policies and the "one sentence" in the Abortion Statement were "pretext").

That conclusion should have been the end of the case: Mr. Warren carried his burden and the Governor did not. A defendant's answer containing an affirmative defense is the functional equivalent of a plaintiff's complaint containing affirmative claims. *See, e.g., Morrison v. Exec. Aircraft Refinishing, Inc.,* 434 F. Supp. 2d 1314, 1318 (S.D. Fla. 2005); *Gomez*, 411 F. Supp. 3d at 1335. Just as the "plaintiff is the master of [his] complaint," *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398-99 (1987), the defendant can choose what facts to allege as the reason it took the challenged action. Having made that choice, "the defendant bears the burden of persuading the factfinder that its reason is credible." *Padilla*,

212 F.3d at 77-78.  The Governor failed to persuade the court that his reason was credible, and his affirmative defense therefore failed.

The defendant's obligation to prove the facts he pleads serves critical interests of fairness and notice.  When a defendant asserts facts supporting an affirmative defense, he provides notice to the court and to the plaintiff what the issue for trial will be and what the defendant intends to prove.  S*ee Crutcher v. MultiPlan, Inc.,* 22 F.4th 756, 765 (8th Cir. 2022) (applying pre-"Twiqbal" cases and holding the Rule 8(c) affirmative defense "pleading requirement is intended to give the opposing party both notice of the affirmative defense and an opportunity to rebut it").  Holding the defendant to his allegations honors the basic principle—a cornerstone of the adversarial system—that courts are generally bound to decide the case before them based on the evidence and the theories presented by the parties.  *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("We rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

Instead of ruling for Mr. Warren, the court embarked on its own unguided search for possible facts and motivations different from the single one the Governor had pleaded.  But the assertion of a *Mount Healthy* affirmative defense is not a license for the court to scour the record for possible motivations that the defendant might have, but chose not to, allege.  In that respect, *Mounty Healthy* "is

39

significantly different from the device used in other employment discrimination contexts, such as Title VII cases," *Padilla,* 212 F.3d at 77, where the defendant's mere articulation of a legitimate reason shifts the burden back to the plaintiff to prove discriminatory motive. *See Acevedo-Díaz,* 1 F.3d at 67. Yet that is effectively how the court approached this case. Under *Mount Healthy*, Mr. Warren did not have the burden to prove that his speech *was* the driving motivation of the suspension; the Governor had the burden to prove that it was *not*.

For the Governor to win on his same-decision defense, it was not enough for the District Court to conclude that the Governor would have suspended Mr. Warren for *some* reason other than his protected speech. To carry his burden and defeat Mr. Warren's claim, the *Governor* was required to prove *the* reason he claimed he would. His failure to do so warrants reversal.

### D.    The Governor Specifically Disavowed the Motivation the District Court Adopted

Compounding the District Court's error and the procedural unfairness to Mr. Warren, the District Court ultimately landed on a "controlling motivation[]" that the Governor himself had specifically disavowed at every turn. R.A. Vol. VII at 1277.

In the District Court's view, the Governor actually suspended Mr. Warren because of the "political benefit that would result" from "bringing down" a "reform prosecutor." *Id.* Before trial, the Governor and his counsel rejected any

allegation that he entertained any motivation other than that set forth in the four corners of the Executive Order. *See supra* at pp. 22-23. During trial, members of Governor DeSantis' administration all disavowed any political motivation. R.A. Vol. V at 880:22-23 (Fenske Testimony); R.A. Vol. VI at 1037:21-24, 1038:11-13 (Treadwell Testimony); R.A. Vol. VII at 1116:5-12 (Newman Testimony). The court directly asked Taryn Fenske, the Governor's communications chief, whether "the fact that Mr. Warren was perceived to be a left-leaning prosecutor [was] relevant to his suspension at all[.]" R.A. Vol. V at 902:19-23. She insisted that it was not and that the Governor's reasons were "all outlined in the Executive Order." *Id.*; *see also id.* at 902:1-4. When pressed by the Court, Ms. Fenske reiterated that politics "had nothing to do with [his suspension]." *Id.* at 904:9-11. Similarly, the Court directly asked the Governor's counsel at trial, "[o]ther than [the four writings cited in the Executive Order], do you have anything that you think rises to the level of neglect of duty or incompetence?" Counsel responded unequivocally: "Other than those four, no, Your Honor." R.A. Vol. VII at 1205:4-7.

Since trial, the Governor has continued to refute the District Court's "controlling motivation" finding, defiantly insisting that he acted for the reason the court dismissed as pretext—that "Mr. Warren signed a statement refusing to prosecute the laws of the land." Motion to Expedite, Dkt. 3 O'Neil Decl. Exhibit 2, *DeSantis Says He Won't Reinstate Suspended Hillsborough Prosecutor Andrew*

41

*Warren*, WUSF Public Media (Jan. 26, 2023, 6:55 AM), https://wusfnews.wusf.usf.edu/politics-issues/2023-01-26/desantis-says-he-wont-reinstate-suspended-hillsborough-prosecutor-andrew-warren.

Thus, Governor DeSantis not only failed to prove that he suspended Mr. Warren for reasons other than his protected speech, but he also specifically denied that there were any other reasons for the suspension.  Because *Mount Healthy* requires defendants to pled and prove the lawful basis for their actions, the District Court erred by conjuring and crediting an alternative motivation for Mr. Warren's suspension that Governor DeSantis did not plead, did not prove, and has specifically disavowed.  *Cf. Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1280 (11th Cir. 2005) (noting that defendant could not make a successful *Mount Healthy* defense when no reason, legitimate or otherwise, was proffered for the firing).

> ### E.    The Motivation the Court Attributed to the Governor was Unlawful for Other Reasons

Under *Mount Healthy*, not only must the defendant prove his actual motivation, but that motivation must reflect a "legitimate reason" for his action. *See Stanley*, 219 F.3d at 1293; *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978) (requiring defendants in an employment discrimination action to proffer a "justification which is reasonably related to the achievement of some legitimate goal").  Thus, even if the court were permitted to find that a defendant

satisfied the same-decision defense based on a motivation he did not plead, the motivation the court adopts must be otherwise lawful. *Stanley*, 219 F.3d at 1296 (instructing defendant to show "an adequate lawful basis" that "existed for the termination").

The District Court concluded that the Governor's "controlling motivations"—the "anticipated political benefits" from "bringing down" a progressive prosecutor—were illegal under state law because they were not lawful bases for suspension. R.A. VII at 1273, 1277. Those motivations therefore could not supply the "legitimate reason" that *Mount Healthy* requires. *Stanley*, 219 F.3d at 1293.

Counsel is unaware of any case in this Circuit—or indeed any other—in which a court has denied relief under *Mount Healthy* where the plaintiff established a First Amendment violation and where, as here, the record reflects that any other bases for adverse action were independently unlawful. The absence of any such precedent is unsurprising; as explained above, a defendant must articulate, plead, and prove the alternate reasons for which he would have taken adverse action, and no rational defendant would affirmatively seek to prove a rationale that would constitute an admission of liability.

This result is also consistent with the purpose of the *Mount Healthy* framework. Affording the defendant an opportunity to prove the same-decision

43

defense "ensures that a plaintiff-employee who would have been dismissed in any event—on legitimate grounds—is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action." *Acevedo-Diaz,* 1 F.3d at 66. But where *no* legitimate other ground exists for adverse action, a plaintiff terminated in violation of the First Amendment could never have been lawfully removed in the first place and deserves reinstatement.

### F.    The Motivation the Court Attributed to the Governor Itself Violates the First Amendment

These errors alone would require reversal of the decision below.  But there is another, even more fundamental flaw in that decision: what the court described as the Governor's "controlling motivation[]" was itself a blatant violation of the First Amendment.  R.A. Vol. VII at 1277.

The court found that the Governor suspended Mr. Warren because he wanted the "political benefit" that would result from "bringing down" a "reform prosecutor."  *Id.* at 1277.  Inexplicably and without citing any support, the court stated that "the First Amendment does not speak to the matter" of firing a public official for political reasons.  *Id.* at 1271.  That was egregiously incorrect.  As the District Court itself recognized at the motion to dismiss stage, "[t]he Supreme Court has made clear" that terminations based on political considerations violate the First Amendment.  R.A. Vol. I at 170.  In two foundational cases on which the District Court relied, *Elrod v. Burns*, 427 U.S. 347, 367 (1976) and *Branti v. Finkel*,

44

445 U.S. 507, 518 (1980), "the [Supreme] Court held that the First Amendment []
bar[s] politically motivated employment" decisions.  *Id.*; *Akers v. Caperton*, 998
F.2d 220, 224 (4th Cir. 1993) (citing *Rutan v. Republican Party*, 497 U.S. 62, 63
(1990)).

That is why, in its decision denying the Governor's motion to dismiss the
First Amendment claim, the District Court highlighted evidence suggesting that
there was a political motivation for the suspension, which would defeat the
Governor's effort to establish the *Mount Healthy* defense.  R.A. Vol. VII at 1244-
45.  The parties tried the case based on the court's correct framing of the issue: Mr.
Warren sought to prove that the suspension was politically motivated, while the
Governor sought to prove that he would have made the same decision without
regard to politics and solely because of the "expressed blanket refusal to prosecute
certain cases."  R.A. Vol. I at 193 ¶ 135.  The District Court found as a factual
matter that Mr. Warren was correct, but incorrectly concluded that the First
Amendment did not prohibit such a politically motivated suspension after all.

The District Court's error stemmed from several basic misconceptions about
the First Amendment.  First, the court appeared to reason that the Governor's
politically motivated suspension offended the First Amendment only if the
Governor's animus stemmed from Mr. Warren's party affiliation, rather than his
political beliefs more broadly.  R.A. Vol. VII at 1227.  But the First Amendment

protects against retaliatory actions motivated by disagreements about political ideology, philosophy, or viewpoint, not just those about political party. *See Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 914 n.2 (6th Cir. 1991) (pointing out that the First Amendment protections "appl[y] to political differences of any kind, not merely differences in party membership"); *see also Williams v. City of River Rouge*, 909 F.2d 151, 153 n.4 (6th Cir. 1990) (noting that "'political affiliation' refers to commonality of political purpose and support, not [just] political party membership").

Second, the District Court reasoned that the Governor's political motivations were permissible if they targeted Mr. Warren because of his "status"—that he embraced "reform prosecutor" ideas—and not because of "what Mr. Warren *said*" about those beliefs. R.A. Vol. VII at 1265; R.A. Vol. VII at 1193 (emphasis added). That, too, is incorrect. "If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes." *Branti*, 445 U.S. at 515. Thus, the Supreme Court has emphasized that the First Amendment protects political viewpoints and ideology to the same extent as traditional speech; the government may not take adverse action "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The District Court's factual findings and the Governor's own words make clear that it was Mr. Warren's beliefs and opinions that gave him the "status" of a "reform prosecutor." R.A. Vol. VII at 1265. In the lexicon of the Governor and his staff, a prosecutor who "do[es not] enforce the law" denoted, and served as shorthand for, a "Soros-backed prosecutor[]," a "leftist prosecutor," a "so-called progressive" prosecutor, or a prosecutor who embraced "woke ideolog[y]." R.A. Vol. V at 830:21-22 (Keefe Testimony), 879:10 (Fenske Testimony); Charlie Kirk, *Live Now: Unite and Win Rally in PHX AZ -powered By Turning Point ACTION*, YouTube (Aug. 14, 2022), https://www.youtube.com/watch?v=-b1W-C9PIVw&t=4578s; DeSantis Memoir, *supra*, at 238; R.A. Vol. V at 873:20-22 (Fenske Testimony). In his own words, Keefe targeted Mr. Warren because he had "taken [up] the mantle" of that "world view" and had become an "expresser or conduit" for such beliefs. R.A. Vol. VII at 1236; R.A. Vol. V at 826:18-19. To "be" a "reform prosecutor" in the Governor's eyes was thus to have reform prosecutor viewpoints. Indeed, that is exactly how the District Court framed the discussion of why Mr. Warren "was a reform prosecutor." R.A. Vol. VII at 1226. The difference between someone who is a "left-leaning" or "reform" prosecutor and someone who is a "law-and-order" "or right-leaning" one, the court explained, is that the two have "*contrasting viewpoints* on prosecutorial issues." *Id.* (emphasis added).

47

The court also referenced as a motivation for the suspension Mr. Warren's "performance" as State Attorney—"how he did his job." *Id.* at 1226, 1263. But the court's own factual findings foreclose any conclusion that the Governor was motivated by disagreement with actual prosecution decisions Mr. Warren made in office. As the court found, "[t]he actual facts" of Mr. Warren's policies or actions "did not matter" to the Governor and his staff. *Id.* at 1277. The Governor "did not wish to know" how Mr. Warren actually did his job or what effect his policies had "on the actual conduct of the Office," so Keefe and the lawyers "made no effort to determine what" Mr. Warren's actual practices were. *Id.* at 1275-76. Indeed, the first time the Governor's staff asked for any information about Mr. Warren's actual performance as State Attorney was *after* the suspension. R.A. Vol. V at 751:13-19. The only information the Governor had about Mr. Warren's actual performance was the Bike Stop Policy and the Low-Level Offense Policy, which the court found "were *not* the real motivation for the suspension." R.A. Vol. VII at 1273 (emphasis added).[12] And the only basis for the Governor's conclusion that Mr.

---

[12] The court specifically found that the quoted language from the FJP Abortion Statement, which the Governor described as an "expressed blanket refusal to prosecute certain cases," was purely a "pretext" for "a decision already in the works on other grounds." R.A. Vol. VII at 1275. In any event, even that pretext was protected speech. As this Court has explained, the "enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017).

48

Warren "was" a "reform prosecutor" were the "impressions" of Mr. Keefe's law enforcement friends that Mr. Warren was a "leading" believer in the "reform prosecutor" approach.[13]  *See* R.A. VII at 1275; R.A. V at 739:8, 742:24-8, 744:10-17.

That the Governor acted because he disapproved of Mr. Warren's beliefs and ideas renders the suspension a First Amendment violation.  That the Governor did so specifically for "political benefit" makes it doubly so.  R.A. Vol. VII at 1277. The "political narrative" that the District Court correctly identified permeates the record, and the "political benefit" that motivated the Governor drove every step of the suspension.  R.A. Vol. VII at 1227, 1277.  It was the reason the Governor asked Mr. Keefe to find a "so-called progressive" prosecutor who "had Soros support," DeSantis Memoir, *supra*, at 238; why Mr. Keefe honed in on Mr. Warren as a ripe target to "bring[] down," R.A. Vol. VII at 1277; why Mr. Keefe based his draft explaining the reasons for the suspension on Mr. Warren's "associations" and "affiliations" with advocacy organizations supporting  the "progressive" movement,

---

[13] For the same reasons, any factual finding that the Governor was genuinely motivated by disagreements with Mr. Warren's actual prosecutorial decisions, as distinct from Mr. Warren's beliefs about criminal justice issues, would have been clearly erroneous.  As the District Court observed, the record contains no evidence "of even a single case in which discretion was not exercised" by Mr. Warren, R.A. Vol. VII at 1273, and the District Court's findings establish that the Governor neither cared about nor wished to find out how Mr. Warren actually performed his job as State Attorney. *Id.* at 1275.

R.A. Vol. III at 472; why the Governor's lawyers recognized that Keefe's reasons were "valuable to the larger political narrative," R.A. Vol. III at 523, and therefore included them in the Governor's talking points; why the Governor's messaging described Mr. Warren as a "woke ideologue," R.A. Vol. III at 584; why the Governor's press aides teased that the announcement would cause the "liberal media meltdown of the year," R.A. Vol. III at 588; and why, when asked on national television the night of the suspension why he suspended Mr. Warren, the Governor immediately referred to the need to counter the political plans of his "progressive" opponents, R.A. Vol. I at 459 0:52-1:26 (Tucker Carlson Tonight); R.A. Vol. V at 880:20-23 (Fenske Testimony); R.A. Vol. VI at 1016:2-4 (Treadwell Testimony); R.A. Vol. VII at 1241, 1263, 1269-70 (Opinion); DeSantis Memoir, *supra*, at 238.

All of this served the political purpose of elevating one set of ideas over another. That is the "political benefit" the District Court identified: The suspension was a prime opportunity for the Governor to promote his signature views on "anti-woke[ness]," R.A. Vol. VII at 1133, and condemn the views of those whom he rejects as "progressive" or "woke" by "bringing down" one of their "leader[s]." R.A. Vol. VII at 1227, 1277. And that is the very definition of viewpoint discrimination. The Governor "surely ha[s] the right to promote" his beliefs about social and criminal justice issues, but he "cannot engage in 'bias,

50

censorship or preference regarding [another] speaker's point of view'" through politically motivated firings. *Otto*, 981 F.3d at 864 (quoting *Messer v. City of Douglasville*, 975 F.2d 1505, 1509 (11th Cir. 1992)); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (explaining that the First Amendment prohibits government officials from "favor[ing] some viewpoints or ideas at the expense of others.").

Indeed, the Governor has essentially admitted that the goal of suspending Mr. Warren was to denigrate progressive ideas.  In his memoir, which he has been promoting on a "book tour" throughout the country, the Governor wrote that the suspension "sent a clear signal to other prosecutors around Florida that the Soros model" would not be tolerated in Florida.  DeSantis Memoir, *supra*, at 239.  The Governor's purpose, in short, was to supress certain viewpoints and beliefs.  That is "censorship in its purest form." *Circle Schs. v. Pappert*, 381 F.3d 172, 180 (3d Cir. 2004); *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (Jackson, J.) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . .").

On the facts the District Court found, the suspension violated the First Amendment.

# CONCLUSION

For the foregoing reasons, the judgment below should be reversed and this Court should remand with instructions to enter a permanent injunction reinstating Mr. Warren.

Dated: March 13, 2023             Respectfully submitted,

DEBEVOISE & PLIMPTON LLP
*/s/ David O'Neil*
David A. O'Neil
801 Pennsylvania Ave. NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

*Counsel for Plaintiff-Appellant Andrew Warren*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    This brief complies with the type-volume limitation of Rule 27(d)(1) of the Federal Rules of Appellate Procedure because it contains approximately 11,915 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Date: March 13, 2023

DEBEVOISE & PLIMPTON LLP
*/s/ David O'Neil*

David A. O'Neil
801 Pennsylvania Ave. NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2023, the foregoing Brief of Plaintiff-Appellant Andrew Warren was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit via the Court's electronic filing system and served on all counsel of record via CM/ECF.

Date: March 13, 2023

DEBEVOISE & PLIMPTON LLP
*/s/ David O'Neil*

David A. O'Neil
801 Pennsylvania Ave. NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

54