**No. 23-10459**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ANDREW H. WARREN,

*Plaintiff-Appellant*,

v.

RON DESANTIS, individually and in his Official Capacity as Governor of the States of Florida,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of Florida

# BRIEF *AMICI CURIAE* OF FIRST AMENDMENT SCHOLARS IN SUPPORT OF PLAINTIFF-APPELLANT


Adam G. Unikowsky
Kathryn L. Wynbrandt
Erica S. Turret
Axel J. Hufford*
Yao Li*
JENNER & BLOCK LLP
1099 New York Ave., NW Suite 900
Washington, DC 20001
Tel: (202) 639-6000
aunikowsky@jenner.com
* Admission pending; supervised by principals of the Firm

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, *amici* certify that, in addition to the persons and entities named in the parties' certificates of interested persons, the following individuals or entities may have an interest in the outcome of this case:

1. Jenner & Block LLP
2. Adam G. Unikowsky
3. Kathryn L. Wynbrandt
4. Erica S. Turret
5. Axel J. Hufford
6. Yao Li
7. William Araiza
8. Clay Calvert
9. Erwin Chemerinsky
10. Susan M. Gilles
11. Daniel T. Kobil
12. Genevieve Lakier
13. Toni M. Massaro
14. Leonard M. Niehoff
15. Ciara Torres-Spelliscy

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Adam G. Unikowsky

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iv

INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 5

I. THE FIRST AMENDMENT PROHIBITS STATE RETALIATION AGAINST ELECTED OFFICIALS ON THE BASIS OF POLITICAL SPEECH AND ASSOCIATION. .......... 5

A. The First Amendment Shields an Elected Official's Political Speech and Association from Retaliation. .......... 5

B. The First Amendment Protects the Speech and Associations at Issue in This Case. .......... 8

II. THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT CONDUCT CATEGORICALLY LACKS FIRST AMENDMENT PROTECTION. .......... 10

A. The First Amendment Prohibits the Government from Regulating Conduct Because of Its Communicative Attributes. .......... 10

B. The Governor's Retaliation Against Mr. Warren's Conduct Was Motivated by a Desire to Suppress Mr. Warren's Viewpoints .......... 13

III. THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT POLITICAL MOTIVATION BRINGS AN OTHERWISE UNCONSTITUTIONAL FORM OF RETALIATION OUTSIDE THE FIRST AMENDMENT'S REACH. .......... 16

A. Politically Motivated Suspension of a Public Official Is a Form of Retaliation that Implicates the First Amendment. .......... 16

B. That Mr. Warren's Suspension Was Motivated by Anticipated Political Benefit Does Not Immunize Governor DeSantis. ................19

CONCLUSION ........................................................................................22

## TABLE OF AUTHORITIES*

**CASES**


*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) ........................................11, 12

*Barry v. Moran*, 661 F.3d 696 (1st Cir. 2011)........................................................17

*Bass v. Richards*, 308 F.3d 1081 (10th Cir. 2002)..................................................17

*Biggs v. Best, Best & Krieger*, 189 F.3d 989 (9th Cir. 1999) ..................................18

**Bond v. Floyd*, 385 U.S. 116 (1966) .............................................................2, 7, 8

**Branti v. Finkel*, 445 U.S. 507 (1980) .....................................................13, 17, 21

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1361 (2022)..................................................................10, 11

**Elrod v. Burns*, 427 U.S. 347 (1976) ...............................................16, 17, 18, 20

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018).........................................................................................11

*Griswold v. Connecticut*, 381 U.S. 479 (1965)..........................................................6

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016) .......................................17, 18

*Houston Community College System v. Wilson*, 142 S. Ct. 1253 (2022).............8, 9

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019)...........................................................12, 16

*Lilith Fund for Reproductive Equity v. Dickson*, No. 21-0978, __ S.W.3d __, 2023 WL 2193586 (5th Cir. Feb. 24, 2023).......................................9

*Matal v. Tam*, 582 U.S. 218 (2017) ........................................................................12

*Mills v. Alabama*, 384 U.S. 215 (1966) ....................................................................5

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).............................................5


* Authorities upon which we chiefly rely are marked with an asterisk.

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ................................ 5-6

*O'Laughlin v. Palm Beach County*, 30 F.4th 1045 (11th Cir. 2022)........................6

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ..........................................6

*Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995).........................................................................................................12

**Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990).......................17, 19, 20

*Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463 (1979)..........................................................................................................6

*Texas v. Johnson*, 491 U.S. 397 (1989) ...........................................................10, 11

**OTHER AUTHORITIES**

Melissa Block, *Florida Is One of a Wave of States to Ban Gender-Affirming Care for Transgender Youth*, NPR (Feb. 20, 2023), https://www.npr.org/2023/02/20/1158401853/florida-is-one-of-a-wave-of-states-to-ban-gender-affirming-care-for-transgender- ...........................9

David W. Chen & Patricia Mazzei, *Florida Republicans Propose 6-Week Abortion Ban*, N.Y. Times (Mar. 7, 2023), https://www.nytimes.com/2023/03/07/us/florida-abortion-ban-republicans.html..........................................................................................9

Gary Fineout, *Florida Eyes More Changes to Voting Law Ahead of 2024*, Politico (Feb. 2, 2023), https://www.politico.com/news/2023/02/02/florida-changes-voting-laws-2024-00080930 ..................................9

Robert Post, *Recuperating First Amendment Doctrine*, 47 Stan. L. Rev. 1249 (1995)..........................................................................................11

Dan Sullivan, *DeSantis Pushes New Florida Death Penalty Standards as Execution Looms*, Tampa Bay Times (Feb. 21, 2023), https://www.tampabay.com/news/florida/2023/02/21/execution-looms-florida-leaders-renew-interest-death-penalty/ .............................................9

## INTEREST OF *AMICUS CURIAE*[1]

*Amici* are legal scholars who have dedicated their professional and academic careers to the study of the U.S. Constitution, with particular focus on the First Amendment.[2] *Amici* are law school professors and professors of jurisprudence who have collectively authored hundreds of articles on topics related to freedom of expression and taught dozens of courses on the First Amendment and constitutional law at leading law schools across the country. Based on their experience and expertise, *Amici* seek to draw attention to the critical First Amendment values at stake when elected officials are removed from office for politically motivated reasons. The *Amici* First Amendment scholars include:

- William Araiza, Stanley A. August Professor of Law at Brooklyn Law School;
- Clay Calvert, Professor of Law & Brechner Eminent Scholar Emeritus at the University of Florida, Levin College of Law;
- Erwin Chemerinsky, Dean & Jesse H. Choper Distinguished Professor of Law at the University of California, Berkeley, School of Law;
- Susan M. Gilles, John E. Sullivan Professor of Law at Capital University Law School;
- Daniel T. Kobil, Professor of Law at Capital University Law School;

---

[1] All parties have provided consent to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.

[2] *Amici* submit this brief in their individual capacities and not on behalf of their employers or any other individuals or entities.

- Genevieve Lakier, Professor of Law & Herbert and Marjorie Fried Teaching Scholar at the University of Chicago Law School;
- Toni M. Massaro, Regents Professor, Dean Emerita & Milton O. Riepe Chair in Constitutional Law Emerita at the University of Arizona College of Law;
- Leonard M. Niehoff, Professor from Practice at the University of Michigan Law School; and
- Ciara Torres-Spelliscy, Professor of Law at Stetson University College of Law.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Few constitutional principles are more fundamental than the First Amendment's protection of individuals' right to speak on matters of public concern and to associate with others in pursuit of political ends. Beyond safeguarding the rights of private citizens, these principles apply, with special strength, to the speech and association of elected public officials. "The manifest function of the First Amendment in a representative government," the Supreme Court has instructed, requires affording officials "the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135-36 (1966). By the same token, the First Amendment does not allow state actors to remove elected public officials from office for engaging in political expression and association.

The district court below departed from this basic rule. Plaintiff-Appellant Andrew Warren is a twice-elected public official who, in an act that nullified the will of voters, was suspended from office for engaging in constitutionally protected

speech and association. The district court determined that this suspension was motivated by Mr. Warren's endorsement of left-leaning statements about election issues, the death penalty, transgender rights, and abortion, and for his associations with a left-leaning organization, the Democratic Party, and George Soros. The court correctly recognized that these forms of speech and association fall squarely within the First Amendment's ambit and that retaliation on that basis violates the U.S. Constitution.

Nonetheless, the district court declined to enter judgment for Mr. Warren. Instead, it searched for a set of alternative motives for Mr. Warren's termination and concluded that those did not implicate the First Amendment. But those alternative motivations—"conduct" conveying Mr. Warren's ideology as a "reform prosecutor" and the "political benefit that would result" from "bringing down a reform prosecutor"—do not bring an otherwise unconstitutional dismissal outside the First Amendment's reach.

In concluding otherwise, the district court misapplied First Amendment law in two primary ways.[3] *First*, the district court erroneously assumed that as long as Mr. Warren's termination was partially motivated by a desire to regulate conduct,

---

[3] Amici also share the additional First Amendment concerns raised in Plaintiff-Appellant's opening brief. *See* Plaintiff-Appellant's Opening Brief, *Warren v. DeSantis*, 23-10459 (11th Cir. Mar. 13, 2023), ECF No. 39.

not purely speech, the First Amendment does not pose any barriers. But the First Amendment's breadth is not limited to the spoken or written word. Conduct is likewise protected where the government's purpose in regulating conduct is to stifle a communicative message—particularly where the message is an expression of political belief. And here, the district court's own factual findings confirm that the motivation behind Mr. Warren's suspension was not the reprimand of professional misconduct, but rather the suppression of viewpoints inextricably linked to Mr. Warren's status and performance as a left-leaning reform prosecutor.

*Second*, the court erroneously assumed that the First Amendment has nothing to say about suspensions motivated by anticipated political benefit. The politically motivated suspension of an elected official is akin to political patronage prohibited by the First Amendment. Patronage dismissals, by their very nature, offer expected political benefits for officials who order them—it would turn the First Amendment on its head if the existence of an anticipated benefit somehow immunizes an unconstitutional suspension from judicial scrutiny.

By failing to recognize the full reach of the First Amendment, the district court would allow state actors to override the democratic process and suspend elected officials at the expense of open political debate. That is precisely what the First Amendment forbids.

## ARGUMENT

### I. THE FIRST AMENDMENT PROHIBITS STATE RETALIATION AGAINST ELECTED OFFICIALS ON THE BASIS OF POLITICAL SPEECH AND ASSOCIATION.

Central to First Amendment jurisprudence is the value of democratic self-governance. The First Amendment safeguards the channels of public discourse and political deliberation that make representative government possible. Courts have long understood that fulfilling these purposes requires the robust exchange of ideas in public fora and, in turn, constitutional protection for political speech and affiliation—not just for private citizens, but for elected public officials as well.

#### A. The First Amendment Shields an Elected Official's Political Speech and Association from Retaliation.

That the First Amendment protects political speech is an elementary principle of the Supreme Court's free speech jurisprudence. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement" that it was adopted in part to "protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 215, 218 (1966). This protection reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Beyond the freedom of speech, the Constitution guarantees a "freedom to engage in *association* for the advancement of beliefs and ideas." *NAACP v. Alabama*

*ex rel. Patterson*, 357 U.S. 449, 460 (1958) (emphasis added). The right to associate means "more than the right to attend a meeting[.]" *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965). It includes the right to "join in a common endeavor" in pursuit of each of the First Amendment's guarantees—religion, speech, press, assembly, and petition. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

And for good reason. After all, "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 622. This freedom allows individuals not only to "speak freely and petition openly" without fear of reprisal but to recruit others and associate with organizations pursuing the same goals. *Smith v. Ark. State Highway Emps., Loc. 1315*, 441 U.S. 463, 465 (1979) (per curiam). Freedom of expressive association therefore provides "an indispensable means of" and a natural corollary to "preserving other individual liberties." 468 U.S. at 618. *See O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1053 (11th Cir. 2022) (noting that the "freedom of expressive association is instrumental to, and protective of, other constitutional rights"). Indeed, without the freedom of association, protected speech risks falling on deaf ears.

These basic First Amendment protections apply not only to private citizens but to elected public officials as well. In fact, the Supreme Court has long recognized

that the censorship of elected public officials poses particular danger to First Amendment values. The Court's decision in *Bond v. Floyd*, 385 U.S. 116 (1966), is instructive here. After being elected to the Georgia House of Representatives, Julian Bond endorsed statements condemning the Vietnam War. The Georgia House objected to Bond's endorsement of the statements and, as a result, refused to seat him. The *Bond* Court held that the House's refusal to seat Bond violated the First Amendment.

In reaching its decision, the Court rejected the notion that the commitments it espoused in *New York Times v. Sullivan* to "uninhibited, robust, and wide-open" discourse on issues of public debate—and the protection of "statements criticizing public policy" in order "to give freedom of expression the breathing space it needs to survive"—apply only to private citizens. *Id*. at 136. Instead, the Court instructed that elected officials "have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them." *Id*. at 136-37. The *Bond* Court understood that safeguarding elected officials' speech goes to the heart of the First Amendment's protection. "The manifest function of the First Amendment in a representative government," the Court explained, "requires that

legislators be given the widest latitude to express their views on issues of policy." *Id*. at 135-36.

These First Amendment principles persist. Just last term, the Supreme Court reaffirmed that "[t]he First Amendment surely promises an elected representative . . . the right to speak freely on questions of government policy." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1261 (2022). And, the Court warned, "just as surely, it cannot be used as a weapon to silence other representatives seeking to do the same." *Id*. For "the role that elected officials play in that [democratic] process 'makes it all the more imperative that they be allowed to freely express themselves.'" *Id*. (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002)).

### B. The First Amendment Protects the Speech and Associations at Issue in This Case.

Applying these principles, the district court was correct in its initial finding that Mr. Warren's suspension because of his political speech and associations violated the First Amendment. On the district court's factual findings, Mr. Warren's suspension was in retaliation for activity the First Amendment protects. The Governor's office targeted Mr. Warren for his endorsement of political statements about election issues, the death penalty, transgender rights, and abortion. *Warren v. DeSantis*, No. 22CV302, __ F. Supp. 3d __, 2023 WL 345802, at *17-18 (N.D. Fla. Jan. 20, 2023) [hereinafter Dist. Ct.]. As the district court recognized, these statements "were chock full of core political speech." *Id*. at *17. They address

timely political topics, recurrent in Florida's public discourse and featured among Governor DeSantis's policy priorities,[4] and they are exactly the "questions of government policy" on which elected officials are entitled to comment. *Houston Cmty. Coll. Sys.*, 142 S. Ct. at 1261. *See also, e.g.*, *Lilith Fund for Reproductive Equity v. Dickson*, No. 21-0978, __ S.W.3d __, 2023 WL 2193586 at *7 (5th Cir. Feb. 24, 2023) (explaining that "the debate over abortion is a fixture of our political landscape" and falls within core First Amendment protection).

The district court also recognized that the Governor's termination of Mr. Warren was further motivated by his political associations—namely, Mr. Warren's association with the left-leaning organization that authored the advocacy statements he joined—Fair and Just Prosecution—and his affiliations with the Democratic Party and George Soros. *See* Dist. Ct., 2023 WL 345802, at *6-7. Here too, Mr. Warren's affiliations fall squarely within the First Amendment's reach.

---

[4] *See, e.g.*, David W. Chen & Patricia Mazzei, *Florida Republicans Propose 6-Week Abortion Ban*, N.Y. Times (Mar. 7, 2023), https://www.nytimes.com/2023/03/07/us/florida-abortion-ban-republicans.html; Melissa Block, *Florida Is One of a Wave of States to Ban Gender-Affirming Care for Transgender Youth*, NPR (Feb. 20, 2023), https://www.npr.org/2023/02/20/1158401853/florida-is-one-of-a-wave-of-states-to-ban-gender-affirming-care-for-transgender-; Gary Fineout, *Florida Eyes More Changes to Voting Law Ahead of 2024*, Politico (Feb. 2, 2023), https://www.politico.com/news/2023/02/02/florida-changes-voting-laws-2024-00080930; Dan Sullivan, *DeSantis Pushes New Florida Death Penalty Standards as Execution Looms*, Tampa Bay Times (Feb. 21, 2023), https://www.tampabay.com/news/florida/2023/02/21/execution-looms-florida-leaders-renew-interest-death-penalty/.

In short, the Governor terminated Mr. Warren for his beliefs as a left-leaning reform prosecutor, and the manifestation of those beliefs in Mr. Warren's speech and associations—a flagrant First Amendment violation. On these points, the district court was correct.

## II. THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT CONDUCT CATEGORICALLY LACKS FIRST AMENDMENT PROTECTION.

Still, the district court identified other motivating factors for Mr. Warren's termination and concluded that those additional factors did not implicate the First Amendment. Specifically, the court found that Mr. Warren's suspension was motivated by a desire to regulate not merely his words, but also certain forms of "conduct." At this point, the district court's First Amendment analysis veered off course. The court's assumption that conduct is categorically unprotected by the First Amendment was wrong.

### A. The First Amendment Prohibits the Government from Regulating Conduct Because of Its Communicative Attributes.

"Constitutional protection for freedom of speech," this court has explained, "does not end at the spoken or written word . . . Rather, the First Amendment offers safeguards for expressive conduct, as well." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021) (internal quotation marks omitted), *cert. denied*, 142 S. Ct. 1361 (2022); *see Texas v. Johnson*, 491 U.S. 397, 404 (1989). This Court has defined "expressive conduct" broadly, as conduct that conveys "some" message that

a "reasonable person" could infer. *See, e.g.*, *Burns*, 999 F.3d at 1336 (declining to categorically exclude architecture from the definition of expressive conduct protected by the First Amendment); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1238 (11th Cir. 2018) (applying this test and holding that a nonprofit organization's practice of sharing food at no cost in a public park "where the homeless tend to congregate" constitutes expressive conduct protected by the First Amendment).

The principle underlying the expressive conduct doctrine is that "our First Amendment jurisprudence is concerned not merely with *what* is regulated, but also with *why* the state seeks to impose regulations." Robert Post, *Recuperating First Amendment Doctrine*, 47 Stan. L. Rev. 1249, 1255 (1995) (emphasis in original). Indeed, "[a]ccording to established First Amendment standards, laws enacted to serve improper interests are unconstitutional for that reason." *Id*. As the Supreme Court explained in *Texas v. Johnson*, "[i]t is, in short, not simply the verbal or nonverbal nature of the expression, but the governmental interest at stake, that helps to determine whether a restriction on that expression is valid." 491 U.S. at 406-07; *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 (1991) (Scalia, J., concurring) ("Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional." (emphasis in original)). The central question is whether "suppressing communication was the

object of the regulation of conduct." *Id*. Where the answer is yes, the speech/conduct distinction is immaterial; First Amendment protection endures.

The First Amendment protects expressive conduct, especially so when the message expressed is a viewpoint about a matter of public concern. It is well established that when the government targets conduct with the purpose of suppressing a viewpoint it disagrees with, that government action violates the First Amendment. The Supreme Court's viewpoint discrimination doctrine embodies these fundamental principles. As the Court has consistently held, viewpoint discrimination is a particularly "egregious form of content discrimination" that is "presumptively unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-830 (1995). It is a "core postulate of free speech law" that the government "may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). The Court has explained that the "danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate." *Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part). Put simply, "[v]iewpoint discrimination is poison to a free society." *Brunetti*, 139 S. Ct. at 2302 (Alito, J., concurring); *see id*. at 2302-03 (Alito, J., concurring) ("At a time when free speech is under attack, it is especially important for this Court to remain firm on the principle that the First Amendment does not tolerate viewpoint discrimination.").

And courts have recognized that the First Amendment protects against retaliations on this basis. *See Branti v. Finkel*, 445 U.S. 507, 515 (1980) ("If the First Amendment protects a public employee from discharge based on what he has *said*, it must also protect him from discharge based on what he *believes*." (emphasis added)). To excuse viewpoint discrimination on the mistaken notion that the First Amendment protects only speech, not conduct, is antithetical to the First Amendment.

### B. The Governor's Retaliation Against Mr. Warren's Conduct Was Motivated by a Desire to Suppress Mr. Warren's Viewpoints.

The district court identified three forms of "conduct" that supposedly motivated Mr. Warren's suspension: (1) Mr. Warren's support of one sentence in the Fair and Just Prosecution ("FJP") abortion statement, conveying that the signatories would "refrain from prosecuting those who seek, provide, or support abortions," Dist. Ct., 2023 WL 345802, at *17 (quoting joint Ex. 5, ECF No. 112-5 at 1); (2) Mr. Warren's overall "performance" carrying out a "reform-prosecutor agenda," *Id.* at *16; and (3) Mr. Warren's bike and low-level-offense policies, *id*. at *18. The court labeled each of these three factors "conduct" without any explanation of its proposed speech/conduct distinction, any justification for why those motivations fell on the conduct side of that distinction, or any citation to legal authority. And the district court treated the "conduct" label as outcome-

determinative—erroneously assuming that "conduct" categorically falls beyond the First Amendment's ambit.

This court has been clear that the First Amendment protects expressive conduct—and that the category of expressive conduct is capacious. *See supra* II.A. Asking whether activity constitutes speech or conduct is therefore not the right question. As explained above, the right question is whether Mr. Warren's actions—speech, association, or expressive conduct—were targeted because of the *message* they conveyed about Mr. Warren's political viewpoint. On the district court's factual findings, the answer is unquestionably yes.

The district court's factual findings confirm that, in the Governor's eyes, Mr. Warren's behavior as a reform prosecutor was inextricably linked to his protected political beliefs and associations. The purpose of Mr. Warren's suspension was not to reprimand any professional misconduct, but rather to suppress *messages* antagonistic to the Governor's "law-and-order agenda"—the Governor's preferred viewpoint in an ongoing public debate over prosecutorial philosophy—messages that Mr. Warren's "reform-prosecutor agenda," FJP statement,[5] and offense policies

---

[5] Mr. Warren's endorsement of the FJP statement—including the isolated sentence at issue—was an expression of Mr. Warren's commitment to abortion rights. Citing no authority, the district court held that the isolated sentence was "not protected speech" because it was "a statement of future conduct." Dist. Ct., 2023 WL 345802, at *17. This is not an accurate representation of First Amendment law. Elected

helped convey.[6]

It bears emphasizing that the Governor's retaliation here was motivated by his desire to suppress the viewpoints endorsed by Mr. Warren. Indeed, the suspension bears all the telltale signs of impermissible viewpoint discrimination. *See supra* II.A (collecting cases). The district court dismissed the notion that Mr. Warren was suspended for any particular instance of prosecutorial misconduct. Instead, the so-called "conduct" motivating the dismissal, from the Governor's perspective, constituted expressions of disfavored political viewpoints and ideology. As the district court acknowledged, Mr. Warren's suspension was motivated by Governor DeSantis's interest in "bringing down" a reform prosecutor—*any* reform prosecutor—who represented an ideological platform and belief system that, in his eyes, contradicted his preferred viewpoint, a "law-and-order agenda." Dist. Ct. 2023

---

public officials issue statements of future conduct all the time: whether they will or will not support a piece of legislation, whether they will or will not join a political group, and so on. It is not the case that a simple switch from the present to future tense vitiates First Amendment protection. And here, any "future conduct" was entirely hypothetical. If—as the district court's reasoning suggests—any expression of future intent is conduct, then nearly any speech by government officials could be considered conduct. After all, government officials could always, in an unspecified future case, act according to their political views and prior expression of those views.

[6] The district court's acknowledgement that "the bike and low-level-offense policies and the one sentence in the FJP abortion statement" provided "pretext" for the Governor's suspension of Mr. Warren further supports this conclusion. *See id*. That the conduct itself was pretext leaves Mr. Warren's underlying ideology as the motivating force.

WL 345802, at *21. Such blatant viewpoint discrimination is "poison to a free society" and prohibited under the First Amendment regardless of whether it targets pure speech or expressive conduct as well. *Brunetti*, 139 S. Ct. at 2302 (Alito, J., concurring).

## III. THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT POLITICAL MOTIVATION BRINGS AN OTHERWISE UNCONSTITUTIONAL FORM OF RETALIATION OUTSIDE THE FIRST AMENDMENT'S REACH.

Finally, the district court pointed to the Governor's motive in suspending a reform prosecutor for political benefit and concluded that such a motive is beyond the First Amendment's ambit. A First Amendment violation is not cured simply because there is political motivation behind it; quite the opposite. In finding otherwise, the court misapplied First Amendment law.

### A. Politically Motivated Suspension of a Public Official Is a Form of Retaliation that Implicates the First Amendment.

The First Amendment interests of public officials enjoy special protection under the Supreme Court's "political patronage" doctrine. Indeed, the Court has long recognized that political patronage and, in particular, the practice of patronage dismissals, "clearly infringes First Amendment interests." *Elrod v. Burns*, 427 U.S. 347, 360 (1976).[7] The Court defines political patronage broadly to include

[7] This First Amendment protection has expanded in recent years. In 1976, the Court

governmental actions taken to provide "support for the favored political party" by restricting the political belief and association of a disfavored subgroup's members. *Id.* at 353-60. Such patronage can take many forms, from placing "loyal supporters in government jobs" to dismissing employees for partisan or ideological reasons. *Id.* at 353.

Political patronage is not limited to purely partisan acts. Patronage-based retaliation can be responsive to political ideology as much as partisanship, and the First Amendment analysis remains unchanged. As the First Circuit has explained, "the term 'political,' in the relevant First Amendment sense, pertains to the conduct of government, public policy or public controversies." *Barry v. Moran*, 661 F.3d 696, 704 (1st Cir. 2011); *id.* at 705 (also noting that "the label 'political' does not necessarily implicate partisan politics and traditional political parties"). *See Bass v. Richards*, 308 F.3d 1081, 1091 (10th Cir. 2002) (explaining that the First Amendment is implicated when an employee is fired "for failing to endorse or pledge

---

first held that the practice of patronage dismissals—firing a public official because of their political affiliation—is unconstitutional under the First and Fourteenth Amendments. *Elrod*, 427 U.S. at 373. Four years later, it clarified that dismissed employees need not prove that they were coerced into changing their political allegiance to win a patronage challenge. *Branti v. Finkel*, 445 U.S. at 517. A decade after that, the Court expanded the prohibition on political patronage to include not just dismissals but also "promotion, transfer, recall, and hiring decisions based on party affiliation." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990). In 2016, the Court expanded the prohibition once more, holding that patronage dismissals are unconstitutional even if they rest upon an employer's factual mistake. *Heffernan v. City of Paterson*, 578 U.S. 266, 274 (2016).

allegiance to a particular political ideology”); *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 996 (9th Cir. 1999) (endorsing the view that “[p]olitical affiliation is broader than party membership in that it includes commonality of political purpose and support.” (quoting *Collins v. Voinovich*, 150 F.3d 575, 577 (6th Cir. 1998) (internal quotation marks omitted))).

The Court’s political patronage doctrine is animated by two First Amendment concerns. *First*, even the dismissal of one person can effectively silence speech and association for all, a result “inimical to . . . our system of government and . . . ‘at war with the deeper traditions of democracy embodied in the First Amendment.’” *Elrod*, 427 U.S. at 357 (quoting *Ill. State Emps. Union v. Lewis*, 473 F.2d 561, 576 (7th Cir. 1972)). The suspension of a single individual, for instance, can produce a chilling effect that impacts everyone within a larger organization; even “the threat of dismissal” of one individual “unquestionably inhibits protected belief and association” among others. *Elrod*, 427 U.S. at 359; *Heffernan*, 578 U.S. at 273 (“The discharge of one tells the others that they engage in protected activity at their peril.”).

*Second*, patronage dismissals undermine the democratic process. When ideology becomes a litmus test for who is allowed to participate in elected government, state actors risk “tip[ping] the electoral process in favor of the incumbent party.” *Elrod*, 427 U.S. at 356. Not only will existing jobholders be deterred from stepping out of line—knowing their employment depends on

remaining in the good graces of political leaders—but also nonconforming jobseekers will be less willing to seek government employment. As a result, free expression is suppressed, ideological orthodoxy entrenched, and the democratic process "decidedly impair[ed]." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75. And, of course, these concerns are all the more serious when the patronage dismissal is of an independently elected official rather than an employee. Through voting, the official's constituents have chosen to vest authority in that individual, and in doing so, have indicated their agreement with that person's political agenda. The power to retaliate against expressions of that political agenda by the official rests in the ballot box at the next election, not with the Governor.

### B. That Mr. Warren's Suspension Was Motivated by Anticipated Political Benefit Does Not Immunize Governor DeSantis.

After examining the possible motivating factors underlying Mr. Warren's suspension, the court's conclusion was unequivocal: "[T]he controlling motivations for the suspension were the interest in bringing down a reform prosecutor . . . and the political benefit that would result." Dist. Ct., 2023 WL 345802, at *21. The court went further, finding that Governor DeSantis's ostensible motivations were merely "a pretext to justify the suspension under the Florida Constitution." *Id.* Despite these factual findings, the court nonetheless incorrectly concluded that the "First Amendment does not speak to the matter" of Governor DeSantis's political

motivations and that "[c]onsidering any anticipated political benefit was not a First Amendment violation." *Id.* at *19.

This conclusion represents a misapplication of First Amendment law. An otherwise unjustified suspension that aims to achieve an "anticipated political benefit" is a form of political patronage that the First Amendment prohibits. Contrary to the district court's findings, the Supreme Court's political patronage cases are rife with examples of government leaders "[c]onsidering . . . anticipated political benefit[s]," *id.*, when taking unconstitutional, retaliatory actions. *See, e.g.*, *Elrod*, 427 U.S. at 367 (rejecting defendant's argument that a patronage dismissal was justified because it would promote "political loyalty of employees" and thus facilitate "the implementation of policies of the new administration"); *Rutan*, 497 U.S. at 65-68, 73 (noting that a Governor-initiated hiring freeze reinforced political control by, among other tactics, denying promotions to individuals who would later "feel a significant obligation to support political positions held by their superiors"). Each of these cases involved political leaders retaliating against ideological opponents for some political advantage. But "[t]o the victor belong only those spoils that may be constitutionally obtained." *Id.* at 64.

The political motivations the district court found in this case are directly analogous to those that have long been held unconstitutional in political patronage cases. In *Branti*, for instance, the Court characterized two assistant county public

defenders as "competent attorneys" who were fired because their "political beliefs differed from those of the ruling Democratic majority in the County Legislature" and due to their association with the Republican party. *Branti v. Finkel*, 445 U.S. at 508-10 (1980) (quoting *Finkel v. Branti*, 457 F. Supp. 1284, 1292-93 (S.D.N.Y. 1978), *aff'd*, 598 F.2d 609 (2d Cir. 1979), *aff'd*, 445 U.S. 507 (1980)). The Democratic legislature sought to systemically terminate Republican-held incumbents and consolidate Democratic control; the retaliatory dismissals violated the First Amendment. *Id.* at 508-10, 519.

Here, too, the district court found that Mr. Warren was an "extraordinarily well-qualified prosecutor" and that he "was diligently and competently performing the job he was elected to perform, very much in the way he told voters he would perform." Dist. Ct., 2023 WL 345802, at *3, *5. Nevertheless—"stripped of pretext"—Governor DeSantis ultimately suspended Mr. Warren because of his beliefs as a "progressive prosecutor" and because "he was being supported by a contributor to, of all things, the Democratic Party." *Id.* at *8. Governor DeSantis, in effect, sought to remove an ideological opponent from his pulpit to amplify the Governor's own law-and-order agenda. *See id*. at *16 ("The Governor was looking for a reform prosecutor from the outset. A reform prosecutor is what [he] found."). The toppling of a political opponent will always be intended to result in political advantage. But a constitutional violation cannot be cast aside purely because the

violator expected a political benefit. Such a result would eviscerate the core First Amendment protections to which elected public officials are entitled.

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed.

Dated: March 20, 2023

Respectfully submitted,

/s/ *Adam G. Unikowsky*
Adam G. Unikowsky
Kathryn L. Wynbrandt
Erica S. Turret
Axel J. Hufford*
Yao Li*
JENNER & BLOCK LLP
1099 New York Ave., NW Suite 900
Washington, DC 20001
Tel: (202) 639-6000
aunikowsky@jenner.com
* Admission pending; supervised by principals of the Firm

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains approximately 4,980 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6)-(7) because this brief has been prepared using Microsoft Office Word and is set in Times New Roman 14-point font.

Dated: March 20, 2023

/s/ Adam G. Unikowsky
Adam G. Unikowsky

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing brief was filed electronically on March 20, 2023 and will therefore be served electronically on all counsel.

Dated: March 20, 2023

/s/ *Adam G. Unikowsky*
Adam G. Unikowsky