No. 23-10459

# In the United States Court of Appeals for the Eleventh Circuit

ANDREW WARREN,
*Plaintiff-Appellant,*

v.

RON DESANTIS,
*Defendant-Appellee.*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
No. 4:22-cv-00302-RH-MAF

**APPELLEE'S ANSWER BRIEF**

ASHLEY MOODY
*Attorney General of Florida*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Defendant-Appellee*

*(Additional counsel on next page.)*

HENRY C. WHITAKER
*Solicitor General*
DANIEL WILLIAM BELL
JEFFREY PAUL DESOUSA
*Chief Deputy Solicitors General*
DAVID M. COSTELLO
*Deputy Solicitor General*
ROBERT S. SCHENCK
ZACHARY GROUEV
*Solicitor General Fellows*

GEORGE T. LEVESQUE
JEFF AARON

GrayRobinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32302
(850) 577-9090
*george.levesque@gray-robinson.com*

*Counsel for Defendant-Appellee*

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee certifies that, to the best of his knowledge, the following is a complete list of interested persons:

1. Aaron, Jeffrey M.,

2. Abel, Richard,

3. Albinson, Jeff,

4. Alfieri, Anthony,

5. Anstead, Harry Lee,

6. Arenella, Peter,

7. Austin, Jr., Roy L.,

8. Bakkedahl, Tom,

9. Ball, David,

10. Ballard, Matthew J.,

11. Bandes, Susan,

12. Barakat, Charbel,

13. Barnett, Martha,

14. Bartlett, Bruce L.,

15. Basford, Larry,

16. Beltran, Michael P.,

17. Bennett, Paul,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

18.   Bentley III, A. Lee,

19.   Benza, Michael,

20.   Berkowitz, Herbert M.,

21.   Bernabe, Alberto,

22.   Bernstein, Anita,

23.   Bernstein, Lauren Jacobson,

24.   Bhabha, Ishan K.,

25.   Bilchik, Shay,

26.   Bondi, Pamela,

27.   Boone, Larry,

28.   Bowling, Bret,

29.   Boyd, Bobbi Jo,

30.   Boyer, Bruce,

31.   Brackney, Ph.D., RaShall,

32.   Brady, Scott,

33.   Brann, Joseph,

34.   Brewer, Jr., Robert,

35.   Bridge, Bobbe J.,

36.   Broderick, Katherine,

37.   Brodsky, Ed,

38.    Broussard, Robert L.,

39.    Buckler, Carol,

40.    Bueermann, Jim,

41.    Buhai, Sande,

42.    Bulman-Pozen, Jessica,

43.    Burbank, Chris,

44.    Burkoff, John,

45.    Burnele, Powell,

46.    Butterworth, Jr., Robert A.,

47.    Cabou, Jean-Jacques,

48.    Cabral, Andrea J.,

49.    Carlisle, Jay,

50.    Casselman, Margo R.,

51.    Cassidy, Michael,

52.    Cerniglia, Christine,

53.    Chemerinsky, Erwin,

54.    Chin, Doug,

55.    Chin, Gabriel,

56.    Christine, Bobby,

57.    Christmas, Natalie,

58.    Clayton, Jerry,

59.    Cochran, Donald,

60.    Coker, Donna Kay,

61.    Colbert, Doug,

62.    Cole, Liz Ryan,

63.    Coleman, Russell,

64.    Colton, Bruce,

65.    Cooper, Benjamin,

66.    Corcoran, Anne,

67.    Costello, David M.,

68.    Cox, Brendan,

69.    Cummings, Scott,

70.    Danneman, Alexis E.,

71.    Davis, Angela,

72.    Deitch, Brittany,

73.    DeSantis, Ron,

74.    DeSousa, Jeffrey P.,

75.    Devereaux, Damon,

76.    Dillof, Anthony,

77.    Dressler, Joshua,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

78.  Dunavant, Michael,

79.  Eaton, Jr., O.H.,

80.  Elliot, Chris,

81.  Emerson, Robert,

82.  Epstein, Jules,

83.  Evans, Robert Wayne,

84.  Ewing, Charles,

85.  Fagan, Jeffrey,

86.  Feldman, Heidi Li,

87.  Fields, Lazaro,

88.  Fields, Shawn,

89.  Fitzpatrick, Hon. Martin A.,

90.  Florida Sheriffs Association,

91.  Flowers, Roberta,

92.  Fox, Amira D.,

93.  Franklin, Neil,

94.  Freed, David,

95.  Freidin, Ellen,

96.  Furgeson, Jr., William Royal

97.  Galoob, Stephen,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

98.   Gamaldi, Joe,

99.   Garcetti, Gil,

100.   Garnett, Stan,

101.   Gentithes, Michael,

102.   Gertner, Nancy,

103.   Gladson, William,

104.   Godsoe, Cynthia,

105.   Goldstock, Ronald,

106.   Gossett, Christian,

107.   Graziano, Kristin,

108.   Green, Bruce A.,

109.   Greenbaum, Arthur,

110.   Griffin, Lissa,

111.   Grodin, Joseph R.,

112.   Grosso, Catherine,

113.   Grouev, Zachary P.,

114.   Gundlach, Jennifer,

115.   Haas, Brian,

116.   Halle, Kris Anne,

117.   Harris, David,

118.    Harshbarger, Scott,

119.    Hawkes, Paul,

120.    Hellman, Lawrence,

121.    Herdman, Justin,

122.    Hessick, Carissa Byrne,

123.    Hicks, Jason,

124.    Hill, Jerry,

125.    Hinkle, Hon. Robert L.,

126.    Hoag-Fordjour, Alexis,

127.    Holder, Gregory Paul,

128.    Howell, Babe,

129.    Hull, Bryan David,

130.    Hutchinson, Ed,

131.    Hyde, Thomas,

132.    Jaroslaw, Ilene,

133.    Joyal, Moe,

134.    Joyal, Ursula,

135.    Kelly, Charles B.,

136.    King, Adam,

137.    King, Brad,

138.  Kobil, Daniel,

139.  Koerner, Matthew R.,

140.  Kollar, Justin F.,

141.  Kramer, Brian,

142.  Kronick, Katie,

143.  Kruse, Katherine R.,

144.  Larizza, R.J.,

145.  Lassar, Scott,

146.  Laurin, Jennifer,

147.  Lawson, Sara Alpert,

148.  Levens, William P.,

149.  Levenson, Laurie,

150.  Levesque, George T.,

151.  Levine, Kay,

152.  Lewis, Timothy K.,

153.  Listenbee, Robert L.,

154.  Little, Rory,

155.  Lopez, Maria Chapa,

156.  Lubet, Steven,

157.  Madden, Ginger Bowden,

158.    Madrid, Patricia A.,

159.    Margulies, Peter,

160.    Markovic, Milan,

161.    Marshall, Steve,

162.    Mather, Lynn,

163.    Matsuoka, Tania C.,

164.    McCollum, Bill,

165.    McFadden, Garry, L.

166.    McMunigal, Kevin,

167.    Medwed, Daniel,

168.    Meggs, William N.,

169.    Melton III, Howell Webster,

170.    Menendez, Jr., Manuel,

171.    Menkel-Meadow, Carrie,

172.    Metzger, Pamela,

173.    Millemann, Michael,

174.    Miller, Eric,

175.    Minkoff, Ronald,

176.    Moore, Richard,

177.    Morris, Chris,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

178.  Morrison, Caren Myers,

179.  Needham, Carol,

180.  Newborn, Steven A.,

181.  Newton, Matthew T.,

182.  Norton, Jerry,

183.  Nunn, Kenneth,

184.  O'Connor, Michol,

185.  O'Neil, David A.,

186.  O'Neill, Jerome,

187.  O'Neill, Timothy,

188.  Orenstein, Aviva Anne,

189.  Ortiz, Carmen M.,

190.  Ouziel, Lauren,

191.  Pariente, Barbara,

192.  Parsons, Ron,

193.  Pearce, Russell,

194.  Pearson, Melba,

195.  Percival, III, James H.,

196.  Perlin, Michael,

197.  Phillips, Channing,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

198. Podgor, Ellen S.,

199. Powell, Burnele

200. Pridgen, Abdul D.,

201. Quick, Albert T.,

202. Quick, Brenda,

203. Quince, Peggy,

204. Rapoport, Nancy,

205. Regalado, Vic,

206. Reid, Teresa Jean,

207. Reiner, Ira,

208. Ricardo, Kim D.,

209. Robbins, Ira,

210. Roberts, Jenny,

211. Robertson, Andra,

212. Robson, Ruthann,

213. Rosen, Robert,

214. Rosenthal, Stephen,

215. Ross, Josephine,

216. Rossman, David,

217. Rozelle, Susan,

218.  Rudovsky, David,

219.  Safavi, Sherry,

220.  Saito, Natsu,

221.  Salcines, E.J.,

222.  Saltzburg, Stephen A.,

223.  Sammons, Jack,

224.  Schaefer, Paula,

225.  Scheindlin, Shira A.,

226.  Schenck, Robert S.

227.  Schnorrenberg, Sarah B,

228.  Scott, McGregor,

229.  Shores, R. Trent,

230.  Shorstein, Harry L.,

231.  Siegel, David,

232.  Singer, David B.,

233.  Singh, Samantha B.,

234.  Singleton, David A.,

235.  Sloan, Cliff,

236.  Smith, Abbe,

237.  Sonnett, Neal R.,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

238.  Southerland, Vincent,

239.  Spagnoletti, Robert J.,

240.  Spitzer, Hugh D.,

241.  Stamper, Norm,

242.  Stempel, Jeff,

243.  Stephens, Darrel,

244.  Strait, John,

245.  Strang, Dean,

246.  Sullivan, Ron,

247.  Suvall, Cara,

248.  Swain, Alexandra P.,

249.  Swan, Sarah L.,

250.  Synan, Tom,

251.  Tanaka, Elizabeth,

252.  Tarr, G. Alan,

253.  Tibbles, Lance,

254.  Tierney, James,

255.  Town, Jay,

256.  Tremblay, Paul,

257.  Tribe, Laurence H.,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

258.  Troy, Anthony F.,

259.  Turner, Kevin,

260.  Turner, Tim,

261.  Unikowsky, Adam G.,

262.  Unikowsky, Lauren Jacobson,

263.  Uphoff, Rodney,

264.  Vance, Cyrus R.,

265.  Varadi, Benjamin,

266.  Walsh, John,

267.  Ward, Dennis W.,

268.  Warren, Andrew H.,

269.  Warren, Jeffrey Wayne,

270.  Waurishuk, Jim,

271.  Waxman, Seth,

272.  Webb, Jeanne,

273.  Weich, Ronald,

274.  Weinberg, Jr., Morris,

275.  Weiss, Jonathan A.,

276.  West, Chris,

277.  Whitaker, Henry C.,

*Warren v. DeSantis*
*Eleventh Circuit Case No. 23-10459*

278. Wilson, Jodi,

279. Woods, Jordan Blair,

280. Wright, Ron,

281. Wynbrandt, Kathryn L.,

282. Yaroshefsky, Ellen,

283. Zitrin, Richard

## ORAL ARGUMENT STATEMENT

The Court has scheduled oral argument for May 2, 2023.

# TABLE OF CONTENTS

Oral Argument Statement .................................................................i

Table of Contents..........................................................................ii

Table of Citations ...................................................................... iv

Statement of Jurisdiction ............................................................ 1

Issues Presented......................................................................... 2

Introduction .............................................................................. 3

    I.    Legal background ........................................................ 4

    II.   Factual background ...................................................... 6

    III.  Proceedings below ..................................................... 11

Standard of Review .................................................................. 13

Summary of Argument ............................................................. 13

Argument................................................................................. 16

    I.    The district court did not rule that the Eleventh Amendment foreclosed Mr. Warren's First Amendment claim........................................... 16

    II.   The district court did not clearly err in finding that the Governor would have suspended Mr. Warren for reasons unprotected by the First Amendment ................................................. 16

        A.    The district court did not clearly err in finding that any motives indispensable to the suspension were unprotected ........................... 18

        B.    The district court did not clearly err in accounting for the trial evidence establishing the same-decision defense................................ 21

        C.    Mr. Warren cannot establish his First Amendment claim with a purported violation of state law........................................................ 24

    III.  The Court may affirm the judgment on other grounds ................................. 26

A.  Mr. Warren's retaliation claim fails because he did not show that the Governor lacked probable cause to suspend him ........................ 26

  1.  Mr. Warren was required to show that the Governor lacked probable cause to suspend him .................................... 26

  2.  Mr. Warren failed to show a lack of probable cause .............. 32

B.  Mr. Warren failed to show that protected activity substantially motivated his suspension ................................................................. 34

  1.  Mr. Warren's transgender and abortion pledges were not protected speech .......................................................................... 35

    a.  Government speech ........................................................ 35

    b.  *Pickering* balancing ............................................................ 43

    c.  Speech incidental to regulation of conduct .................. 44

  2.  Mr. Warren was a policymaker with no First Amendment protection for his political associations .................................... 45

C.  The district court lacked equitable authority to reinstate Mr. Warren ................................................................................................. 50

Conclusion ............................................................................................................. 52

Certificate of Compliance ................................................................................... 53

Certificate of Service .......................................................................................... 54

# TABLE OF CITATIONS

**Cases**                                                                                    **Page(s)**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.,*
  557 F.3d 1177 (11th Cir. 2009) ................................................................. 13

*Alves v. Bd. of Regents of Univ. Sys.,*
  804 F.3d 1149 (11th Cir. 2015) ................................................................. 37

*Austin v. State ex rel. Christian,*
  310 So. 2d 289 (Fla. 1975) ................................................. 5, 37, 40, 49

*\* Ayala v. Scott,*
  224 So. 3d 755 (Fla. 2017) ....................................................... Passim

*Baker v. Carr,*
  369 U.S. 186 (1962) ................................................... 16, 51, 52

*Baldwin v. Blue Cross/Blue Shield of Ala.,*
  480 F.3d 1287 (11th Cir. 2007) ................................................................. 34

*Bd. of Cnty. Comm'rs v. Umbehr,*
  518 U.S. 668 (1996) ................................................................. 37

*Belcher v. City of McAlester,*
  324 F.3d 1203 (10th Cir. 2003) ................................................................. 44

*Berry v. Bailey,*
  726 F.2d 670 (11th Cir. 1984) ................................................................. 45

*Bickel v. Burkhart,*
  632 F.2d 1251 (5th Cir. 1980) ................................................................. 13

*Bond v. Floyd,*
  385 U.S. 116 (1966) ................................................................. 40, 43

*Boquist v. Courtney,*
  32 F.4th 764 (9th Cir. 2022) ................................................................. 41

iv

*Borzilleri v. Mosby,*
874 F.3d 187 (4th Cir. 2017) ........................................................................... 47

*Branti v. Finkel,*
445 U.S. 507 (1980) ............................................................................ 15, 46, 47

*Bundren v. Peters,*
732 F. Supp. 1486 (E.D. Tenn. 1989) ............................................................. 24

*Camacho v. Brandon,*
317 F.3d 153 (2d Cir. 2003) ........................................................................... 50

*Chambless v. La.-Pac. Corp.,*
481 F.3d 1345 (11th Cir. 2007) ...................................................................... 21

*Cnty. of Sacramento v. Lewis,*
523 U.S. 833 (1998) ........................................................................................ 25

*Common Cause/Ga. v. Billups,*
554 F.3d 1340 (11th Cir. 2009) ...................................................................... 13

*Connick v. Myers,*
461 U.S. 138 (1983) ........................................................................................ 45

*Crutcher v. MultiPlan, Inc.,*
22 F.4th 756 (8th Cir. 2022) ........................................................................... 21

*\* DeMartini v. Town of Gulf Stream,*
942 F.3d 1277 (11th Cir. 2019) ................................................................ Passim

*Elrod v. Burns,*
427 U.S. 347 (1976) ............................................................................ 15, 46, 47

*Fineran v. Bailey,*
2 F.2d 363 (5th Cir. 1924) .............................................................................. 51

*\* Garcetti v. Ceballos,*
547 U.S. 410 (2006) ................................................................................. Passim

*GEOMC Co., Ltd. v. Calmare Therapeutics Inc.,*
918 F.3d 92 (2d Cir. 2019) ............................................................................. 21

*Georgia v. Stanton*,
  (1867) ...................................................................................... 51, 52

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) ................................................................. 45

*Gogel v. Kia Motors Mfg., Inc.*,
  967 F.3d 1121 (11th Cir. 2020) ............................................. 25

*Greene v. Doruff*,
  660 F.3d 975 (7th Cir. 2011) .................................................. 24

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ............................................................. 47, 50

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ................................................................. 51

*Gundy v. City of Jacksonville*,
  50 F.4th 60 (11th Cir. 2022) ............................... 35, 36, 41, 42

*Hartman v. Moore*,
  547 U.S. 250 (2006) ................................... 27, 28, 29, 30

*Hassan v. U.S. Postal Serv.*,
  842 F.2d 260 (11th Cir. 1988) ............................................... 21

*Herrera v. Churchill McGee, LLC*,
  680 F.3d 539 (6th Cir. 2012) .................................................. 21

*Houston v. Twp. of Randolph*,
  559 F. App'x 139 (3d Cir. 2014) ........................................... 37

*In re Sawyer*,
  124 U.S. 200 (1888) ............................................................ 51, 52

*Ingram v. Johnson*,
  187 F.3d 877 (8th Cir. 1999) ................................................. 45

*Israel v. DeSantis*,
  269 So. 3d 491 (Fla. 2019) .................................... 5, 6, 29, 33

*Jones v. Miles,*
656 F.2d 103 (5th Cir. Unit B Aug. 31, 1981)................................................. 23

*Kennedy v. Bremerton Sch. Dist.,*
142 S. Ct. 2407 (2022)...................................................................... 36

*Kingsland v. City of Miami,*
382 F.3d 1220 (11th Cir. 2004)........................................................... 34

*Kurowski v. Krajewski,*
848 F.2d 767 (7th Cir. 1988)........................................................... 47, 49

*Leake v. Drinkard,*
14 F.4th 1242 (11th Cir. 2021)........................................................... 36

*LSREF2 Baron, LLC v. Tauch,*
751 F.3d 394 (5th Cir. 2014).............................................................. 21

*McBeth v. Himes,*
598 F.3d 708 (10th Cir. 2010)........................................................... 28, 31

*McCabe v. Sharrett,*
12 F.3d 1558 (11th Cir. 1994)............................................................ 44

*Mech v. Sch. Bd.,*
806 F.3d 1070 (11th Cir. 2015)........................................................... 36

*Moody v. Atl. City Bd. of Educ.,*
870 F.3d 206 (3d Cir. 2017).............................................................. 21

*\* Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
429 U.S. 274 (1977).................................................................. Passim

*Nicholas v. Penn. State Univ.,*
227 F.3d 133 (3d Cir. 2000).............................................................. 24

*\* Nieves v. Bartlett,*
139 S. Ct. 1715 (2019)............................................................... Passim

*Norwegian Cruise Line Holdings LTD v. State Surgeon Gen.,*
50 F.4th 1126 (11th Cir. 2022)........................................................... 45

*Otto v. City of Boca Raton,*
41 F.4th 1271 (11th Cir. 2022) ................................................................ 13

*Parks v. City of Horseshoe Bend,*
480 F.3d 837 (8th Cir. 2007) ................................................................ 41

*Pennhurst State School & Hospital v. Halderman,*
465 U.S. 89 (1984) ................................................................ 11

*Peters v. Del. River Port Auth. of Pa. & N.J.,*
16 F.3d 1346 (3d Cir. 1994) ................................................................ 48, 50

*Pickering v. Bd. of Educ.,*
391 U.S. 563 (1968) ................................................................ 15, 35, 44

*Ray v. City of Leeds,*
837 F.2d 1542 (11th Cir. 1988) ................................................................ 47

*Reichle v. Howards,*
566 U.S. 658 (2012) ................................................................ 30

*Romero-Barcelo v. Hernandez-Agosto,*
75 F.3d 23 (1st Cir. 1996) ................................................................ 50

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
547 U.S. 47 (2006) ................................................................ 15, 18, 36, 45

*Rutan v. Republican Party of Ill.,*
497 U.S. 62 (1990) ................................................................ 46, 47

*Shahar v. Bowers,*
114 F.3d 1097 (11th Cir. 1997) ................................................................ 44

* *Shurtleff v. City of Boston,*
142 S. Ct. 1583 (2022) ................................................................ Passim

*Spiegla v. Hull,*
481 F.3d 961 (7th Cir. 2007) ................................................................ 40

*Stanley v. City of Dalton,*
219 F.3d 1280 (11th Cir. 2000) ................................................................ 25

*State ex rel. Hardee v. Allen*,
  172 So. 222 (Fla. 1937) ................................................................. 6, 49

*Taylor v. Kercheval*,
  82 F. 497 (C.C.D. Ind. 1897) ............................................................... 51

*Turner v. Williams*,
  2023 WL 2821728 (11th Cir. 2023) ..................................................... 34

*United States v. Bornscheuer*,
  563 F.3d 1228 (11th Cir. 2009) ........................................................... 23

*United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*,
  936 F.3d 1341 (11th Cir. 2019) ........................................................... 23

*Velez v. Levy*,
  401 F.3d 75 (2d Cir. 2005) ................................................................. 50

*Walden v. CDC*,
  669 F.3d 1277 (11th Cir. 2012) ........................................................... 34

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ........................................................................... 42

*Waters v. Churchill*,
  511 U.S. 661 (1994) ........................................................................... 38

*Wood v. Georgia*,
  370 U.S. 375 (1962) ...................................................................... 44, 45

**Statutes**

28 U.S.C. § 509 ..................................................................................... 48

28 U.S.C. § 541 ..................................................................................... 48

Fla. Const. art. I, § 1 ............................................................................ 40

Fla. Const. art. IV, § 1 .................................................................... 4, 5, 49

* Fla. Const. art. IV, § 7 .............................................................. Passim

Fla. Const. art. V, § 17 .................................................................5, 37

Fla. Stat. § 27.01 ................................................................................ 5

Fla. Stat. § 27.02–.341 ..................................................................... 47

Fla. Stat. § 112.43 ........................................................................29, 30

Fla. Stat. § 27.14 ............................................................... 5, 37, 40, 48

Fla. Stat. § 27.15 ............................................................... 5, 37, 40, 48

**Other Authorities**

*Discretion Power at Its Zenith: The Power to Protect Liberty*,
    97 B.U.L. Rev. 489,& n.45 (2017) .................................................. 41

Restatement (First) of Torts § 674 .............................................30, 31

*The Origins of the Elected Prosecutor*,
    121 Yale L.J. 1528 (2012) ............................................................. 41

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has juris-diction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Governor Ron DeSantis exercised his constitutional authority to suspend Andrew Warren as chief prosecutor for Hillsborough County when Mr. Warren announced that he would refuse to enforce the law. After a three-day bench trial, the district court found that Mr. Warren's suspension was not caused by activity protected by the First Amendment. The issues are:

1.     Whether the district court's finding that the Governor would have suspended Mr. Warren regardless of any protected activity is clearly erroneous.

2.     Whether Mr. Warren made the "threshold showing" that the Governor lacked probable cause to believe that Mr. Warren had committed suspendable offenses under the Florida Constitution. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019).

3.     Whether the suspension was substantially motivated by First Amendment protected activity.

4.     Whether the district court lacked equitable authority to reinstate Mr. Warren to his post.

2

## INTRODUCTION

Plaintiff Andrew Warren is a former locally elected prosecutor in Florida. He sued the Governor for First Amendment retaliation after the Governor suspended him for "commit[ting]" not to "prosecut[e] those who . . . provide[] or support abortions," App. 390; pledging not to prosecute crimes related to transgender-transition treatments, App. 381–88; and ordering his line prosecutors not to pursue many low-level offenses absent satisfaction of an extra-statutory element of his choosing—the presence of a public-safety threat, App. 344–49. Mr. Warren's constitutional theory was that he has a First Amendment right to say that he would not do his job—so long as he also explained why he would rather not.

The Governor moved to dismiss the case for several threshold reasons, chiefly because Mr. Warren has no such right. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006). But the district court bought Mr. Warren's theory and ordered expedited discovery and a trial to test it. In the ensuing litigation, the Governor produced thousands of pages of documents, waived applicable privileges, and permitted some of his top advisors—including his General Counsel—to sit for depositions and trial examination. The result was a three-day trial over the propriety of a quintessential matter of internal state governance: the Governor's decision to suspend a state official for violating his state constitutional obligations.

After all that, not even the district court could bring itself to grant Mr. Warren's extraordinary request to re-install him as the chief prosecutor for Hillsborough County.

3

Along the way to that result, the district court was critical of the Governor and made several determinations adverse to him. But its bottom line was that the Governor—as he had contended all along—disciplined Mr. Warren for his *conduct* as a prosecutor, and that he would have done so quite apart from what the district court erroneously viewed as First Amendment protected activity. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977).

Mr. Warren now appeals. But he bears a heavy burden to show that the district court clearly erred, and he has not shouldered it. The district court's finding is backed by an extensive trial record—largely developed by Mr. Warren himself, though he now contends that the district court should have ignored much of it—and detailed factual findings. The errors the district court did make do not help Mr. Warren's cause on appeal: The district court should never have sent this case to trial in the first place. This is a state constitutional dispute that the federal courts have no business refereeing. That would be reason enough to affirm even apart from the district court's finding.

The judgment should be affirmed.

## BACKGROUND

### I.    Legal background

The Governor of Florida is vested with the State's "supreme executive power," which includes broad authority to supervise state executive officers through the Governor's power to "take care that the laws be faithfully executed." Fla. Const. art. IV, § 1(a). Part of that power is that the Governor "may suspend from office any state

4

officer not subject to impeachment." *Id.* § 7(a). Permissible bases for suspension are "malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony." *Id.* The final decision to "remove" or "reinstate" a suspended officer, however, lies solely with the Florida Senate, which may do so "in proceedings prescribed by law." *Id.* § 7(b).

The state officers subject to the Governor's supervisory and suspension authority include Florida's 20 state attorneys, who prosecute crime for the State in Florida's trial courts and perform other duties prescribed by the Florida legislature. *Id.* art. V, § 17. State attorneys are elected to four-year terms by constituents within the State's 20 judicial circuits. *Id.*; Fla. Stat. § 27.01. But a state attorney "is not merely a prosecuting officer in the circuit in which he is elected." *Austin v. State ex rel. Christian*, 310 So. 2d 289, 292 (Fla. 1975). "[H]e is also an officer of the State in the general matter of enforcement of the criminal law," and thus exercises his responsibilities under the Governor's supervision through his authority to execute the State's laws. *See id.* The Governor may thus assign a state attorney to assist another state attorney with official duties and reassign classes of cases handled by one state attorney to another. *See id.*; Fla. Stat. §§ 27.14(1), 27.15(1).

Two grounds for suspending a state attorney are relevant here: "neglect of duty" and "incompetence." Fla. Const. art. IV, § 7(a). The Florida Supreme Court has defined neglect of duty as "the neglect or failure" of "a public officer to do and perform some duty" required by "his office." *Israel v. DeSantis*, 269 So. 3d 491, 496 (Fla. 2019) (Lagoa,

J.). It has noted that "incompetence" may "arise from gross ignorance of official duties or gross carelessness in the[ir] discharge." *Id.* It has observed that a Florida prosecutor's "blanket refusal" to enforce the law "embodies[] at best a misunderstanding of Florida law." *Ayala v. Scott*, 224 So. 3d 755, 759 (Fla. 2017). And it has upheld the Governor's authority to suspend a state prosecutor for exercising prosecutorial discretion in a way that the Governor views as not faithfully executing Florida law. *See State ex rel. Hardee v. Allen*, 172 So. 222, 224 (Fla. 1937).

## II.    Factual background

**A.** Plaintiff Andrew Warren was State Attorney for Florida's Thirteenth Judicial Circuit, which spans Hillsborough County. Op. Br. 7. During his tenure, he announced his position, and promulgated various policies reflecting, that he could lawfully refuse to prosecute criminal conduct that, in his view, the Florida legislature should not have criminalized.

In March 2021, for example, Mr. Warren finalized a written policy that his prosecutors "presumptively" would not prosecute dozens of misdemeanor offenses, including trespass at a business location, disorderly intoxication, and prostitution. App. 514. That presumption could be overcome only if the case raised "significant public safety concerns," even if a threat to public safety was not an element of the offense. *Id.*; *see also* DE144-4 at 22–23. The "presumption" functioned categorically in practice: If no "public safety" concern existed, the crime would not be prosecuted. *Id.* at 55, 57–59.

In June 2021, Mr. Warren signed an open letter alongside other local prosecutors, sponsored by a group called "Fair and Just Prosecution" (FJP), condemning state legislatures that criminalized performing gender-reassignment surgeries and the like on children (though Florida had no such criminal laws then). App. 381–88, 695 (the transgender pledge). Mr. Warren stated that such laws "do not promote public safety" and "serve no legitimate purpose." App. 383. He "pledge[d] to use [his] settled discretion" not to enforce such laws, *id.*, no matter a legislature's judgment otherwise.

Despite paying lip service to individualized prosecutorial discretion in a memorandum to his office in December 2021, App. 448, Mr. Warren in January 2022 established another presumptive non-prosecution policy, App. 645. That policy instructed his prosecutors not to prosecute any crime—even a serious felony—revealed after an individual is stopped for a bicycle or pedestrian infraction unless the crime posed "a direct threat to public safety." App. 512.

Mr. Warren's presumptive non-prosecution policies alarmed Hillsborough County Sheriff Chad Chronister, who had donated to Mr. Warren's 2016 election campaign. DE144-1 at 66–67, 142–43; App. 1114–15. Through experience with those policies, the Sheriff's office understood them to mean that Mr. Warren's office would categorically refuse to prosecute the identified conduct. DE144-1 at 94–95, 97, 102–03, 127–28, 140. Because they knew the conduct would not be prosecuted, Sheriff Chronister's deputies would not even make arrests for those crimes. DE144-4 at 140–41. Sheriff Chronister complained to Mr. Warren about the bicyclist-and-pedestrian policy,

noting that the policy "empower[ed]" the commission of "additional crimes," and ex-horting Mr. Warren to exercise individualized prosecutorial discretion. DE135-14 at 2.

**B.** In early 2022, Mr. Warren's policies and practices drew the attention of the Governor's staff. In December 2021, the Governor had asked his public safety advisor, Larry Keefe—former U.S. Attorney for the Northern District of Florida—whether any state attorneys were refusing to enforce the law, and Mr. Keefe offered to look into the matter. App. 737–38. By January or February 2022, Mr. Keefe's discussions with Florida's law-enforcement community had focused him on Mr. Warren, who was reputed to be a prosecutor who refused to enforce the law. App. 742–43. Mr. Keefe then reached out to Sheriff Chronister, who sent Mr. Keefe a 126-page packet of written materials that included some of Mr. Warren's written non-prosecution policies, along with other evidence that, in Sheriff Chronister's view, demonstrated Mr. Warren's disregard for Florida law. App. 758–60; DE144-1 at 58, 77–81; DE136-10. Mr. Keefe also spoke with former Tampa police chief Brian Dugan, who echoed Sheriff Chronister's concerns. App. 754.

Mr. Keefe's inquiry "lay dormant until June 2022," Op. Br. 12, when he and the Governor's General Counsel, Ryan Newman, were "alert[ed]" to a media report that Mr. Warren had, in the story's telling, "vowed not to prosecute abortion," DE112-34 at 1–2. That report cited another open FJP letter Mr. Warren had signed in which he "commit[ted]" to "decline to use [his] office's resources to criminalize reproductive health decisions" and "refrain from prosecuting" individuals who "provide[] or support

8

abortions." App. 390 (the abortion pledge). The letter expressed Mr. Warren's view that, while a legislature "may decide to criminalize personal healthcare decisions," he was "obligated to prosecute only those cases that serve the interests of justice and the people"—cases, in other words, not involving abortion crimes. App. 392. Mr. Warren's then-chief of staff, Gary Weisman, understood the abortion pledge to reflect Mr. Warren's official policy that the state attorney's office would not prosecute abortion cases. DE113-24 at 1; DE146 at 537, 545, 574.

Mr. Keefe proposed to Mr. Newman that the Governor suspend Mr. Warren. App. 941, 1087. At first, Mr. Newman was reluctant to recommend that course, chiefly because Florida's recently enacted 15-week abortion ban was facing a legal challenge. App. 1086–87, 1159. But after realizing that Mr. Warren's abortion pledge immunized providers who perform abortions that were plainly constitutionally unprotected, Mr. Newman decided to recommend suspension. App. 1087, 1164–66.

Mr. Keefe prepared several drafts of a proposed suspension order to present to the Governor, the first of which he produced no later than July 13, 2022. App. 527–59. He sent his draft to Ray Treadwell, the Governor's Chief Deputy General Counsel, App. 464–87, who refined it along with Mr. Newman, App. 1017, 1109, 1141–42; DE112-25. Mr. Treadwell recommended removing from Mr. Keefe's draft references to two FJP letters concerning the death penalty and election security, because Mr. Treadwell did not believe them to be lawful bases for a suspension under Florida law. App. 1012. He also proposed removing reference to Mr. Warren's association with

9

George Soros. App. 518–25, 1012–13. Mr. Treadwell did not anticipate that the suspension order would be challenged in a First Amendment retaliation action, App. 949, 1017, and Mr. Newman's focus was likewise on whether the suspension was lawful under Florida law, App. 1098–1100, 1102–05.

The Governor knew nothing of the proposal to suspend Mr. Warren until Mr. Newman first presented it to him on July 26, 2022. App. 1096–97, 1101, 1124. Later, Mr. Newman provided the Governor a draft suspension order that the Governor edited, which contained no references to the death-penalty and election statements or to George Soros. App. 500–09, 1019–20, 1111. Instead, the draft proposed suspending Mr. Warren because of his abortion and transgender pledges and because of his presumptive non-prosecution policies. App. 502–06.

On August 4, 2022, the Governor signed the final executive order suspending Mr. Warren on those bases. App. 342–51. The order explained that Mr. Warren's "avowed refusal to enforce certain criminal laws" constituted "neglect of [Mr. Warren's] duty" to exercise his case-by-case discretion, App. 348, and that his "public proclamations of non-enforcement further demonstrate his incompetence and lack of judgment," App. 349. The order appointed Judge Susan Lopez to temporarily serve as State Attorney in Mr. Warren's place, App. 351, as the Florida Constitution authorizes, *see* Fla. Const. art. IV, § 7(a).

### III.  Proceedings below

Rather than contest his suspension in the Florida Senate, Mr. Warren immediately hired his former communications director, Grayson Kamm, as a media consultant at the rate of $15,000 per month, DE144-2 at 13, 15–16, and launched a fundraising website, *Andrew Warren Legal Fund*, https://andrewwarrenfl.com. This First Amendment retaliation action quickly ensued. App. 34–60. In Count I, Mr. Warren alleged that the Governor violated the First Amendment by retaliating against him for the abortion and transgender pledges. App. 50–55. In Count II, Mr. Warren claimed that his suspension did not comply with Florida law. App. 55–59.

Mr. Warren moved for a preliminary injunction, DE3, and the Governor moved to dismiss, contending among other things that Mr. Warren's pledges were not protected by the First Amendment and that the district court lacked authority to interfere with Florida's pending removal proceedings, App. 111–47. The district court dismissed Count II under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984) (federal courts may not enjoin state officials to comply with state law). App. 156–58. But it declined to dismiss Count I, concluding that the pledges were protected speech. App. 160–70, 179. The district court also declined to issue a preliminary injunction, App. 178, and refused to certify for interlocutory appeal its order denying the Governor's motion to dismiss, DE74 at 2–4. The court then ordered expedited discovery, setting trial for November 29, 2022. DE69 at 3.

11

After a three-day bench trial, the district court ruled for the Governor. App. 1279. It reiterated its conclusion that the First Amendment protected the abortion and transgender pledges. App. 1250–55. And it rejected the Governor's argument that Mr. Warren's retaliation claim failed at the threshold because he failed to establish that the Governor lacked probable cause to suspend him under *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). App. 1247–50.

Remarkably, the district court also opined that Mr. Warren's suspension violated Florida law—the state-law claim it had previously dismissed for lack of jurisdiction. It rejected the characterization of Mr. Warren's pledges as being "blanket nonprosecution policies," and claimed that Mr. Warren thus had not committed suspendable offenses. App. 1221, 1232–35, 1238–39, 1278.

But while the district court faulted the Governor in some respects, it ultimately rejected Mr. Warren's First Amendment claim. Applying the two-step framework established by *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), the district court concluded that the Governor was substantially motivated by the transgender and abortion pledges in suspending Mr. Warren and therefore had retaliated against Mr. Warren for protected speech. App. 1262. But under *Mount Healthy*'s second step, the district court found that the Governor would have suspended Mr. Warren for reasons unprotected by the First Amendment—in other words, that retaliation did not drive the suspension. App. 1262–78.

This appeal followed.

12

## STANDARD OF REVIEW

This Court generally reviews the denial of a "permanent injunction for an abuse of discretion," the "underlying findings of fact for clear error," and the underlying "conclusions of law *de novo*." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009). But under the "constitutional fact" doctrine, *see ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1203 (11th Cir. 2009), First Amendment retaliation claims are unique. In reviewing whether activity was protected by the First Amendment, this Court reviews both the law and the facts de novo. *See Otto v. City of Boca Raton*, 41 F.4th 1271, 1272 (11th Cir. 2022) (Grant, J., concurring in denial of rehearing en banc). But whether a defendant retaliated *because of* First Amendment protected activity—i.e., the defendant's ultimate motivation for acting—is a fact question reviewed for clear error. *See ACLU*, 557 F.3d at 1203–05; *Bickel v. Burkhart*, 632 F.2d 1251, 1256 n.7 (5th Cir. 1980).

## SUMMARY OF ARGUMENT

Mr. Warren challenges on appeal the district court's finding that his suspension was not ultimately caused by any First Amendment retaliation. But Mr. Warren fails to identify any error in that finding, let alone clear error; and the district court's judgment is supportable on several alternative grounds in any event.

**I.** Mr. Warren's initial ground for appeal is premised on his misreading the district court's order to have held that the Eleventh Amendment barred the court from granting relief under the First Amendment. The district court in fact rejected Mr.

13

Warren's First Amendment claim on the merits. The district court relied on the Eleventh Amendment only to dismiss Mr. Warren's state-law claim.

**II.** The district court did not clearly err in finding that the Governor would have suspended Mr. Warren for reasons unprotected by the First Amendment—said differently, that the Governor would have made the same decision regardless of any First Amendment protected activity. The Governor's suspension order explained from the start why he suspended Mr. Warren: his inadequate performance as a prosecutor. The order cited several examples of Mr. Warren's neglect and misunderstanding of his duty—including a pledge not to enforce abortion crimes and a series of presumptive non-prosecution policies that effectively rewrote Florida law. The district court correctly held that those factors implicated Mr. Warren's *conduct*, not any protected speech or political affiliation. It also rightly recognized that any political goodwill the Governor expected to follow did not implicate the First Amendment either. And relying on an extensive trial record compiled largely at Mr. Warren's insistence, the district court correctly found that Mr. Warren would have been suspended for those unprotected reasons standing alone.

Mr. Warren does not lay a glove on that ruling. He claims that any political benefit the Governor may have anticipated itself turned on retaliating against Mr. Warren's protected political beliefs. But the district court found that any expected political benefit stemmed solely from thwarting a prosecutor who was conducting himself in a lawless way. He also is quite wrong to assert that the district court should have disregarded

evidence establishing the Governor's same-decision defense—the Governor clearly no-tified Mr. Warren that he intended to rely on such evidence and certainly never disa-vowed any of it. Nor can Mr. Warren find error in the district court's decision to rely on evidence that he himself submitted. And Mr. Warren is incorrect that the Governor's motives could not be the basis for a same-decision defense if they violated state law.

**III.** This Court may also affirm the judgment on several alternative grounds.

**A.** For one, Mr. Warren's challenge to Florida's suspension process involves the same causal difficulties and policy considerations identified in *Nieves v. Bartlett* and sim-ilar cases. 139 S. Ct. 1715, 1727 (2019). He was thus required to make the "threshold showing," *id.*, that the Governor lacked probable cause to suspend him—a requirement he flunked.

**B.** Next, the transgender and abortion pledges were unprotected speech three times over: They were government speech, *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022); speech that interfered with Mr. Warren's job, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); or speech only inci-dentally infringed upon by a valid conduct restriction (Florida's suspension standard), *Rumsfeld v. F. for Acad. & Institutional Rts., Inc. (FAIR)*, 547 U.S. 47, 62 (2006).

Mr. Warren's political association, too, was unprotected because he is a policy-maker. *Elrod v. Burns*, 427 U.S. 347, 367 (1976) (plurality op.); *Branti v. Finkel*, 445 U.S. 507, 518 (1980).

**C.** Finally, the district court lacked equitable authority to re-install Mr. Warren because federal courts lack the power to interfere with a state's chosen process for suspending and removing its own officials. *Baker v. Carr*, 369 U.S. 186, 231 (1962).

## ARGUMENT

### I.   The district court did not rule that the Eleventh Amendment foreclosed Mr. Warren's First Amendment claim.

In his opening salvo, Mr. Warren argues (at 31–33) that the district court erred in using the Eleventh Amendment to deny him relief on his First Amendment claim. The district court did no such thing. The court rejected Mr. Warren's First Amendment claim on the merits. *See* App. 1256–78 (applying *Mt. Healthy*). It held that the Eleventh Amendment precluded it from granting relief only on Mr. Warren's *state-law* claim. App. 1225, 1235 (citing *Pennhurst*). To drive the point home, the district court directed the clerk to enter a judgment dismissing Mr. Warren's First Amendment claim "with prejudice," but dismissing the claims "arising under state law . . . without prejudice based on the Eleventh Amendment." App. 1279. The Eleventh Amendment had nothing to do with Mr. Warren's First Amendment defeat.

### II.   The district court did not clearly err in finding that the Governor would have suspended Mr. Warren for reasons unprotected by the First Amendment.

After a three-day bench trial laying bare the internal deliberations in the Governor's office over suspending Mr. Warren, the district court rejected Mr. Warren's First Amendment retaliation claim. In doing so, the court applied the two-step framework

the Supreme Court established in *Mount Healthy*. *See* App. 1255–56. Under *Mount Healthy*, the plaintiff must first show that protected activity was a substantial factor in the challenged decision. App. 1255. If that burden is met, the defendant may defeat the First Amendment claim by showing that he would have made the same decision regardless of the protected activity. *Id.*

Applying this framework, the district court concluded that the Governor had acted in part based on protected activity. The district court pointed to Mr. Warren's pledges not to prosecute crimes implicating abortion and gender-reassignment surgery and the explanations Mr. Warren provided for why he would refuse to enforce those laws. App. 1256–61. The district court also concluded that the Governor was motivated by Mr. Warren's political affiliation in suspending him. App. 1269–71.

The district court nonetheless found that the Governor would have suspended Mr. Warren, despite that protected activity, for four reasons unprotected by the First Amendment: Mr. Warren's performance as a prosecutor, his commitment not to prosecute abortion crimes, his presumptive non-prosecution policies, and the anticipated political benefit associated with suspending a prosecutor who refused to enforce Florida law. App. 1276–77. The district court carefully distinguished those permissible motives from what it believed were impermissible ones. App. 1273. It correctly noted that Mr. Warren's "reform" prosecutorial policies—including his presumptive non-prosecution policies and his pledge not to prosecute abortion cases—were conduct, not protected speech. App. 1264–65, 1268–69. The court also rightly observed that the First

17

Amendment does not prohibit the Governor from seeking "political benefit" for suspending prosecutors who refuse to enforce the law. App. 1277; *see also* App. 1271. And the court found that the Governor's decision would have happened anyway based on the permissible factors quite apart from what it saw as impermissible ones. App. 1273. The district court thus concluded that Mr. Warren's assertedly protected activity did not ultimately cause his suspension. *See Mt. Healthy*, 429 U.S. at 285–86.

Mr. Warren argues that this analysis suffers from three flaws. He is mistaken.

### A.    The district court did not clearly err in finding that any motives indispensable to the suspension were unprotected.

Mr. Warren first attacks (at 44–51) the district court's finding that the Governor would have suspended Mr. Warren anyway in part for "political benefit." He says (at 44, 47) that this motive "was itself a blatant violation of the First Amendment" because any anticipated political benefit stemmed from suspending Mr. Warren for his protected political "viewpoints."

Mr. Warren misunderstands the district court's decision. The court carefully distinguished and separated Mr. Warren's reform advocacy and ideology—protected activity, by the district court's lights—from Mr. Warren's "performance" as a reform prosecutor—plainly unprotected "conduct, not speech." App. 1264; *see* App. 1273; *FAIR*, 547 U.S. at 62. The district court also found that any anticipated political benefit flowed not from suspending Mr. Warren for his advocacy and ideology, but from suspending

a prosecutor who was "perform[ing]" his job in what the Governor viewed as a lawless way. App. 1277.

Nowhere did the district court suggest that this benefit was linked to stifling Mr. Warren's "political beliefs," Op. Br. 45, or "'reform prosecutor' ideas," Op. Br. 46. It instead flowed from suspending a "prosecutor whose *performance* did not match the Governor's law-and-order agenda," App. 1277—an agenda ratified by over 4 million Floridians, twice.[1] The district court's point was simply that the Governor could permissibly suspend Mr. Warren for his conduct as a prosecutor—for "[r]unning [his] office" inconsistent with "law-and-order," App. 1264—and could "maximize the political benefit from [that] decision" because the underlying activity was itself unprotected, App. 1244.

Mr. Warren's real quarrel with the district court is not legal, but factual. He argues (at 48–49 & n.13) that the district court clearly erred in finding that the Governor suspended him based on his conduct as a prosecutor. An avalanche of evidence, however, showed exactly that. As the district court found, App. 1276, the Governor was motivated by Mr. Warren's pledge not to prosecute abortion cases, which the suspension order identified as a sufficient basis for the suspension standing alone, App. 348, and

---

[1] *Ron DeSantis (R) won the race for Florida Governor*, Politico, https://www.politico.com/2022-election/results/florida/statewide-offices/ (Feb. 2, 2023); *Florida Governor Election Results 2018*, Politico, https://www.politico.com/election-results/2018/florida/governor/ (last visited Apr. 12, 2023).

which the district court agreed could be construed as a pledge not to prosecute abortion cases, App. 1238–39. Much evidence confirmed that obvious fact, including the testimony of Mr. Warren's own chief of staff, who characterized Mr. Warren's pledge as an official policy of the state attorney's office to refuse to prosecute abortion crimes. DE146 at 537, 591; *see also, e.g.*, App. 529–30, 857, 986, 998, 1087–88, 1144–45.

Contrary to Mr. Warren's suggestion (at 48), the district court likewise found that Mr. Warren's presumptive non-prosecution policies motivated the suspension—hardly a jaw-dropper since those policies, too, were a centerpiece of the executive order. App. 1276, 1278. Much evidence backed that finding as well. App. 769–70, 776–77, 969–73, 1093–95, 1101–06; DE119-2 at 119, 150–51, 200–01; DE146 at 704, 708–09. And the district court found too that the Governor was otherwise motivated by his dissatisfaction with Mr. Warren's prosecutorial conduct, noting, among other things, that Sheriff Chronister provided the Governor's staff a 126-page packet of material containing specific cases that should have been prosecuted more aggressively, App. 1237, 1274; *see also* App. 758–60; DE144-1 at 58, 77–81; DE136-10, and that, at a press conference after the suspension, the Governor "presented speaker after speaker who criticized Mr. Warren's policies and cited prosecutorial decisions" with which they disagreed, App. 1277; *see also* App. 1114–15. The finding that the Governor was motivated by Mr. Warren's conduct as a prosecutor is thus amply supported by the record, and certainly is not clearly erroneous.

**B.    The district court did not clearly err in accounting for the trial evidence establishing the same-decision defense.**

Mr. Warren is also mistaken (at 37–42) that the district court should have ignored the extensive evidence proving that the Governor did not violate the First Amendment. He first protests (at 37–40) that the facts at trial deviated from how the Governor pleaded the same-decision defense in his answer. That hyper-formalistic understanding of civil pleading is not the law: The Governor pleaded in his answer that "[r]egardless of any protected speech," he "would have suspended" Mr. Warren "anyway," App. 193, which, under the standard this Court has applied to same-decision-defense answers, was more than enough to put Mr. Warren "on notice that one or more reasons other than retaliation" would be at issue at trial, *Chambless v. La.-Pac. Corp.*, 481 F.3d 1345, 1349 (11th Cir. 2007). Answers need at most provide "fair notice" of what is to be proven,[2] and the Governor's did just that. Indeed, this Court has held that an answer can even omit an affirmative defense if the plaintiff has actual notice of it. *See Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988). Mr. Warren's own statement of the issues to be tried in the pretrial stipulation showed that he was on notice. DE123 at 6.

---

[2] *E.g.*, *Crutcher v. MultiPlan, Inc.*, 22 F.4th 756, 765–66 (8th Cir. 2022); *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 218–19 (3d Cir. 2017); *LSREF2 Baron, LLC v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014); *Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 546–47 (6th Cir. 2012). *But see GEOMC Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019).

Mr. Warren notes (at 37) that the Governor's answer also provided additional factual detail about the same-decision defense: that he suspended Mr. Warren for his "blanket refusal to prosecute certain cases," which the district court concluded was "false." But in mentioning Mr. Warren's "blanket refusal," the Governor was referring to Mr. Warren's presumptive non-prosecution policies and his pledge not to prosecute abortion crimes—the causal significance of which was extensively litigated at trial. App. 115–17, 125–28, 1168–71; DE127 at 10–16. Nor did the district court reject the Governor's reliance on those policies—quite the opposite, it found that the Governor *was in fact* motivated by them, App. 1273, 1278; it just disagreed with the Governor that those policies were "blanket" ones that justified the suspension under Florida law. App. 1221, 1235, 1263–64. None of that adds up to unfairness or a lack of notice.

Mr. Warren is also wrong (at 40–42) that the district court should have averted its eyes from evidence favorable to the Governor on the ground that the Governor "disavowed" being motivated by any expected political benefit. The Governor at most "disavowed" only Mr. Warren's contention (mistakenly accepted by the district court) that he was motivated by Mr. Warren's political ideology and protected speech. App. 1209. The Governor believes (and certainly has never denied) that upholding the rule of law by suspending Mr. Warren was both the right thing to do and supported by the public.

In any event, Mr. Warren cannot complain about the district court's reliance on evidence of political benefit—*Mr. Warren* submitted evidence on and actively litigated

whether the Governor acted for the "impact and buzz [of] the suspension." DE138 at 15:15–17. When, as here, a party's "own evidence discloses the defense," that party "necessarily indicat[es] his express consent" to try an issue. *Jones v. Miles*, 656 F.2d 103, 107 n.7 (5th Cir. Unit B Aug. 31, 1981); *see also United States v. Bornscheuer*, 563 F.3d 1228, 1238 (11th Cir. 2009) (party which introduces allegedly improper evidence cannot complain on appeal). More fundamentally, the district court was not bound to accept the facts as posited by the pleadings. "The court's role is to get it right, not to choose which side's argument is better and adopt it lock, stock, and barrel." *United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1350 (11th Cir. 2019). The court therefore did not need to "accept either side's view of the facts and law. Nor should [it] have done so." *Id.* It could instead find the facts as it "believe[d]" them to be, *id.*, which it did.[3]

---

[3] Were Mr. Warren correct that the Governor's answer did not adequately notify him of the issues to be tried in the Governor's same-decision defense, it would follow that the district court erred in considering whether Mr. Warren was suspended based on political affiliation in contravention of the *Elrod-Branti* doctrine. *See* App. 1269–71. Mr. Warren's complaint alleged only that the Governor "suspended Warren from his elected office because he signed the [transgender and abortion pledges]," which Mr. Warren claimed were protected speech. App. 50–55. Mr. Warren's complaint did not assert a claim for relief based on his political affiliation with "[George] Soros" and the "Democratic Party" and did not mention the *Elrod-Branti* doctrine. So if this Court accepts Mr. Warren's argument about the Governor's answer, it should also hold that the district court erroneously considered evidence of Mr. Warren's political affiliation.

**C.    Mr. Warren cannot establish his First Amendment claim with a purported violation of state law.**

Finally, Mr. Warren errs in claiming (at 42–44) that the four unprotected reasons cited by the district court were not "legitimate" because, in the court's view, they violated Florida law. Even accepting that dubious premise, a reason's propriety under state law says nothing of its legitimacy in a *First Amendment* retaliation case. *See Nicholas v. Penn. State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000) (Alito, J.); *Bundren v. Peters*, 732 F. Supp. 1486, 1497 (E.D. Tenn. 1989); *see also Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011) (Posner, J.). In *Nicholas*, for example, the plaintiff was fired for reasons that potentially breached a contract under state law. The Third Circuit, per then-Judge Alito, nonetheless rejected the argument that a same-decision defense failed as "illegitimate" on that basis. *See* 227 F.3d at 144.

That makes sense. The rationale of the same-decision defense is to avoid "plac[ing] an employee in a better position" for partaking in "constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy*, 429 U.S. at 285. But if Mr. Warren had a First Amendment retaliation claim because some of his conduct was protected by non-First Amendment law—federal employment law or state law, say—then he would be placed in a better position, because he would have a First Amendment remedy on top of remedies available under other legal sources. In fact, Mr. Warren is pursuing his state-law remedies right now, having challenged his suspension

24

in a quo warranto proceeding before the Florida Supreme Court. *Warren v. DeSantis*, No. SC23-247 (Fla. filed Feb. 15, 2023).

An alternative ground's legitimacy under *Mount Healthy* thus does not turn on extraneous legal authorities. Section 1983, after all, is not a "font of tort law" that draws in countless legal issues that federal courts have no business resolving. *E.g.*, *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Nor are federal courts "super personnel department[s]" equipped to resolve whether a defendant's reasons comply with all manner of state law and internal business policy. *Gogel v. Kia Motors Mfg., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc). An alternative basis for suspension therefore is "legitimate" if it is unprotected by the First Amendment. *See Mt. Healthy*, 429 U.S. at 285 (adverse action is valid if it would have been taken absent "protected conduct").

Mr. Warren (at 42–43) distorts this Court's precedent in suggesting that it held otherwise in *Stanley*. All this Court said there is that "a government employer must show that *the* legitimate reason . . . motivated it to make" the "employment decision." *Stanley v. City of Dalton*, 219 F.3d 1280, 1293 (11th Cir. 2000) (emphasis added). The surrounding statements make clear that the Court's point was that "the legitimate reason" must not be First Amendment "protected conduct" or "protected speech." *Id.*

In sum, the district court did not clearly err in finding that the Governor would have suspended Mr. Warren regardless of protected activity.

## III.    The Court may affirm the judgment on other grounds.

The Court need go no further to affirm. But it may also affirm on several alternative grounds. Each of those grounds establishes that Mr. Warren's retaliation claim—which attempts to elevate a state-law dispute between state constitutional officers into a matter of federal constitutional law—should have been dismissed without a trial.

### A.    Mr. Warren's retaliation claim fails because he did not show that the Governor lacked probable cause to suspend him.

In certain retaliation cases challenging the government's institution of legal process, courts require the plaintiff to make a "threshold showing" that the government lacked probable cause to initiate the legal process. *See Nieves*, 139 S. Ct. at 1723, 1727. That "no-probable-cause" requirement properly applies here, and Mr. Warren failed to meet it.

#### 1.    Mr. Warren was required to show that the Governor lacked probable cause to suspend him.

**a.** When a plaintiff claims that the government retaliated by instituting otherwise valid legal processes against him based on First Amendment protected activity, vexing causation problems arise. *See id.* at 1723–25; *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1304–06 (11th Cir. 2019). Protected expression "may convey vital information" about whether an individual has violated the law, making it a "wholly legitimate consideration" for the government. *Nieves*, 139 S. Ct. at 1723–24; *see also DeMartini*, 942 F.3d at 1305–06. Instituting legal process also tends to involve multiple government actors, so the "chain of causation" is substantially "more complex" than in a mine-run

26

retaliation case. *DeMartini*, 942 F.3d at 1304. And the official instituting legal process is often entitled to a "presumption of regularity" that courts will "not lightly discard" given judicial respect for "executive discretion," *Hartman v. Moore*, 547 U.S. 250, 263 (2006), further blurring the line between a good-faith decision and one fueled by animus.

Compounding the problem, challenges to legal process can thwart government efficacy. They hinge on an official's purportedly improper "state of mind," which is "easy to allege and hard to disprove." *Nieves*, 139 S. Ct. at 1725 (cleaned up). "[A]ny inartful turn of phrase or perceived slight during a legitimate [use of legal process]" can lead to "years of litigation," "dampen[ing] the ardor of all but the most resolute" public official. *Id.* (cleaned up).

When those concerns are present, courts rely on a time-tested threshold requirement for establishing improper use of legal process: "plead[ing] and prov[ing] the absence of probable cause." *Id.* at 1724–25. That requirement simplifies the causation inquiry because probable cause's "absence" or "presence" is "high[ly] probative" evidence of retaliatory animus or its lack thereof. *Hartman*, 547 U.S. at 265. If probable cause is lacking, the evidence will often be sufficient to overcome the difficulties in a retaliatory-legal-process case. *Id.* at 261, 265. But when probable cause exists, it is "weighty evidence" that animus did not drive the enforcement action. *Nieves*, 139 S. Ct. at 1724. This requirement also can be implemented "with little or no added cost" because the "existence of probable cause will be at issue in practically all" retaliatory-legal-

27

process cases. *Id.* at 1723 (cleaned up). And applying a no-probable-cause requirement in such circumstances tracks our common-law tradition, *see id.* at 1726 ("When defining the contours of a claim under § 1983, [courts] look to common-law principles[.]"), because the "closest analog[ies]" to retaliatory-legal-process claims at common law all required that the plaintiff prove a lack of probable cause, *see DeMartini*, 942 F.3d at 1308 (analyzing tort of "wrongful civil proceedings"); *Nieves*, 139 S. Ct. at 1726 (same for "false imprisonment" and "malicious prosecution").

**b.** Those rationales apply to Mr. Warren's retaliatory-suspension claim. That claim presents the same causal complexities present in other cases where courts have applied a no-probable-cause requirement. *See Nieves*, 139 S. Ct. at 1723–24 (retaliatory arrest); *Hartman*, 547 U.S. at 263 (retaliatory prosecution); *DeMartini*, 942 F.3d at 1303–04 (retaliatory civil process); *McBeth v. Himes*, 598 F.3d 708, 719 (10th Cir. 2010) (retaliatory administrative proceedings).

As in those cases, speech is often a "wholly legitimate consideration" for a governor weighing whether to discipline a state attorney. *See Nieves*, 139 S. Ct. at 1724. Take *Ayala* for example. There, a Florida state attorney pledged at a press conference not to pursue the death penalty because doing so in her view was "not in the best interest of th[e] community or in the best interest of justice." *Ayala*, 224 So. 3d at 756. Yet it was legitimate for Governor Scott to consider those statements in deciding whether the "ends of justice" required that he reassign her death-eligible cases. *Id.* at 757–58. This case proves the point as well. Mr. Warren was suspended in part for "incompetence,"

28

App. 343–44; Fla. Const. art. IV, § 7(a), which includes "gross ignorance of official duties." *Israel*, 269 So. 3d at 496. An official's statements are often the only way to determine whether he has such a misunderstanding. *See Ayala*, 224 So. 3d at 759. Here, for example, the Governor reasonably viewed Mr. Warren's categorical transgender pledge—even though the Governor acknowledged that the pledge implicated no specific Florida law—to reflect that Mr. Warren fundamentally misunderstood the role of a Florida prosecutor: to enforce the law, not rewrite it. *See* App. 1089–90, 1156–57.

Alongside all that, the Governor's exercise of the suspension power is entitled to the "presumption of regularity" afforded to "executive discretion." *Hartman*, 547 U.S. at 263. And that presumption is particularly strong here because suspension is akin to a prosecutorial power, Fla. Stat. § 112.43 ("All suspensions" shall "be prosecuted by the Governor, the Governor's legal staff, or an attorney designated by the Governor."), and courts afford a "longstanding presumption of regularity" to "prosecutorial decisionmaking," *Hartman*, 547 U.S. at 263. As the Governor's staff noted, a suspension order is akin to a charging document filed by a prosecutor; it is not a final decision to remove an official, but simply initiates a Senate trial that tests whether the suspended official should be removed or reinstated. *See* App. 1008, 1105, 1174; *see also Israel*, 269 So. 3d at 495.

A suspension also typically involves multiple government actors and a "causal gap" between the decisionmaker (Florida's governor) and the actors who developed the suspension (his staff). *Reichle v. Howards*, 566 U.S. 658, 668 (2012). This case again proves

the point. The Governor of course made the final call to suspend Mr. Warren. But his staff—Mr. Newman, Mr. Treadwell, and Mr. Keefe—recommended the action and developed the suspension order. Their substantial involvement "widens the causal gap" between alleged animus and injury, *id.*, stretching the "chain of causation" further, *see DeMartini*, 942 F.3d at 1304.

A no-probable-cause requirement solves these problems. The presence of probable cause makes it more likely that a governor and his staff acted in good faith, and vice versa. *See Nieves*, 139 S. Ct. at 1724. A no-probable-cause requirement also "can be made mandatory with little or no added cost," *Hartman*, 547 U.S. at 265, both because it is "likely to be raised by some party at some point" given its probative value in proving or disproving animus, *see id.*, and because the suspended official will inevitably assess probable cause while preparing for the Senate trial, which will adjudge the suspension order's merit, *see* Fla. Senate Rs. 12.7, 12.9–15 (2022–2024); Fla. Stat. § 112.43.

Last, applying a no-probable-cause requirement here tracks the common law. Just as in *DeMartini*, the closest analogue to a retaliatory-suspension claim is the tort of wrongful civil proceedings. *See* 942 F.3d at 1308. Indeed, Mr. Warren challenges the Governor's "initiat[ion of removal] proceedings" through suspension, which "set[] the machinery of" Florida's removal process "in motion." *See* Restatement (First) of Torts § 674 cmt. a. That is precisely the injury that the tort of wrongful civil proceedings remedied historically. *See* DE127 at 29–30 (collecting historical sources). And like malicious prosecution and false imprisonment, *Nieves*, 139 S. Ct. at 1726, the tort of

wrongful civil proceedings required the plaintiff to prove a lack of probable cause for initiating the challenged legal process, *see* Restatement (First) of Torts §§ 674–75.

**c.** The district court erred in rejecting *Nieves*'s probable-cause requirement here. App. 1246–50. The court first said that "probable cause is a criminal-law concept," while a Florida suspension is more like a civil employment matter. App. 1248. But the no-probable-cause requirement is not limited to 1983 actions stemming from criminal matters. This Court applied *Nieves*'s reasoning to require a no-probable-cause showing in a retaliation suit challenging a town's civil RICO action. *DeMartini*, 942 F.3d 1308. The Tenth Circuit, too, has applied the requirement in retaliation challenges to civil administrative proceedings. *McBeth*, 598 F.3d 719. And again, the common-law tort of wrongful *civil* proceedings required a no-probable-cause showing. *See* Restatement (First) of Torts §§ 674–75.

The court next noted that *Mount Healthy*, not *Nieves*, continues to apply "in the employment context." App. 1248. But as the district court elsewhere impressed upon the Governor, App. 1222, Mr. Warren is not the Governor's employee, and this is not a mine-run employment case. Rather, this case involves Florida's decision to commence, in its sovereign capacity, a formal legal process for removing a state constitutional officer. It thus falls right in line with other cases challenging the institution of formal legal process in which courts have required a no-probable-cause showing.

Lastly, the court posited that a suspension differs from the retaliatory-arrest context considered in *Nieves* because police officers make "29,000 often-split-second arrests

31

per day"—a good reason to shield them from abusive litigation with a no-probable-cause requirement. App 1250. But as outlined above, the fast-paced context in which officers work was not the only or even the dispositive reason why *Nieves* instituted a no-probable-cause requirement. Relevant too was that speech can be a "wholly legitimate consideration" for instituting legal process, that many government actors may contribute to initiating legal process, that government actors are typically cloaked in a presumption of regularity, and that the common-law required a no-probable-cause showing for analogous torts. *Supra* 26–28. That is why *DeMartini*, (civil RICO), *McBeth* (administrative proceedings), and *Hartman* (prosecution), all extended *Nieves*'s reasoning to legal processes with a statelier pace.

In sum, the district court was wrong: Mr. Warren was required to establish that the Governor lacked probable cause to suspend him.

## 2.    Mr. Warren failed to show a lack of probable cause.

Mr. Warren did not meet that burden. Probable cause "requires no more than a reasonable belief" of "a chance that a claim may be held valid upon adjudication." *DeMartini*, 942 F.3d at 1300–01 (cleaned up). The question, then, is whether the Governor reasonably believed—"based on the facts and circumstances known to him"—that Mr. Warren neglected his duties or was incompetent. *See id.* at 1301. Because a Florida state attorney neglects his duties and exhibits incompetence when he declares a "blanket policy" of non-prosecution, *Ayala*, 224 So. 3d at 758–59; *Israel*, 269 So. 3d at 496, Mr.

Warren had to show that the Governor could not reasonably think Mr. Warren had made such blanket determinations here.

Mr. Warren failed. The abortion and transgender pledges teem with promises not to enforce certain Florida laws. *E.g.*, App. 76 ("[P]ledg[ing]" signatories to not enforce laws that they believe "serve no legitimate purpose"), 83 ("[W]e decline to use our offices' resources [to enforce abortion laws] and commit to exercise our well-settled discretion and refrain from prosecuting those" who "provide[] or support abortions."). If the public, FJP's promotional materials, FJP's director, and Mr. Warren's own chief of staff took them to mean that Mr. Warren would not prosecute various state crimes, DE127 at 40–41, 40 n.4; DE146 at 540–42, surely the Governor reasonably could too.

The same goes for Mr. Warren's presumptive non-prosecution policies. In issuing them, Mr. Warren refused to exercise case-by-case discretion absent the presence of a self-imposed additional element not found in the relevant statutes—the presence of a "public safety" risk. App. 512, 514; *see* DE144-4 at 55, 59. Those pronouncements, on their face, created a reasonable belief that Mr. Warren was refusing to exercise "case-by-case" prosecutorial discretion, *Ayala*, 224 So. 3d at 759—a belief bolstered by the many Florida law enforcement officials who identified Mr. Warren as a prosecutor who refused to enforce Florida law, App. 741–46, 834–41, and by the sheriff in Mr. Warren's jurisdiction who confirmed that consensus, App. 745, 754; DE119-2 at 62–64.

In response to all this, the district court concluded that the Governor's belief was unreasonable because he conducted a "deficient inquiry" into whether Mr. Warren truly

33

intended to follow through on these statements. App. 1247. But reasonableness does not require an investigator to ask a defendant who confesses if he really meant it. *Turner v. Williams*, — F.4th —, 2023 WL 2821728, at *13 (11th Cir. 2023) ("[If] the totality of the evidence points to a substantial chance of a crime, an officer is not 'required to sift through conflicting evidence or resolve issues of credibility.'"). Nor does it require the Governor to "explore and eliminate every theoretically plausible claim of innocence." *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004). Instead, it was entirely reasonable for the Governor to "rely on investigations by trusted third parties or subordinates," *Walden v. CDC*, 669 F.3d 1277, 1288–89 (11th Cir. 2012), and such investigations are often conducted "informally" where there is "an effort to arrive at a reasonably fair estimate of truth," *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1304 (11th Cir. 2007). The combined efforts of Mr. Keefe to determine whether Mr. Warren was enforcing Florida law and of Mr. Newman and Mr. Treadwell to discern whether the facts violated Florida's Constitution more than satisfied that standard.

Mr. Warren thus failed to make the "threshold" showing that the Governor lacked probable cause to suspend him. *See Nieves*, 139 S. Ct. at 1727.

### B. Mr. Warren failed to show that protected activity substantially motivated his suspension.

To carry his burden under *Mount Healthy*, Mr. Warren had to prove that protected activity substantially motivated his suspension. *See* App. 1255–56. He failed to make that showing.

34

1.    **Mr. Warren's transgender and abortion pledges were not pro-
      tected speech.**

The district court concluded that Mr. Warren proved a prima facie retaliation

case principally on the strength of Mr. Warren's abortion and transgender pledges. App.

1256–62.[4] Those pledges were unprotected for three reasons. First, they were unpro-

tected government speech. *See Garcetti*, 547 U.S. at 421; *Gundy v. City of Jacksonville*, 50

F.4th 60, 71 (11th Cir. 2022). Second, they impeded Mr. Warren's job duties. *See Picker-*

*ing*, 391 U.S. at 572. And finally, they constituted speech only incidentally burdened by

a valid conduct restriction—Florida's suspension standard. *See FAIR*, 547 U.S. at 62.

a.    **Government speech**

"The First Amendment [shields] private persons from encroachments by the

government on their right to speak freely," *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th

Cir. 2021) (cleaned up), but it "does not regulate government speech," *Mech v. Sch. Bd.*,

806 F.3d 1070, 1074 (11th Cir. 2015). If Mr. Warren spoke as the government, then, he

has no First Amendment claim. *Gundy*, 50 F.4th at 71.

---

[4] The district court did not conclude that the death-penalty and election FJP statements substantially motivated the suspension, although it did determine that they were a weak factor in the decision. App. 1265; *see Mt. Healthy*, 429 U.S. at 287 (noting that protected conduct must be a "substantial factor" in the decision to support a retaliation claim). Rightly so—they were mentioned only in Mr. Keefe's early drafts and were cut by the General Counsel's Office, so they never made their way to the Governor's desk. App. 1240–42; *see also* App. 500–09, 1011–12, 1171. This Court therefore need only consider whether the abortion and transgender pledges were protected speech. Regardless, the death-penalty and election statements were unprotected for many of the same reasons as the transgender and abortion pledges. *Infra* 35–45.

The Supreme Court has applied two distinct, yet related tests to determine whether expression is government speech. Under *Garcetti*, when an individual with an appropriate relationship to the government—characterized by "official duties" and hierarchical "discipline"—"make[s] statements pursuant to" those duties, the speaker has spoken for the government, not "as [a] citizen[] for First Amendment purposes." 547 U.S. at 421; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022) (describing *Garcetti* as a government-speech case). But even apart from *Garcetti*, speech can be government speech based on a "holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022). That inquiry turns on three factors: the "history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589–90; *Gundy*, 50 F.4th at 76.

Under either approach, the abortion and transgender pledges were government speech.

**i.** *Garcetti*'s first element is whether the speaker was a government employee, *see Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 677–78 (1996) (applying government-employee-speech doctrine to government contractors); *Houston v. Twp. of Randolph*, 559 F. App'x 139, 142 (3d Cir. 2014) (same for a volunteer firefighter). The second is whether the speech at issue was made "pursuant to [the individual's] official duties." *Garcetti*, 547 U.S. at 421. Both elements are met.

36

First, Mr. Warren was a state employee. "A state attorney in Florida is not merely a prosecuting officer in the circuit in which he is elected, he is also an officer of the State in the general matter of enforcement of the criminal law." *Austin*, 310 So. 2d at 292. The State paid his salary, *see id.*, and endowed him with a title, duties, and powers, Fla. Const. art. V, § 17. As with other state employees, Mr. Warren was also held accountable by other government officials. The Governor could suspend him for cause, and the Senate could remove him. *Id.* art. IV, § 7. And the Governor could reassign Mr. Warren's cases or assign other state attorneys to assist his prosecutions. Fla. Stat. § 27.14(1); *see also Austin*, 310 So. 2d at 292. So Mr. Warren was a state employee.

At *Garcetti* step two, courts consider whether the speech at issue "owe[d] its existence" to an official's job, *Alves v. Bd. of Regents of Univ. Sys.*, 804 F.3d 1149, 1160–62 (11th Cir. 2015), or was produced "in the course of *trying* to perform" the official's "ordinary role[]," *id.* at 1164–65. Here, the Governor reasonably concluded that Mr. Warren's pledges were pursuant to his duties as State Attorney. *See Waters v. Churchill*, 511 U.S. 661, 677 (1994) (plurality op.) (courts analyze retaliation claims based on "the facts as the [government] *reasonably* found them to be"). Indeed, Mr. Warren's duties included developing and announcing prosecutorial priorities, *cf.* Dep't of Just., Justice Manual, §§ 9-27.001–.130 (2023); *Ayala*, 224 So. 3d at 756–57 (state attorney announced at a press conference that she would not seek the death penalty); App. 612–14, 700–01, and these statements pronounced his official prosecutorial intentions.

In the abortion pledge, for example, Mr. Warren "commit[ted] to exercise [his] well-settled discretion and refrain from prosecuting those" who "provide[] or support abortions" and explained why he would do so. App. 83; *see also Ayala*, 224 So. 3d at 756–57 (similar statements). And in the transgender pledge, he similarly "pledge[d]" not to "promote the criminalization of gender-affirming healthcare." App. 74. He signed those pledges with his official signature and title, attributing them to his role as State Attorney. *See Garcetti*, 547 U.S. at 422 (a message's form informs whether it is "official"). And many besides the Governor took the pledges to be official pronouncements, including news outlets, DE112-35 at 2–4; *see also* DE127 at 40 n.4 (collecting examples), the organization that drafted the pledges, DE136-2 at 2; DE113-16 at 1–2; DE127 at 41, and Mr. Warren's own chief of staff, DE113-24 at 1; DE146 at 536–37, 540–42; *see also Shurtleff*, 142 S. Ct. at 1589–90 ("the public's likely perception" is critical to the "[government-speech] inquiry"). The Governor thus fairly concluded that these pledges announced Mr. Warren's official prosecutorial intentions.

The district court determined that Mr. Warren's pledges constituted mere "political statements that Mr. Warren subscribed to individually," not in any governmental capacity. App. 1260. But its support for that premise is weak. It first noted that neither pledge "mentioned Florida law." App. 1259. But that was because the pledges were drafted so like-minded prosecutors nationwide could commit to a common course of prosecutorial conduct within their local purviews—for Mr. Warren, that was Florida.

Next, the district court emphasized that the abortion and transgender pledges were not adopted through Mr. Warren's usual policymaking procedures. App. 1259–60. But those procedures were optional—as State Attorney, Mr. Warren could shift his office's direction at will. App. 700–01. Nor did his pledges need to be formalized to be official. The Florida Supreme Court, for instance, has held that a Florida prosecutor contravened her constitutional duties in announcing at a press conference that she would categorically refuse to seek the death penalty. *See Ayala*, 224 So. 3d at 756–58. What was true of a press conference is even more true of the public, written pledges to which Mr. Warren affixed his official title. App. 81, 90.

Last, the district court noted that the abortion and transgender pledges were never formally communicated to office staff. App. 1259–60. But again, statements need not be circulated formally to reveal Mr. Warren's official intentions. And in any event, Mr. Warren's accession to the joint statements were open and notorious events subject to extensive media coverage, which is how they came to the attention of the Governor's staff. DE112-35 at 2–4; DE127 at 40–41 & n.4.

Joining the pledges therefore was not "simply [a] political statement[.]" App. 1260. It was a public indicator of Mr. Warren's prosecutorial intentions.

The district court also concluded, relying on *Bond v. Floyd*, 385 U.S. 116 (1966), that Mr. Warren was immune from discipline for his pledges because he "was an elected official, not a rank-and-file employee." App. 1257. That too was wrong. A government official whose authority flows from the direct democracy of a local election is no less a

39

state employee who speaks for the government than one appointed by a higher-ranking elected official. "All political power is inherent in the people." Fla. Const. art. I, § 1. When an individual exercises some measure of that power, they do so as an employee of the State and its people and speak for the State no less than an official who is appointed.

That is particularly evident for Mr. Warren, who, as State Attorney, was responsible for enforcing the State's laws. *See Garcetti*, 547 U.S. at 421 (prosecutor enforcing state laws spoke for the government). That function creates clear official duties that an officeholder must fulfill, and hierarchical structures of "discipline" to course-correct should his performance be wanting. *See* Fla. Stat. § 27.14(1); *see also Austin*, 310 So. 2d at 292. Mr. Warren's former role as a state attorney is thus much like the many other government actors—police officers, first responders, and so on—who perform executive functions and are subject to *Garcetti*'s reach. *See Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (applying *Garcetti* to correctional officer); *see also Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 n.4 (8th Cir. 2007) (noting that *Garcetti* would apply to an elected treasurer).[5]

---

[5] In holding otherwise, the district court relied on out-of-circuit decisions refusing to apply *Garcetti* to elected legislators. *E.g.*, *Boquist v. Courtney*, 32 F.4th 764, 774–75, 779–80 (9th Cir. 2022). But legislators differ from executive and administrative officials carrying out the government's daily business. Legislators vote on policy and enact laws using *their own voice*. They do not ordinarily represent the government as an entity; they represent themselves and their constituents. That analysis does not apply to non-legislative elected officials. *E.g.*, *Parks*, 480 F.3d at 840 n.4; *see also infra* n.6.

40

**ii.** Apart from *Garcetti,* Mr. Warren also spoke for the State under the three-part government-speech test. *See Shurtleff*, 142 S. Ct. at 1589–90. Under that test, courts consider the "history" of the form of speech, whether the public would think that the government "endorse[s]" the speech, and whether the government "control[s]" the speech. *Gundy*, 50 F.4th at 77. Here, all three factors favor attributing to the government the speech in the transgender and abortion pledges.

Starting with history, when both "the medium" and "the message conveyed" are "traditionally associated with governments," history "weighs in favor of" government speech. *Id.* at 78. Here, the medium—a public announcement of how and why Mr. Warren intended to prosecute cases—has long been linked to government. *E.g.*, Peter L. Markowitz, *Prosecution Discretion Power at Its Zenith: The Power to Protect Liberty*, 97 B.U.L. Rev. 489, 498 & n.40, 499 & n.45 (2017) ("Broad categorical prosecutorial discretion policies were implemented by [many] early presidents."); *see also United States Attorneys' Manual & Resource Manual Archives,* Dep't of Just., https://www.justice.gov/archive/usao/usam/index.html (Department of Justice manual, first published in 1953, which conveys to the public how the federal government exercises prosecutorial discretion). There are few more "traditional" officials to communicate this type of government message than elected prosecutors, who have been a feature of American government for almost 200 years. *See* Michael J. Ellis, *The Origins of the Elected Prosecutor*, 121 Yale L.J. 1528, 1530 (2012).

41

Observers also would have reasonably believed that a chief prosecutor's announcement explaining a "pledge" to adopt a particular enforcement stance conveyed a government message. Several observers close to the issue thought exactly that. DE127 at 40–41, 40 n.4; DE146 at 540–42. That conclusion was only natural given that the "literal speaker"—Mr. Warren—was the government official in charge of prosecutions in his jurisdiction, a fact made quite clear given that Mr. Warren signed the statements "State Attorney 13th Judicial Circuit (Tampa), Florida," App. 81, 90; *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212 (2015) (placing "TEXAS" on license plate sufficed to establish government endorsement).

Finally, the government "maintain[ed] direct control over" Mr. Warren's "message[]" in two ways. *Gundy*, 50 F.4th at 79. At a granular level, Florida law prescribes a range of acceptable conduct for state attorneys. *See Ayala*, 224 So. 3d at 758–59. For example, a state attorney can be suspended for making statements reflecting that he fundamentally misunderstands his official duties—a charge of "incompetence" that was part of why Mr. Warren himself was suspended. *E.g.*, App. 69. By defining and restricting Mr. Warren's power to announce his office's prosecutorial priorities, the government "shaped th[ose] messages." *Shurtleff*, 142 S. Ct. at 1592. And by providing the Governor with a concrete means of checking Mr. Warren's power, the government exercised "active[] control[]." *Id.*

More directly, a state attorney himself speaks for the State within his jurisdiction. Such announcements flow from, and are thus controlled by, one who is "charged by

law with implementing a government's communicative agenda." *Id.* at 1599 (Alito, J., concurring in the judgment). There is no need to speculate whether the government controls speech when that speech comes from an "individual[] charged with speaking on behalf of the government act[ing] within the scope of [his] power to do so." *Id.* at 1598.[6]

### b. *Pickering* balancing

Even if Mr. Warren spoke as an individual, his speech was unprotected. When a government employee speaks as a citizen on matters of "public concern," courts balance the employee's interest against the State's interest "in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568. The "more closely the [suspension] serves the [State's] interest in the efficient and effective functioning of" a government office, the "more heavily" the balance "weigh[s]" against First Amendment protection. *McCabe v. Sharrett*, 12 F.3d 1558, 1570 (11th Cir. 1994). And when the employee's speech "harm[s]" a governmental process, the First Amendment is unlikely to apply. *See Wood v. Georgia*, 370 U.S. 375, 394 (1962) (sheriff's political statements about a grand-jury investigation were protected because they did not "harm" that process, but

---

[6] All of that is perfectly consistent with *Bond*. There, the Court considered a materially different type of speech: an interview given by a congressman-elect to a local radio station after his victory but before he was formally seated—and a materially different class of speaker: an elected official whose duties were solely legislative. 385 U.S. at 118, 121. Bond was speaking as an individual there, not for the state.

43

the case would be different if the sheriff had, for instance, "refuse[d] to issue summonses or to maintain order" in the proceedings).

Here, Mr. Warren's speech flunks the *Pickering* balance because the Governor reasonably construed Mr. Warren's pledges to publicly repudiate classes of Florida law, "imped[ing] the performance of [his] duties" and "interfer[ing] with the regular operation of" his office. *Belcher v. City of McAlester*, 324 F.3d 1203, 1208 (10th Cir. 2003); *see also Shahar v. Bowers*, 114 F.3d 1097, 1107–08 (11th Cir. 1997) (crediting government's reasonable prediction that speech will impede job duties). The State tasked Mr. Warren with enforcing the criminal law and keeping his community safe. By openly defying Florida law, Mr. Warren shirked his obligations, barred line prosecutors from fulfilling their own, and encouraged individuals to commit crimes. His statements therefore represent the "simplest example of a statement by a public employee that would not be protected": "answering 'No' to a request that the employee perform a lawful task within the scope of his duties." *Connick v. Myers*, 461 U.S. 138, 163 n.3 (1983) (Brennan, J., dissenting); *see also Berry v. Bailey*, 726 F.2d 670, 676 (11th Cir. 1984) ("refusal to perform a duty" is unprotected); *Wood*, 370 U.S. at 394 (similar).

### c.     Speech incidental to regulation of conduct

Any speech for which the Governor disciplined Mr. Warren also was unprotected because it was incidental to the State's regulation of Mr. Warren's conduct as a prosecutor.

44

Regulations on "non-expressive conduct do not implicate the First Amendment" even if "they incidentally burden speech." *Norwegian Cruise Line Holdings LTD v. State Surgeon Gen.*, 50 F.4th 1126, 1135 (11th Cir. 2022) (cleaned up). That is so even when "the conduct was in part initiated, evidenced, or carried out by means of language." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (antitrust laws do not infringe on protected speech even though conspiracies often use words); *FAIR*, 547 U.S. at 62 (same for anti-discrimination laws).

Here, the Florida suspension standard regulates conduct. Neglect of duty is an action that an official takes, just like the "commission of a felony," "drunkenness," and "malfeasance." Fla. Const., art. IV, § 7(a). And "incompetence" is a state of being, not an expression of speech. *See id.* So like the anti-discrimination law in *Norwegian Cruise Line*, Florida's suspension provision targets conduct—irrespective of any speech used to prove the conduct—and thus does not implicate the First Amendment. 50 F.4th at 1135–37; *see also Giboney*, 336 U.S. at 502; *Ingram v. Johnson*, 187 F.3d 877, 879 (8th Cir. 1999) (holding that the speech-incidental-to-conduct doctrine authorizes "incidental limitations on First Amendment freedoms" in a retaliation case).

### 2. Mr. Warren was a policymaker with no First Amendment protection for his political associations.

In accepting the Governor's same-decision defense, the district court also suggested that a "substantial, motivating" factor in the Governor's suspension was Mr. Warren's "political affiliation with" the "Democratic Party" and "[George] Soros."

45

App. 1263, 1269. Even if that were right—a point the Governor disputes—doing so would not have violated the First Amendment because Mr. Warren was a policymaker.[7]

The Supreme Court has held that the First Amendment may indeed protect a public employee from retaliation based on political affiliation. *See Elrod v. Burns*, 427 U.S. 347 (1976) (plurality op.); *Branti v. Finkel*, 445 U.S. 507 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990). For low-level public employees with "limited responsibility," *Elrod*, 427 U.S. at 367 (plurality op.), discipline based on party affiliation could coerce them to compromise their politics without sufficient justification, *see Branti*, 445 U.S. at 517; *Rutan*, 497 U.S. at 65. Yet the Court has never extended that limited exception beyond "low-level public employees," *Rutan*, 497 U.S. at 65, like a "rehabilitation counselor," "prison guard," or "garage worker," *id.* at 67; *id.* at 89 n.5 (Stevens, J., concurring); *see also Elrod*, 427 U.S. at 350–351 (plurality op.) ("process server," "bailiff," and "security guard"); *Branti*, 445 U.S. at 519 (assistant public defenders). Roles like these do not involve governmental "policymaking," so politics may not be considered when managing their functions. *See Branti*, 445 U.S. at 518.

---

[7] The district court stated that the Governor "ha[d] not asserted" below that "he could properly consider" Mr. Warren's political association consistent with the First Amendment. App. 1270. That is wrong. In closing, the Governor made that exact point: the First Amendment "would not prohibit the Governor from considering politics as one factor among many, because under the *Elrod/Branti* doctrine Mr. Warren is a policymaker." App. 1209.

But the First Amendment does not shield governmental policymakers from the rough-and-tumble of partisan politics. Such officials exercise "discretion concerning issues of public importance," *Gregory v. Ashcroft*, 501 U.S. 452, 466–467 (1991), "wield[] the final authority of the government," *Kurowski v. Krajewski*, 848 F.2d 767, 770 (7th Cir. 1988) (Easterbrook, J.), and deal with "the sort of decisions about which there are political debates," *id*. When managing such "policymaking" officials, *Ray v. City of Leeds*, 837 F.2d 1542, 1544 (11th Cir. 1988), politics may fairly be considered.

Mr. Warren—formerly chief prosecutor in Hillsborough County—qualified as a policymaker. *See Borzilleri v. Mosby*, 874 F.3d 187, 193 (4th Cir. 2017) (Wilkinson, J.) (state prosecutors are policymakers). Prosecutors have "broad[] public responsibilities" that include "safeguard[ing] the public," *id*. at 191, formulating "priorities" where "much room for political disagreement" exists, *id*. (cleaned up), and "exercis[ing] [charging] discretion," *id*. at 192; *see also* Fla. Stat. §§ 27.02–.341 (outlining state-attorney powers). That is why a "unanimous chorus of courts of appeals" has held that state prosecutors are policymakers whose political affiliations are not protected by the First Amendment. *Borzilleri*, 874 F.3d at 193 (collecting cases).

The district court conceded all that. It admitted, for example, that "chief prosecutors" in the federal system are policymakers that fall outside of *Elrod-Branti*. App. 1271. Yet it held that Florida state attorneys are different because they are "independently elected," not "appointed" by the Governor, and do not serve at the "governor's pleasure." App. 1271. But as Judge Easterbrook has explained, "the disposition

47

under *Elrod* and *Branti* depends on the duties of the office rather than the tenure of the incumbent." *Kurowski,* 848 F.2d at 770. "[H]igh elected officials" can thus no doubt be policymakers "under *Branti–Elrod.*" *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1355 n.9 (3d Cir. 1994). The contrary theory proves too much. It would imply, for example, that the President could never consider a Vice President's political affiliation in refusing to give him an assignment. It would also imply that the U.S. Attorney General, who supervises but does not appoint or remove U.S. Attorneys,[8] could not consider a U.S. Attorney's political affiliation, either.

At any rate, the district court undersold the Governor's supervisory power over state attorneys. The Governor is the State's "supreme executive," and is obliged to "take care that the laws be faithfully executed" consistent with his vision as head of Florida's executive branch. Fla. Const. art. IV, § 1(a). Florida's legal system thus empowers the Governor to supervise the work of state attorneys, *see Austin*, 310 So. 2d at 292; authorizes him to transfer cases and resources among them, Fla. Stat. § 27.14(1); *see also Ayala*, 224 So. 3d at 757–59; and arms the Governor with a critical tool to fulfill his supervisory role—the power to suspend state attorneys for neglect of duty and incompetence, Fla. Const. art. IV, § 7. He thus exercises substantial control over their job performance.

True, Florida state attorneys are elected. But they are also conduits through which Florida enforces its criminal laws, and they do so subject to the Governor's

---

[8] Dep't of Just., Justice Manual, § 9-2.001 (2018); 28 U.S.C. §§ 509, 541.

authority to "faithfully execute[]" those laws. Fla. Const. art. IV, § 1(a). Poor performance in that objective reflects on the Governor because he is ultimately charged with "tak[ing] care" that the law is enforced, *id.*, and ensuring that state attorneys do not neglect their prosecutorial function, *see id.* § 7; *Austin*, 310 So. 2d at 292. That is why the Florida Supreme Court has upheld the Governor's authority to suspend a state attorney not just for failing to exercise individualized prosecutorial discretion, but also for refusing to exercise that discretion in individual cases in what the Governor views as an improper way. *See State ex rel. Hardee v. Allen*, 172 So. 222, 224 (Fla. 1937); *see also* App. 343 (Governor's suspension order citing *Hardee*).

If anything, Florida's election-based system for state attorneys makes it *more* likely that Mr. Warren is a policymaker unprotected by *Elrod-Branti*. Elected positions are usually "embroiled in politics," *Kurowski*, 848 F.2d at 770, because they typically "participate directly in the formulation, execution, or review of broad public policy," *Gregory*, 501 U.S. at 462. Elected officials are therefore frequently treated as policymakers under *Elrod-Branti. E.g.*, *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 34 (1st Cir. 1996) (elected governor and political party leader did not have political-retaliation claim against legislature controlled by rival political party because he "assuredly qualified as" a "policy maker"); *Camacho v. Brandon*, 317 F.3d 153, 162 (2d Cir. 2003) (similar for

elected legislator).[9] Surely "no one would argue" that "the highest elective offices in the nation" are not policymaking positions simply because they are filled at the ballot box rather than by appointment. *Peters*, 16 F.3d at 1355 n.9. The same principle applies here.

To be clear, political affiliation is not cause for suspending an official under Florida law. *See* Fla. Const. art. IV, § 7(a). But if there is valid cause, the Governor "may" effect a suspension. *Id.* In making that discretionary choice, the Governor is not limited by the *Elrod/Branti* principle.

### C.     The district court lacked equitable authority to reinstate Mr. Warren.

Merits aside, this Court should also affirm because intervening in Florida's suspension-and-removal process is well beyond the historical limits on federal equitable authority. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999).

The equitable powers of federal courts are limited by the types of relief "traditionally accorded by courts of equity" at the Founding. *Id.* at 319. And back then—as

---

[9] The Second Circuit seemed to walk back aspects of *Camacho* in *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005), a case the district court stressed, App. 1253-54. But *Velez*'s reasoning is unpersuasive for the reasons described above. The First Circuit's decision in *Romero-Barcelo*, 75 F.3d at 34, is the more persuasive authority.

many treatises[10] and cases explained[11]—"federal equity power could not be exercised to enjoin a state proceeding to remove a public officer." *Baker v. Carr*, 369 U.S. 186, 231 (1962); *see also Fineran v. Bailey*, 2 F.2d 363, 363 (5th Cir. 1924) ("It is well settled by the decisions of the Supreme Court that a District Court of the United States has no jurisdiction over the appointment and removal of public officers.").

The Supreme Court's decision in *Sawyer* exemplifies that traditional rule. There, a local elected officer sought an injunction barring a city council and its mayor from removing him. 124 U.S. at 201. After the council and mayor were held in contempt of that injunction, the Court issued a writ of habeas corpus to vacate their convictions because the injunction was issued without jurisdiction. *Id.* at 207–09. The Court explained that a federal court in equity "has no jurisdiction over the appointment and removal of public officials," *id.* at 212, and has even less power to interfere "with the appointment or removal of [state] public officers," *id.* at 220. Mr. Warren's challenge to Florida's suspension-and-removal process, therefore, "is no case for" a federal "court of equity." *See Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 59 (1867).[12]

---

[10] *E.g.*, 3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 1345 n.3 (1883).

[11] *E.g.*, *In re Sawyer*, 124 U.S. 200, 210 (1888); *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 71 & n.20 (1867); *Taylor v. Kercheval*, 82 F. 497, 499 (C.C.D. Ind. 1897).

[12] *Bond v. Floyd* and *Wood v. Georgia* did not address this issue. Neither did *Carr*, which addressed only whether state apportionment presented a political question, and even cited approvingly to the equitable limitations laid out in *Sawyer*. 369 U.S. at 231.

51

## CONCLUSION

The Court should affirm.

Dated: April 12, 2023

Respectfully submitted,

ASHLEY MOODY
   *Attorney General of Florida*

*/s/ Henry C. Whitaker*

GEORGE T. LEVESQUE
JEFF AARON

HENRY C. WHITAKER
   *Solicitor General*
DANIEL WILLIAM BELL
JEFFREY PAUL DESOUSA
   *Chief Deputy Solicitors General*

GrayRobinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32302
(850) 577-9090
*george.levesque@gray-robinson.com*

DAVID M. COSTELLO
   *Deputy Solicitor General*
ROBERT SCOTT SCHENCK
ZACHARY GROUEV
   *Solicitor General Fellows*

*Counsel for Defendant-Appellee*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Counsel for Defendant-Appellee*

52

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,959 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Henry C. Whitaker*
Solicitor General

## CERTIFICATE OF SERVICE

I certify that on April 12, 2023, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Henry C. Whitaker*
Solicitor General