CASE NO.: 23-10459-AA

_____

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
_____

ANDREW H. WARREN,

Plaintiff – Appellant,

v.

RON DESANTIS, in his official capacity as
Governor of the State of Florida

Defendant – Appellee.

_____

On Appeal from the United States District Court
for the Northern District of Florida

_____

## BRIEF OF *AMICI CURIAE* FLORIDA SHERIFFS ASSOCIATION FLORIDA POLICE CHIEFS ASSOCIATION AND FLORIDA PROSECUTING ATTORNEYS ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLEE RON DESANTIS IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF FLORIDA

_____

ROBERT WAYNE EVANS, ESQ.
BENJAMIN M. LAGOS, ESQ.
**ALLEN, NORTON & BLUE, P.A.**
906 North Monroe Street, Suite 100
Tallahassee, Florida 32303
(850) 561-3503

JOHN DAVID MARSEY, ESQ.
**RUMBERGER KIRK & CALDWELL, P.A.**
101 N. Monroe St., Suite 1050
Tallahassee, Florida 32301
(850) 222-6550

ARTHUR IVAN JACOBS, ESQ.
**JACOBS SCHOLZ & WYLER, LLC**
961687 Gateway Blvd., Ste. 2011
Fernandina Beach, FL 32034-9159
(904) 261-3693

## <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT OF INTEREST OF *AMICI CURIAE*……………….….…………….. 1

SUMMARY OF ARGUMENT………………….………….….…….…....…….…..…… 8

ARGUMENT……………….…………….…………….………….…….…....…….…..… 9

    I.    Warren did not Engage in Protected Speech Under the First Amendment……….…………….….…………….…...…....….…..… 9

    II.    Warren Cannot Prevail on his First Amendment Retaliation Claim Because the Governor Would Have Made the Same Decision Regardless of any Protected Activity................................................... 12

CONCLUSION…………….…………....…….………………………...……….... 15

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ayala v. Scott*,
    224 So. 2d 755 (Fla. 2017)……………………….…………….............……… 3

*Barber v. State*,
    5 Fla. 199 (Fla. 1853)……………………………………………..……… 3

*Bennett v. Hendricks*,
    423 F.3d 1247 (11th Cir. 2005)……………………….…………....……… 13

*Bryson v. Waycross*,
    888 F.2d 1562 (11th Cir. 1989)……………………….…………....……… 13

*Connick v. Myers*,
    461 U.S. 138 (1983)……………………………….………….…..……… 9

*Finch v. Fitzpatrick*,
    254 So. 2d 203 (Fla. 1971)…………………….....…………....………. 11

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)……………………………….………….…....……… 10

*Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*,
    429 U.S. 274 (1977)……………………….…………….………...……… 13

*Pickering v. Board of Education*,
    391 U.S. 563 (1968)…………………………………..………….……… 9

*Pinto v. Rambosk*,
    2021 WL 3406253 (M.D. Fla. Aug. 4, 2021)…………...……..………... 2

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)……………………….…………….………....……… 10

*State v. A.R.R.*,
    113 So. 3d 942 (Fla. 5th DCA 2013)…………………………………... 2

*Weitzenfeld v. Dierks*,
  312 So. 2d 194 (Fla. 1975)……………………………………..………… 2

*Wood v. Georgia*,
  370 U.S. 375 (1962)……………………………..………………………… 11

## Constitutional Provisions, Statutes, Orders, & Other Authorities

Fla. Const. Art. IV § 1(a)……………………………………...………………..…… 11

Fla. Const. Art. IV § 7(a)……………………………………...………………..…… 11

Fla. Stat. § 30.15(1)(e) (2022)…………………………….……………..…… 2

*Merriam-Webster Online Dictionary*………………………..………..………… 4

## <u>STATEMENT OF INTEREST OF *AMICI CURIAE*</u>

The Florida Sheriffs Association (FSA) is a statewide organization comprised of the sheriffs of the state of Florida. Its mission as a self-sustaining not-for-profit charitable organization is to foster the effectiveness of the office of sheriff through leadership, education and training, innovative practices, and legislative initiatives. On occasion the FSA appears as *amicus curiae* in cases of interest to the sheriffs that may impact their operational duties and responsibilities.

The Florida Police Chiefs Association ("FPCA") is a statewide organization founded in 1952 and is now composed of more than 900 law enforcement executives representing every region of the state. The FPCA is committed to law enforcement training, legislation, professional development, and other issues impacting public safety and Florida's law enforcement agencies, administrators, and officers. More specifically, the FPCA promotes legislation and activities that enhance public and officer safety by providing superior police protection for the residents of Florida and its many visitors, and provides advocacy, communication, education and training for the state's police agencies and personnel.

The Florida Prosecuting Attorneys Association ("FPAA") represents the nineteen (19) elected state attorneys and the approximately 2,000 assistant state attorneys. The FPAA is concerned about the administration of justice in Florida and

participates in those matters which the FPAA believes are important to that principle involving the administration of justice.

The present case involves a challenge to the Governor's authority to remove the Plaintiff, Andrew H. Warren ("Warren") as the State Attorney for the 13th Judicial Circuit. Although this judicial circuit comprises only Hillsborough County, it is not just the Sheriff of Hillsborough County or the chiefs of police in this county who are stakeholders in these matters. To the extent that Warren abused his authority as a state attorney by carving out categories of criminal activity that in effect would no longer be prosecuted in his circuit, the sheriffs, police chiefs, and state attorneys have significant concerns with the outcome of these proceedings.

Historically, sheriffs and the chiefs of police have partnered with state attorneys to protect the public by enforcing the criminal laws of this state, but their roles differ significantly. The sheriff is the chief law enforcement officer of the county. *Weitzenfeld v. Dierks*, 312 So. 2d 194, 196 (Fla. 1975). Statutorily, the sheriff's duties include serving as the conservator of the peace. § 30.15(1)(e), Fla. Stat. (2022).

In this role as conservator of the peace, sheriffs and their deputies serve as community caretakers by protecting people and property under a variety of circumstances. *See Pinto v. Rambosk*, 2021 WL 3406253, *21 at fn. 14 (M.D. Fla., August 4, 2021), citing *State v. A.R.R.*, 113 So. 3d 942, 944-45 (Fla. 5th DCA 2013).

Sworn to uphold the law, sheriffs' deputies are required to protect against crime without waiting for it to occur. *Id.*

The police chiefs are similarly empowered to enforce criminal laws within the jurisdiction of the city limits, and often work hand-in-hand with their Sheriff counterparts, through participation in joint task forces and mutual aid agreements, during times of natural or other disasters, and in critical incidents. Their officers often encounter similar criminal activity as deputy sheriffs and face comparable challenges in protecting the public from being victimized by the criminal element.

Sheriffs and police chiefs anticipate that arrests by their officers will be reviewed on a case-by-case basis and the state attorney will exercise prosecutorial discretion. Although state attorneys have complete discretion in deciding whether to prosecute an arrest, prosecutorial discretion requires a state attorney to make case specific and individualized determinations. *Ayala v. Scott*, 224 So. 3d 755, 759 (Fla. 2017) "[E]xercising discretion demands an individualized determination 'exercised according to the exigency of the case, upon a consideration of the attending circumstances.'" *Id.,* quoting *Barber v. State*, 5 Fla. 199, 206 (Fla. 1853) (Thompson J. concurring).

In the present case, Warren was not removed for simply exercising his prosecutorial discretion. Rather, he established policies indicating that his office

would not prosecute[1] certain classes of "low-level offenses" or that there would be a presumption of non-prosecution for a variety of offenses, including charges arising from pedestrian and bicycle stops. These proclamations detrimentally impacted law enforcement's ability to effectively safeguard the public and foreclose the use of valuable law enforcement tools that result in the discovery of those wanted for other crimes or the discovery of other, more serious offenses.

Ironically, perhaps as an unintended consequence, Warren's policies actually encouraged lawlessness. The bike and pedestrian policy, for example, incentivized criminals to explore methods that would not attract the attention of law enforcement officers, such as carrying drugs on the person or while riding a bicycle.

The District Court incorrectly concluded that Warren's non-prosecution policies were not blanket policies, reasoning that they were merely presumptive in nature. The court assumed that cases would be individually scrutinized because a supervisor in the State Attorney's Office could approve filing of charges based on the facts and circumstances of the case if the public safety needs of the community outweighed the presumption.

---

[1] It is axiomatic that to "prosecute" means to bring legal action against for redress or punishment of a crime or violation of law. *Merriam-Webster Online Dictionary*, at https://www.merriam-webster.com/dictionary/prosecute.

4

Respectfully, Amici disagree with the court's finding that no blanket policies were promulgated by Warren. In effect, the policies categorically excluded certain crimes from prosecution.

Warren's Policy Regarding Prosecution of Cases Based on Pedestrian and Bicycle Violations, Doc. 112-22[2]. exemplifies the ramifications to law enforcement of a prosecutorial edict disqualifying particular criminal activity from prosecution. As in the case of vehicle stops for noncriminal moving violations, pedestrian and bicycle stops may result in arrests on more serious charges relating to illegal drugs, offenders involved in committing property or other crimes, or arrests of suspects wanted for violent crimes.

Indeed, in the policy, Warren acknowledges that "[b]icycle and pedestrian stops can be a legal and legitimate tool to promote community safety, particularly in high crime areas." *Id*. at 1. In his deposition which was admitted at trial, Hillsborough County Sheriff Chad Chronister concurred. In his experience, traffic and bike stops were the largest crime solving tool available to law enforcement as they allowed officers to make arrests for more serious crimes such as weapons and drugs. Doc. 144 -1, pp 141-42.

---

[2] Citations to the docket of the United State District Court, Case No. 4:22-cv-302-RH-MAF, shall be identified by "Doc." followed by a pincite to the page number(s) of the docket entry, if any.

The policy on low level offenses presents different issues but, as Sheriff Chronister represented in his deposition, nonetheless negatively impacts public safety. Sheriff Chronister clearly articulated the impact of such a policy. Deputies and victims alike were frustrated that offenders lacked accountability and justice was not being done. *Id*. at pp. 66, 149, 179. Knowing that cases would likely not be prosecuted, deputies simply would not make these arrests. *Id*. at pp. 140-43.

Additionally, although bike and pedestrian stops serve as a means to effectively remove criminals from neighborhoods and communities, the presumption of non-prosecution placed law enforcement officers in an untenable position. They could either discontinue enforcing these violations to the detriment of public safety or proceed with the arrests knowing these cases would likely not be prosecuted and thereby invite civil claims of false arrest. *Id*. at pp. 83-84.

Additionally, ignoring "low level offenses" did not necessarily mean that just low-level offenders were getting a pass. In many cases less serious offenses are committed by the same individuals who are committing more egregious crimes. Abandoning enforcement of the lower-level offenses ultimately leads to more crime rather than less criminal activity. *Id*. at pp. 182-84.

In a letter dated January 25, 2022, Sheriff Chronister expressed his frustrations to Warren with these policies. In the letter, Chronister informed Warren that he was

failing to fulfill his prosecutorial obligation to look at each case individually. Doc. 135-14.

Although much attention was paid to the non-prosecution policies, Warren's subscription to the joint statements relating to gender-transition treatments and abortion can hardly pass unnoticed. These pronouncements may not have impacted the efforts of sheriffs and police chiefs to address criminal activity as dramatically as the non-prosecution policies, but the implication is clear. If a state attorney, under the guise of prosecutorial discretion, can decline to prosecute abortions, a state attorney could effectively legalize recreational marijuana by announcing that possession cases would not be prosecuted. In other words, regardless of legislation criminalizing certain conduct, a state attorney could effectively nullify the will of the legislature and advance his or her personal philosophy as to what conduct is criminal in nature.

The Governor was justified in the removal because Warren, as result of his neglect of duty and incompetence, effectively usurped the role of the legislature by dictating to the sheriff and chief of police in Hillsborough County what is a crime in the 13th Judicial Circuit. These actions fractured the relationship between the State Attorney and law enforcement in Hillsborough County and effectively breached the trust reposed in the State Attorney's office that cases would be reviewed individually on their merits.

Although Sheriff Chronister was speaking for his agency when he testified to the operational impact of Warren's policies, it is safe to say that the sheriffs, chiefs of police, and state attorneys share his concerns. Non-prosecution policies such as the policies at issue in this case hinder law enforcement's efforts to curb criminal conduct, including drug-related crimes, on the misguided assumption that through prosecutorial discretion a state attorney can pick and choose criminal offenses to be enforced.

A state attorney cannot hide behind prosecutorial discretion under these circumstances, nor can he claim protected speech under the First Amendment when the expression in question is tied to the performance of his official duties. Warren's pronouncements went beyond prosecutorial discretion. Rather, he blatantly abused his executive powers. The Governor's Executive Order removing Warren from his position is well grounded as a matter of law and amply supported by the record in this case.

## SUMMARY OF THE ARGUMENT

Warren's non-prosecution policies and joint statements indicating his unwillingness to prosecute certain crimes effectively breached the working relationship between the state attorney's office and law enforcement agencies in Hillsborough County. Rather than cases being reviewed on an individualized basis, the policies represented that a category of crimes were unlikely to be prosecuted,

8

thereby discouraging officers from making arrests and incentivizing criminals to continue their unlawful activity.

At the outset, the District Court erred in concluding that Warren engaged in in speech protected by the First Amendment. Rather, Warren's actions constituted conduct or speech incident to conduct which is not protected by the First Amendment.

Even assuming that Warren met the initial threshold of protected activity, the District Court correctly held that the Governor would have taken the same action to suspend him regardless of any protected activity. The Governor's Executive Order effectively summarized law enforcement's concerns with these blanket non-prosecution policies and Warren's derogation from his duties as state attorney to review each arrest on a case-by-case basis. Accordingly, assuming that some First Amendment activity exists, the District Court's order on the merits should be affirmed as a result of the Governor meeting his burden on the same decision defense.

## **ARGUMENT**

## I.    **WARREN DID NOT ENGAGE IN PROTECTED SPEECH UNDER THE FIRST AMENDMENT.**

Fundamentally, the First Amendment protects a public employee's right, in certain instances, to speak as a citizen addressing matters of public concern. *Pickering v. Board of Education*, 391 U. S. 563, 568 (1968); *Connick v. Myers,* 461

9

U. S. 138, 147(1983). In this case, however, Warren's expressions may be fairly characterized as conduct or speech incident to conduct which enjoy no First Amendment protection. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U. S.47, 65 (2006) (law school's actions denying access to military recruiters deemed conduct that did not warrant First Amendment protection); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 501-02 (1949) (holding that restraint of picketing did not violate First Amendment because it constituted a course of conduct which could be regulated by state law: "[I]t has never been an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part  initiated, evidenced, or carried out by means of language, either spoken, written, or printed.")

Warren's public statements on transgender and abortion care cannot be meaningfully distinguished from his non-prosecution policies. They are intrinsically interwoven into the performance of his duties which could lawfully be called into question as conduct by the Governor.

Amici particularly take issue with Warren's non-prosecution policies, which effectively placed certain categories of criminal activity off limits for law enforcement. To the extent that the District Court characterized these actions as conduct rather than protected speech, Amici concur with this finding.

10

Because Warren's actions related to his performance as a state attorney, thereby constituting conduct or speech incident to conduct, Governor DeSantis did not violate Warren's First Amendment rights by removing him from office. Warren's abuse of prosecutorial discretion, in these instances, afforded him no protection constitutionally.

The Governor properly exercised his duties under Article IV, section 1(a) of the Florida Constitution "to take care that the laws be faithfully exercised." *See Finch v. Fitzpatrick*, 254 So.2d 203, 204 (Fla. 1971). The Florida Constitution expressly provides authority to the Governor to suspend from office "any county officer for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform duties, or commission of a felony. Article IV, §7(a) Fla. Const. The First Amendment did not insulate Warren from suspension of office for reasons related to the performance of his duties.

Clearly, the present case can be contrasted from *Wood v. Georgia,* 370 U.S. 375 (1962), in which a sheriff publicly criticized the empanelment of a grand jury to investigate allegations of vote buying involving African American voters. Holding that the sheriff was entitled to express himself on matters of public importance, the Court also noted that there was no evidence that the sheriff's publications interfered with the performance of his duties as sheriff. *Wood*, 370 U.S. at 394.

Such is not the case here. The non-prosecution policies as well as the joint statements, unequivocally expressed an unwillingness to prosecute specific criminal activity. As Sheriff Chronister articulated in his deposition, these policies compromised public safety by discouraging officers from making arrests, incentivizing criminals to continue their trade by avoiding apprehension, impeding criminal investigations of serious crimes including drug-related crimes, and denying accountability to those who violated the law. Doc. 144-1, pp. 140-42, 179-80, 182-84.

Amici submit that when Warren's joint statements and policies are viewed in the context of his duties and responsibilities as state attorney, this Court should hold that Warren did not engage in First Amendment protected speech. Accordingly, the Court should reverse the District Court's holding on this issue and direct entry of judgment for the Governor.

## II. WARREN CANNOT PREVAIL ON HIS FIRST AMENDMENT RETALIATION CLAIM BECAUSE THE GOVERNOR WOULD HAVE MADE THE SAME DECISION REGARDLESS OF ANY PROTECTED ACTIVITY

The Governor did not violate Warren's First Amendment rights because the unprotected speech would have produced the same result. To establish a First Amendment retaliation claim, a plaintiff must (1) engage in speech or activity protected by the First Amendment; (2) suffer an adverse job action; and (3) establish

a causal connection between the protected speech and the adverse action. *Bennett v. Hendricks*, 423 F.3d 1247, 1250 (11th Cir. 2005).

A defendant may ultimately prevail if it meets the burden of showing that it would have made the same decision anyway even in the absence of the protected speech. *Bryson v. Waycross,* 888 F.2d 1562, 1566 (11th Cir. 1989) (citing *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 286 (1977)). In finding for the Governor on the same decision defense, the District Court correctly applied the *Mt. Healthy* analysis.

Here, the record is abundantly clear. The factors that motivated the Governor's decision to suspend Warren related to performance and not advocacy, as the court properly concluded. Sheriff Chronister provided ample evidence to the Governor that Warren was not fulfilling his duties as the State Attorney for the 13th Judicial Circuit.

Specifically, when asked if the Sheriff's Office had any difficulty getting cases prosecuted in Hillsborough County, Sheriff Chronister replied affirmatively. He subsequently provided a list of cases to the Governor' staff that were not prosecuted. Doc. 144-1, pp. 62-63, 78, 81.

It was hardly surprising, therefore, that the Governor chose to single out Warren for removal from office. In fact, the Governor's Executive Order parroted Sheriff Chronister's letter to Warren when the Governor announced "Warren's

13

policies of presumptive non-enforcement are not a proper exercise of prosecutorial discretion because they do not require 'case specific' and 'individualized determinations' as to whether they warrant prosecution but instead are based on categorical exclusions of otherwise criminal conduct that is tantamount to rewriting Florida criminal law." Doc. 112-3, p. 4.

Sheriff Chronister also expressed his reservations with Warren's encroachment on the separation of powers between the executive branch and the legislature. Although the State Attorney and the Sheriff were charged with enforcement of the laws, Warren unilaterally decided what constituted criminal conduct in Hillsborough County. Doc 144-1, p. 266.

Once again, the Executive Order mirrors Chronister's grievances with Warren's policies. In addressing this issue of separation of powers the Executive Order states that Warren's policies "have the effect of usurping the province of the Florida legislature to define criminal conduct as well as the duties of other law enforcement officials in Hillsborough County to faithfully enforce violations of Florida criminal law…" Doc. 112-3, p. 4.

In sum, even if Warren engaged in protected activity, the Governor would have removed Warren based upon the breach of his duties as the State Attorney for the 13th Judicial Circuit. On this issue, the District Court correctly found in favor of

the Governor on the First Amendment retaliation claim and the Order on the Merits must be affirmed.

## **CONCLUSION**

Based on the record in this case and the applicable case law, the Order on the Merits must be affirmed.  The Court should  find in favor of Governor DeSantis on the First Amendment retaliation claim by holding that Warren did not engage in protected speech. In the event that this Court finds that Warren's actions were protected under the First Amendment, the Court should affirm the Order by holding that the Governor would have removed Warren regardless of any protected activity.

Respectfully submitted this 18th day of April 2023.

By: */s/ R. W. Evans*
ROBERT WAYNE EVANS, ESQ.
Florida Bar No. 198862
revans@anblaw.com
BENJAMIN M. LAGOS
Florida Bar No. 1025146
blagos@anblaw.com
**ALLEN, NORTON & BLUE, P.A.**
906 North Monroe Street, Suite 100
Tallahassee, Florida 32303
(850) 561-3503
(850) 561-0332 (Facsimile)

*Counsel for Florida Sheriffs Association*

By: */s/ J. David Marsey*
J. DAVID MARSEY, ESQ.
Florida Bar No. 0010212
dmarsey@rumberger.com
docketingorlando@rumberger.com

15

dmarseysecy@rumberger.com
**RUMBERGER, KIRK & CALDWELL**
**A Professional Association**
101 North Monroe Street, Suite 1050
Post Office Box 10507
Tallahassee, FL 32302-2507
(850) 222-6550
(850) 222-8783 (Telecopier)

*Counsel for Florida Police Chiefs Association*

By: */s/ Arthur Ivan Jacobs*
ARTHUR IVAN JACOBS, ESQ.
Florida Bar No. 108249
buddy@jswflorida.com
**JACOBS SCHOLZ & WYLER, LLC**
961687 Gateway Blvd., Ste 2011
Fernandina Beach, FL 32034-9159
(904) 261-3693
(904) 261-7879 (Telecopier)

*Counsel for Florida Prosecuting Attorneys Association*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of April 2023, I electronically filed the foregoing using the Court's CM/ECF system, which will automatically send a notice of electronic filing to all counsel of record, including:

David O'Neil
**Debevoise & Plimpton LLP**
801 Pennsylvania Ave NW
Suite 500
Washington, D.C. 20004
Daoneil@debevoise.com

16

Marisa L. Pagan-Figueroa
Samantha B. Singh
Anagha Sundararajan
Jane Tien
**Debevoise & Plimpton, LLP**
66 Hudson Blvd
New York, NY 10001

Alexandra P. Swain
**Debevoise & Plimpton, LLP**
650 California Street
San Francisco, CA 94108

Jean-Jacques Cabou
Alexis E. Danneman
Margo Casselman
Matthew Robert Koerner
**Perkins Coie LLP**
2901 N. Central Avenue
Suite 200
Phoenix, AZ 85012
(602) 351-8000
Jcabou@perkinscoie.com
Adanneman@perkinscoie.com
Mcasselman@perkinscoie.com

David B. Singer
Matthew Thomas Newton
Amanda Brewer
**Older Lundy Koch & Martino**
1000 W. Cass Street
Tampa, FL 33606
(813) 254-8998
Dsinger@olderlundylaw.com
Mnewton@olderlundylaw.com
Abrewer@olalaw.com

Henry Charles Whitaker
Jeffrey Paul Desousa
David Costello

James Percival
Natalie Page Christmas
Zachary Grouev
Robert Scott Schenck
Florida Attorney General Service
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
Henry.whitaker@myfloridalegal.com
Jeffrey.desousa@myfloridalegal.com
David.costello@myfloridalegal.com
James.percival@myfloridalegal.com
Natalie.christmas@myfloridalegal.com

George Ty Levesque
Jeffrey Aaron
**Gray Robinson, P.A.**
301 South Bronough Street
Suite, 600
Tallahassee, FL 32302
(850) 577-9090
George.levesque@gray-robinson.com
Jeff.aaron@gray-robinson.com

Adam Granich Unikowsky
**Jenner & Block, LLP**
1099 New York Ave NW STE 900
Washington, DC 20001

Michael Paul Beltran
**Beltran Litigation, PA**
405 S. Dale Mabry Hwy STE 370
Tampa, FL 33609

Lauren Jacobson Bernstein
Adam King
Tania C. Matsuoka
Sherry Safavi
Sara B. Schnorrenberg
**Weil Gotshal & Manges, LLP**

757 5th Ave
New York, NY 10153

Bryan D. Hull
Howell W. Melton, III
Jeffrey Wayne Warren
**Bush Ross, PA**
1801 N. Highland Ave
Tampa, FL 33602

Sara Lawson
Morris Weinberg, Jr.
**Zuckerman Spaeder, LLP**
101 E. Kennedy Blvd. STE 1200
Tampa, FL 33602

Steven A. Newborn
**Weil Gotshal & Manges, LLP**
2001 M St. NW STE 600
Washington, DC 20036

Joshua Rosenthal
**Public Rights Project**
490 43rd St. STE 115
Oakland, CA 94609

By: */s/ R. W. Evans*
     Attorney

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7(B) because this brief contains 3,091 words, excluding the parts of the document exempted by Federal Rule of Procedure 32(f).

By: <u>*/s/ R. W. Evans*</u>
               Attorney