IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

ANDREW H. WARREN,

*Plaintiff-Appellant,*

—v.—

RON DESANTIS, individually and
in his Official Capacity as Governor of the State of Florida,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

## PLAINTIFF-APPELLANT'S REPLY BRIEF

DAVID A. O'NEIL
DEBEVOISE & PLIMPTON, LLP
801 Pennsylvania Avenue, N.W.,
Suite 500
Washington, DC 20004
(202) 383-8000
daoneil@debevoise.com

ALEXANDRA P. SWAIN
DEBEVOISE & PLIMPTON, LLP
650 California Street
San Francisco, California 94108
(415) 738-5700
apswain@debevoise.com

ANAGHA SUNDARARAJAN
SAMANTHA B. SINGH
MARISA L. PAGÁN-FIGUEROA
JANE TIEN
DEBEVOISE & PLIMPTON, LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000
asundararajan@debevoise.com
sbsingh@debevoise.com
mlpaganfigueroa@debeovise.com
jtien@debevoise.com

DAVID B. SINGER
MATTHEW T. NEWTON
OLDER LUNDY KOCH & MARTINO
1000 West Cass Street
Tampa, Florida 33606
(813) 254-8998
dsinger@olderlundylaw.com
mnewton@olderlundylaw.com

JEAN-JACQUES CABOU
ALEXIS E. DANNEMAN
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 351-8000
jcabou@perkinscoie.com
adanneman@perkinscoie.com

*Attorneys for Plaintiff-Appellant*

## AMENDED CERTIFICATE OF INTERESTED PERSONS

Plaintiff-Appellant certifies that the following is a complete updated list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1. Entities and individuals that have been added to the list are indicated with an asterisk (*):

1. Aaron, Jeffrey M., *Attorney for Defendant-Appellee*

2. Allen, Norton & Blue, P.A., *Attorneys for Amicus Curiae**

3. Araiza, William, *Amicus Curiae**

4. Bailey, Andrew, *Amicus Curiae**

5. Cabou, Jean-Jacques, *Attorney for Plaintiff-Appellant*

6. Calvert, Clay, *Amicus Curiae**

7. Cameron, Daniel, *Amicus Curiae**

8. Carr, Christopher M., *Amicus Curiae**

9. Casselman, Margo R., *Attorney for Plaintiff-Appellant*

10. Chemerinsky, Erwin, *Amicus Curiae**

11. Christmas, Natalie, *Attorney for Defendant-Appellee*

12. Costello, David M., *Attorney for Defendant-Appellee*

13. Danneman, Alexis, *Attorney for Plaintiff-Appellant*

14. Debevoise & Plimpton, LLP, *Attorneys for Plaintiff-Appellant*

15. DeSantis, Ron, *Defendant-Appellee*

16.  DeSousa, Jeffrey P., *Attorney for Defendant-Appellee*

17.  Evans, Robert Wayne, *Attorney for Amicus Curiae\**

18.  Fitch, Lynn, *Amicus Curiae\**

19.  Florida Office of the Attorney General, *Attorneys for Defendant-Appellee*

20.  Florida Police Chiefs Association, *Amicus Curiae\**

21.  Florida Prosecuting Attorneys Association, *Amicus Curiae\**

22.  Florida Sheriffs Association, *Amicus Curiae\**

23.  Flowers, Benjamin M., *Amicus Curiae\**

*24.*  Gilles, Susan M., *Amicus Curiae\**

25.  Gray Robinson, P.A., *Attorneys for Defendant-Appellee*

26.  Griffin, Tim, *Amicus Curiae\**

27.  Grouev, Zachary, *Attorney for Defendant-Appellee*

28.  Hilgers, Michael T., *Amicus Curiae\**

29.  Hinkle, Robert L., *District Court Judge*

30.  Hufford, Axel J., *Attorney for Amicus Curiae\**

31.  Jackley, Marty, *Amicus Curiae\**

32.  Jacobs, Arthur Ivan, *Attorney for Amicus Curiae\**

33.  Jenner & Block LLP, *Attorneys for Amicus Curiae\**

34.  Keller, Zachery P., *Amicus Curiae\**

35.  Knudsen, Austin, *Amicus Curiae\**

36.  Kobil, Daniel T., *Amicus Curiae\**

37.  Lagos, Benjamin M., *Attorney for Amicus Curiae\**

*38.*  Lakier, Genevieve, *Amicus Curiae\**

39.  Landry, Jeff, *Amicus Curiae\**

40.  Levesque, George T., *Attorney for Defendant-Appellee*

41.  Li, Yao, *Attorney for Amicus Curiae\**

*42.*  Lopez, Susan, *Interested party*

43.  Marsey, John David, *Attorney for Amicus Curiae\**

44.  Marshall, Steve, *Amicus Curiae\**

45.  Massaro, Toni M., *Amicus Curiae\**

46.  Moody, Ashley, *Attorney for Defendant-Appellee*

47.  Morrisey, Patrick, *Amicus Curiae\**

48.  Newton, Matthew T., *Attorney for Plaintiff-Appellant*

49.  Niehoff, Leonard M., *Amicus Curiae*

50.  Older, Lundy, Koch & Martino, *Attorneys for Plaintiff-Appellant*

51.  O'Neil, David A., *Attorney for Plaintiff-Appellant*

52.  Pagan-Figueroa, Marisa L., *Attorney for Plaintiff-Appellant\**

53.  Paxton, Ken, *Amicus Curiae\**

54.  Percival, James H., *Attorney for Defendant-Appellee*

55. Perkins Coie LLP, *Attorneys for Plaintiff-Appellant*

56. Public Rights Project, *Amicus Curiae\**

57. Reyes, Sean D., *Amicus Curiae\**

58. Rosenthal, Joshua, *Attorney for Amicus Curiae\**

59. Rumberger Kirk & Caldwell, P.A., *Attorney for Amicus Curiae\**

60. Schenck, Robert S., *Attorney for Defendant-Appellee*

61. Singer, David B., *Attorney for Plaintiff-Appellant*

62. Singh, Samantha B., *Attorney for Plaintiff-Appellant*

63. Sundararajan, Anagha, *Attorney for Plaintiff-Appellant\**

64. Swain, Alexandra P., *Attorney for Plaintiff-Appellant*

65. Tien, Jane, *Attorney for Plaintiff-Appellant\**

66. Torres-Spelliscy, Ciara, *Amicus Curiae\**

67. Turret, Erica S., *Attorney for Amicus Curiae\**

68. Unikowsky, Adam G., *Attorney for Amicus Curiae\**

69. Warren, Andrew, *Plaintiff-Appellant*

70. Whitaker, Henry C., *Attorney for Defendant-Appellee*

71. Wilson, Alan, *Amicus Curiae\**

72. Wynbrandt, Kathryn L., *Attorney for Amici\**

73. Yost, Dave, *Amicus Curiae\**

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: April 26, 2023          **DEBEVOISE & PLIMPTON LLP**

*/s/ David A. O'Neil*

David A. O'Neil
801 Pennsylvania Ave. NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com


*Counsel for Plaintiff-Appellant
Andrew Warren*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................1

ARGUMENT ........................................................................................2

I.   The District Court Had Authority to Remedy the First Amendment Violation It Found ...............................................................2

II.  The District Court Improperly Applied the *Mount Healthy* Framework ........3

   A.   The Governor Failed to Prove His Affirmative Defense.........................4

   B.   The Governor Could Not Lawfully Have Suspended Mr. Warren Based on the Reasons the District Court Created .............................................11

   C.   The District Court's Findings Describe a First Amendment Violation.......................................................................13

III. The Governor's Alternative Arguments Are Meritless ................................18

   A.   The *Nieves* Probable-Cause Argument Fails on Both the Facts and the Law ........................................................................19

   B.   The First Amendment Protects the Speech of Elected Officials ............21

   C.   Elected State Attorneys Are Not the Governor's Confidential Assistants or Advisors.......................................................26

CONCLUSION ......................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (2009) ................................................................................................17

*Austin v. State ex rel. Christian,* 310 So. 2d 289 (Fla. 1975) ................................27

*Baker v. Carr*, 369 U.S. 186 (1962)..........................................................................3

\* *Bond v. Floyd*, 385 U.S. 116 (1966) .....................................................22, 23, 24, 26

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) ................................................23

*Branti v. Finkel*, 445 U.S. 507 (1980) ...................................................................26

*Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000) ....................................8

*Ex parte Young*, 209 U.S. 123 (1908).......................................................................3

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978).............................................12

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .......................................................23, 24

*Greene v. Doruff*, 660 F.3d 975 (7th Cir. 2011) .......................................................7

*Hartman v. Moore*, 547 U.S. 250 (2006)................................................................21

*Houston Cmty. Coll. Sys. v. Wilson*, 142 S.Ct. 1253 (2022) ...................................21

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)..................................20

*Lane v. Central Ala. Comm. Coll.*, 772 F.3d 1349 (11th Cir. 2014) .........................3

*Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769 (11th Cir. 1982).........................8, 9

\* *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).............................*passim*

\* *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977).....................................................................................................*passim*

*Nichols v. Penn. State Univ.*, 227 F.3d 133 (3d Cir 2000) .....................................13

*Nieves v. Bartlett*, 139 S.Ct. 1715 (2019) ...................................................19, 20, 21

*O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045 (11th Cir. 2022) .........................22

*Parks v. City of Horseshoe Bend*, 480 F.3d 837 (8th Cir. 2007)..........................24

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)..........................3

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243 (10th Cir. 2000) ....................................................................................................24

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)................................................23, 24

*Rangra v. Brown*, 566 F.3d 515, *reh'g en banc granted*, 576 F.3d 531 (5th Cir. 2009)..................................................................................................24

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002)................................22, 25

*Shurtleff v. City of Boston*, 142 S.Ct. 1583 (2022) .............................................24

∗ *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ...................................9, 10, 11

*Stanley v. City of Dalton*, 219 F.3d 1280 (11th Cir. 2000)..................................9, 12

*Tanner v. McCall*, 625 F.2d 1183 (5th Cir. 1980) ...........................................8, 9, 11

∗ *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981)........................8, 10, 12

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977) ....................................18

*Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011).....................................................9

∗ *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998) ..........................................8, 11

*Werkheiser v. Pocono Twp.*, 780 F.3d 172 (3d Cir. 2015) ....................................24

*Wood v. Georgia*, 370 U.S. 375 (1962) ..........................................................22, 25

## Other Authorities

42 U.S.C. § 1983 ......................................................................................................3

Fla. Const. art. IV, § 7(a) ..........................................................................................21

*Pretext, Merriam-Webster*, https://www.merriam-webster.com/dictionary/pretext ..........................................................................6

U.S. Const. amend. I ...........................................................................*passim*

U.S. Const. amend. XI ......................................................................1, 3

**Other Sources**

Ron DeSantis, *The Courage to Be Free: Florida's Blueprint for America's Revival* (2023) ....................................................................13, 14, 22

## PRELIMINARY STATEMENT

Andrew Warren explained in his opening brief that the District Court's decision not to reinstate him rested on a number of legal errors. In addition to perceiving an Eleventh Amendment bar that did not exist, the District Court misapplied the applicable First Amendment framework by failing to hold the Governor to his burden of proof, by concluding that the Governor would have suspended Mr. Warren anyway on grounds for which he had no legal authority, and by failing to recognize that its own factual findings describe a textbook case of viewpoint discrimination. Correction of any one of these errors requires reversal.

The Governor cannot defend these rulings on the actual record, so he attempts to a write a different one. Just as he misrepresented Mr. Warren's policies to create the pretext for suspension, the Governor misstates what happened in the District Court to justify the suspension on appeal. He "cho[o]se[s] to ignore" critical parts of the District Court opinion, makes "untrue statement[s]" about others, and even distorts his own arguments where they do not "fit the narrative" he now seeks to advance. App. 1247, 1243.

If the Governor's willingness to misstate the record is remarkable, the vision of the First Amendment he presents through his alternative arguments is all the more so. In the Governor's view, an elected official has no right to tell her constituents—and voters have no right to hear—what the official believes about

the issues and policies for which she is responsible. As far as the First Amendment goes, the Governor may undo elections and remove incumbents solely because he disagrees with the viewpoints they express. He may remove any state attorney purely because she is not a member of his political party. And even if all of that did violate the First Amendment, federal courts are powerless to do anything about it. Whatever else the Governor's worldview describes, it does not reflect the law in this Circuit or this country.

This Court should reverse and remand for entry of a permanent injunction reinstating Mr. Warren to his elected post.

## ARGUMENT

## I.  The District Court Had Authority to Remedy the First Amendment Violation It Found

The Governor's attempt to rewrite the District Court's decision begins with his defense of the District Court's remedial analysis. According to the Governor, the District Court "rejected [the] First Amendment claim on the merits." Appellee's Brief at 12-13. What the District Court actually said—and then repeated multiple times—is that the Governor "violated the First Amendment." App.[1] 1278. The District Court did not, as he would tell it, "fault[] the Governor in some respects," Appellee's Brief at 12; it concluded that the Governor deprived

---

[1] "App." refers to Plaintiff-Appellant's Appendix.

Mr. Warren of his most basic constitutional rights. App. 1278. For the reasons Mr. Warren explained in his opening brief, nothing prevented the District Court from providing injunctive relief to remedy that constitutional violation. Opening Brief at 31-33. The Governor offers no meaningful defense of the District Court's Eleventh Amendment analysis because he fails even to acknowledge the District Court's ruling that his conduct was unconstitutional.[2]

## II. The District Court Improperly Applied the *Mount Healthy* Framework

The District Court erroneously applied *Mount Healthy* in three critical respects. First, the District Court did not hold the Governor to his burden of proof, instead excusing the Governor's constitutional violations by finding the "same-decision" affirmative defense satisfied even though the District Court rejected as

---

[2] The Governor separately contends that federal courts lack equitable authority to remedy constitutional violations by ordering reinstatement of a state official. Appellee's Brief at 50. He relies primarily on Reconstruction-era cases that predate *Ex parte Young*, 209 U.S. 123, 160 (1908), and the merger of law and equity. Appellee's Brief at 51 n.11. At least since then, federal courts have had the remedial authority "necessary to . . . vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Young*, 209 U.S. at 160); *Baker v. Carr*, 369 U.S. 186, 231 (1962) (federal courts may enjoin state power when used "as an instrument for circumventing a federally protected right"). That authority includes reinstatement. *See, e.g., Lane v. Central Ala. Comm. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) ("[R]equests for reinstatement constitute prospective injunctive relief that fall within the scope of the *Ex parte Young* exception."). And this case arises under Section 1983, a federal statute in which Congress granted federal courts full authority to issue injunctive relief, including reinstatement, against state officials. 42 U.S.C. § 1983.

false and pretextual the only reason the Governor pled in support of that affirmative defense. Second, the District Court rested the same-decision finding on a rationale that rendered the Governor's conduct unlawful and *ultra vires* under state law and therefore illegitimate for purposes of *Mount Healthy*. And third, in excusing the Governor's constitutional tort, the District Court attributed to the Governor a motivation that itself violated the First Amendment.

The Governor defends the District Court's analysis by blatantly misrepresenting his own position through this litigation, ignoring the District Court's actual findings, and misstating the law.

### A.      The Governor Failed to Prove His Affirmative Defense

To excuse the District Court's failure to hold him to his burden of proof, the Governor makes two arguments. First, he tries to square the circle between what he sought to prove at trial and what the District Court actually found. Second, he contends that he was not required to persuade the District Court that his proffered reason was true. Both contentions are meritless.

### 1.   *The District Court Rejected the Governor's Proffered Motivation*

From beginning to end, the Governor has emphasized that he suspended Mr. Warren entirely and exclusively on the basis of four specific writings: the FJP transgender statement, the FJP abortion statement, the bike-stop policy, and the low-level offense policy. The Executive Order cited only those four writings and

4

based its finding of "neglect of duty" and "incompetence" solely on them. App. 341-79. In discovery, the Governor repeatedly denied that there was any reason for the suspension other than the four writings. *See, e.g.*, App. 212 ("Governor's motives are fully expressed within the four corners of the suspension order itself"); 246; App. 261-62, 290, 269. In his Answer, the Governor said that he would prove the same-decision defense on the basis of the "expressed blanket refusal" purportedly contained in the four writings. *Id.* at 193. During trial, the Governor's witnesses uniformly repeated the same mantra: All the reasons for the suspension are contained in the order. *Id.* at 880:22-23, 902:1-4, 902:19-23 (Fenske); 1037:21-24, 1038:11-13 (Treadwell); 1116:5-12 (Newman). In closing, the District Court asked the Governor's counsel point-blank: Do "you have anything" else that would warrant suspension? Counsel's answer could not have been more explicit: "Other than those four [writings], no, Your Honor." *Id.* at 1205:4-7. Even after trial, the Governor has maintained that he ordered the suspension because Mr. Warren "signed a statement refusing to prosecute the laws of the land." Motion to Expedite, Dkt. 3 Exhibit 2.

Just as clearly, the District Court rejected the Governor's assertion that the four writings were the real reason for his action. App. 1272-73. The Governor cites the portion of the decision below identifying the "unprotected" factors that informed the suspension, but he then proceeds to ignore entirely the District

Court's actual analysis of the role those factors played. This is what the District Court actually found: "[T]he alleged nonprosecution policies were not the real motivation for the suspension." *Id.* at 1272-73. They were instead a "pretext to justify the suspension under the Florida Constitution." *Id.* at 1278. "The FJP Statements were a way to justify a decision already in the works on other grounds." *Id.* at 1275. Likewise, the bike stop and low-level offense policies appeared in the suspension order only because the lawyers considered it necessary to include a pretext—"something that could be labeled a blanket nonprosecution policy"—so that the suspension "could eventually be defended in the heavily partisan Florida Senate." *Id.* at 1276, 1278 (noting "the pretext provided by the bike and low-level-offense policies and the one sentence in the FJP abortion statement"). As the Governor well knows, pretext is the definitional opposite of a genuine motivation. *Pretext*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/pretext ("a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs").

In light of these explicit findings, it is disingenuous in the extreme for the Governor to represent that the District Court agreed with what the Governor "had contended all along," Appellee's Brief at 4, and, in particular, to say that the District Court "found that the Governor *was in fact* motivated by" Mr. Warren's "presumptive non-prosecution policies and his pledge not to prosecute abortion

crimes." *Id.* at 20 (emphasis in original) (asserting that the District Court "found that Mr. Warren's presumptive non-prosecution policies motivated the suspension"). The District Court found the opposite. App. 1273, 1221, 1247, 1263. And the District Court correctly observed that, as to the real motivation it identified—scoring political points by "bringing down" a leader of the "progressive" prosecution movement—the Governor never so much as "acknowledged that this was a factor in the suspension." *Id.* at 1277, 1242, 1265. Indeed, he adamantly denied any motivation other than the four writings and continues to do so. Opening Brief at 40-41.

### 2. The Governor's Failure to Prove His Proffered Reason Required Judgment for Mr. Warren

Because the Governor failed to prove his proffered reason for the suspension, he did not carry his burden of proof and the District Court should have entered judgment in Mr. Warren's favor. The Governor counters by asserting that he was not required to proffer a reason at all, nor was he obligated to prove the specific reason that he in fact advanced. Those assertions conflict with settled law and the basic nature of an affirmative defense.

As Judge Posner has recognized, one of the key benefits of "the approach of *Mt. Healthy* is that it avoids putting a plaintiff to the burden of disproving a host of alternative hypotheses concerning possible causes of his harm." *Greene v. Doruff*,

660 F.3d 975, 980 (7th Cir. 2011). Instead, the defendant, "who is in the best position among the parties to know why certain employment decisions were made," *Walker v. Mortham*, 158 F.3d 1177, 1183 n.10 (11th Cir. 1998), "must clearly set forth . . . the reason" for his action, and he must be "reasonably specific." *Id.* at 1184; *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 775-76 (11th Cir. 1982) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981)). The defendant's obligation to "articulate[] a clear and reasonably specific factual basis" for the adverse action ensures that "the plaintiff [is] afforded a full and fair opportunity" to hold the defendant to his burden. *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) (quoting *Burdine*, 450 U.S. at 258).

Having proffered the specific reasons for his conduct, as the Governor did in his Answer, the Defendant must prove that he would in fact have taken the same action on that asserted basis. *Tanner v. McCall*, 625 F.2d 1183, 1195 n.21 (5th Cir. 1980) ("Mt. Healthy clearly places on the defendant the burden of proving independent reasons for discharge."). It is not enough, as the Governor contends, merely to incant the words of *Mount Healthy* and then rely on the court to search the record for its own truth. Appellee's Brief at 21-23. This Court has repeatedly rejected that approach. *See, e.g.*, *Walker*, 158 F.3d at 1181-1182 n.8 ("[A] court may not assume, based on its own perusal of the record, that the decision-maker in

a particular case was motivated by a legitimate reason."); *Lee*, 684 F.2d at 775 (rejecting on appeal the legitimate nondiscriminatory reasons "assigned by the court" because they were "not [reasons] articulated by [the decision-makers] when they were questioned"); *Tanner*, 625 F.2d at 1195 n.21 (concluding that a defendant had failed to carry his *Mount Healthy* burden because he "never testified" or sought to prove "that these [reasons] were motivating factors in his decisions").

In the decision below, the District Court essentially applied the *McDonnell Douglas* framework, which differs from *Mount Healthy* in exactly the respect that is dispositive here. App. 1262-78. The key difference between the two doctrines is simple: Under *McDonnell Douglas*, the "plaintiff at all times bears the ultimate burden of persuasion," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 503 (1993), whereas under *Mount Healthy*, once the plaintiff makes his case "the burden of persuasion itself passes to the defendant-employer." *Wagner v. Jones*, 664 F.3d 259, 270 (8th Cir. 2011). The plaintiff-employee therefore "will prevail" under *Mount Healthy*, *id.*, unless the defendant affirmatively proves "that the legitimate reason [it proffered] would have motivated it to make the same employment decision." *Stanley v. City of Dalton*, 219 F.3d 1280, 1293 (11th Cir. 2000).

The Supreme Court's decision in *Hicks* highlights the difference and makes clear why Mr. Warren prevails here. The issue in *Hicks* was whether, in a Title VII

case governed by *McDonnell Douglas*, "the trier of fact's rejection of the employer's asserted reasons for its actions mandates a finding for the plaintiff." 509 U.S. at 504. The Supreme Court answered "no" to that question precisely because the defendant bears only a burden of *production*, not a burden of *persuasion*, under the *McDonnell Douglas* framework. *Id.* at 503. "It is important to note," the Court began, "that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 507 (emphasis in original) (quoting *Burdine*, 450 U.S. at 253). The Court quoted Federal Rule of Evidence 301, which provides that a presumption like that established by *McDonnell Douglas* "does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." *Id.* Thus, the Court explained, a rule "that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'" *Id.* at 511 (emphasis in original).

*Mount Healthy* does exactly what *McDonnell Douglas* does not: It shifts to the defendant the "ultimate burden of persuasion" and "the risk of nonpersuasion."

*See Walker*, 158 F.3d at 1198 (explaining that where "the defendant's legitimate, non-discriminatory explanation [is] an affirmative defense," then the Rule 301 construct does not apply). The reasoning of *Hicks* therefore compels a judgment in Mr. Warren's favor. The essential premise of that decision was that the defendant bore only a burden of production, not one of proof. 509 U.S. at 511. *Mount Healthy* reverses that premise. Where, as here, the law "clearly places on the defendant the burden of *proving* independent reasons for discharge," the Governor's failure to persuade the court requires judgment against him. *Tanner*, 625 F.2d at 1195 n.21 (emphasis added).

## B. The Governor Could Not Lawfully Have Suspended Mr. Warren Based on the Reasons the District Court Created

As Mr. Warren explained in his Opening Brief, *Mount Healthy* permits a defendant, found to have illegally considered protected conduct, to show that reinstatement is still not warranted because the adverse action would have happened anyway for legitimate, non-discriminatory reasons. To satisfy that affirmative defense, the defendant must prove not only that he *would* have fired the plaintiff for the reasons he asserted and pled, *see supra* at p. 9, but also that he *could* have done so. After all, the defendant can hardly object to reinstatement if he lacked legal authority to fire the plaintiff anyway, regardless of speech.

That is the situation here. The District Court concluded that the Governor had no authority under the Florida Constitution to remove Mr. Warren for the reasons that actually motivated him. App. 1279. That conclusion, too, alone sufficed to end the *Mount Healthy* defense.

The Governor's principal answer is that the innumerable courts that have articulated the "legitimate, non-discriminatory reason" requirement really only meant "non-discriminatory." That argument is neither persuasive nor accurate. As the Supreme Court has made clear, "[t]he explanation provided must be legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 255; *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978) (defendant must offer a "justification which is reasonably related to the achievement of some legitimate goal"); *Stanley*, 219 F.3d at 1296 (defendant must show "an adequate lawful basis").[3]

It is therefore unsurprising that the Governor, too, has been unable to locate a single reported case like this one, in which a court excused a First Amendment violation by denying reinstatement under *Mount Healthy* even though it found that

---

[3] The Governor also objects that the "legitimacy" requirement under *Mount Healthy* inappropriately introduces state law into a Section 1983 claim. Appellee's Brief at 24-25. That is a curious argument, considering that the Governor's preferred framework would place consideration of state law front and center by requiring a court to decide at the threshold whether the defendant had probable cause under state law. *Id.* at 26-32.

the defendant did not have lawful authority to fire the plaintiff on the purportedly non-discriminatory grounds. The Governor relies on *Nichols v. Penn. State Univ.*, 227 F.3d 133 (3d Cir 2000), but that case at most involved a finding that the manner in which the termination was effectuated did not comply with a private agreement between the parties. Appellee's Brief at 24; *Nichols*, 227 F.3d at 140. *Nichols* provides no support for the fundamentally different proposition that a defendant can avoid reinstatement by pointing to an alternative hypothetical course of action that he would have had no legal authority to pursue.

### C.    The District Court's Findings Describe a First Amendment Violation

Mr. Warren has explained why the ultimate motivation the District Court attributed to the Governor vividly describes a politically motivated, viewpoint-discriminatory termination. Opening Brief at 44-51. Animus toward Mr. Warren's beliefs, ideology, viewpoints, and associations saturates the Governor's conduct, from his first instruction that Mr. Keefe find a prosecutor who "had Soros support" to his crowing about how the suspension "sent a signal that the Soros model" would "not fly in the Sunshine State." *See* Ron DeSantis, *The Courage to Be Free: Florida's Blueprint for America's Revival* 238, 239 (2023) (hereinafter "DeSantis Memoir"). The District Court itself noted at trial that "this whole thing is chockful of animus against [reform] prosecutors." App. 1203:22-23.

Thus, when the District Court found that the Governor's real motivation was to take down a leading "reform prosecutor" and to score a "political benefit" from doing so, that motivation was inextricably intertwined with retaliation against First Amendment-protected activity. *Id.* at 1277. The reason the Governor believed that Mr. Warren "was a reform prosecutor" whom he wanted to "bring[] down," *id.* at 1226, 1277, is that, as Mr. Keefe himself testified, Mr. Warren had aligned himself publicly with that ideology; in Mr. Keefe's words, Mr. Warren was "an expresser or a conduit for Mr. Soros's world views on criminal prosecution" and "had taken [up] th[e] mantle" of progressive ideas. *Id.* at 826:18-19, 1236. A prosecutor who "refuse[s] to enforce the law" (a counterfactual descriptor the Governor and his State *amici* invoke in variations no less than 25 times) is a barely coded reference to a prosecutor who is "Soros-backed," "leftist," or "woke"[4] —in short, a prosecutor associated with an ideology that the Governor abhors and has sought to promote himself by denigrating. The District Court's findings describe, in detail, classic viewpoint discrimination by the Governor.

The Governor's effort to convert that finding into one based purely on conduct is singularly unpersuasive. To avoid implicating the First Amendment, one would have to believe that the Governor would have suspended Mr. Warren

---

[4] *See* Appellee's Brief at 2, 6, 7, 8, 10, 14, 17, 18, 33; Ohio *et al.* Amicus Brief at 1, 2, 4, 9, 10, 11, 13, 19; App. 830:21-22 (Keefe Testimony), 873:20-22, 879:10 (Fenske Testimony); DeSantis Memoir, *supra*, at 238.

even if he were a Republican leader and staunch political supporter of the Governor. One would have to believe that the Governor would have targeted Mr. Warren even if he had never uttered the words "criminal justice reform"; never campaigned on "progressive" ideas; never signed statements advocating viewpoints opposed to the Governor; and never associated with the "oft-vilified Democratic party contributor George Soros," App. 1235, or the "series of shell organizations, affiliates and pass-through entities, including the Democratic Party," that Mr. Keefe emphasized in the first draft of the Executive Order. *Id.* at 472-73. Instead, one would have to conclude that even if every single one of those facts were removed from the Governor's mind, he would still have suspended Mr. Warren solely because he disagreed with the actual prosecutorial decisions that Mr. Warren made in specific cases.

The District Court's findings render that conclusion untenable. The District Court found that "[t]he actual facts" of Mr. Warren's performance as a prosecutor "did not matter" to the Governor so his office "made no effort" to understand them. *Id.* at 1277. The Governor "did not wish to know" how Mr. Warren prosecuted specific cases, so when Mr. Keefe asked around among his friends in law enforcement, "he paid no attention to the details and took not a single note." *Id.* at 1275, 1237. Mr. Keefe "did not speak to . . . anyone who worked in the office—to anyone in position to know" how Mr. Warren in fact did his job. *Id.* at 1236-37.

Mr. Keefe did not ask about whether any of Mr. Warren's policies "affected the handling of even a single case." *Id.* at 1237-38. The hunt the Governor commissioned was focused entirely on finding someone who had a "reform prosecutor approach"—a "viewpoint" about the role of a prosecutor in the criminal justice system—and that ideologically driven search, not any disagreement with actual case decisions, was what placed Mr. Warren in the Governor's "crosshairs." *Id.* at 1237, 1226, 1242.

Indeed, even the *Governor* agrees that he was *not* actually motivated by case-based disagreements with how Mr. Warren exercised his discretion as a prosecutor. Just as he did in the District Court, the Governor insists that he was motivated solely by the purported "blanket refusals" in the four writings. Appellee's Brief at 10, 19-20, 22. The Governor is therefore left in the non-sensical position of arguing that he proved a fact—about his own state of mind— that he simultaneously asserts is incorrect. In any event, the record cannot support that effort. The Governor describes an "avalanche" of supporting evidence for the incorrect fact, *id.* at 19, by which he apparently means only two things: first, that Sheriff Chronister shared with Mr. Keefe "a very small number of cases" in which the Sheriff disagreed with Mr. Warren, App. 1237; and second, that the Governor's hand-selected speakers at the press conference announcing the suspension complained about Mr. Warren's performance. App. 1237. But the

"very small number of cases" Sheriff Chronister referenced were exactly the "details" to which Mr. Keefe "paid no attention." *Id.* at 1237. Not one witness at trial said that the suspension was driven by prosecutorial decisions, and the District Court emphasized that even "with unlimited time," the Governor "has been unable to identify even a single case in which" Mr. Warren did not appropriately exercise his discretion. *Id.* at 1273. As to the press conference, if the Governor's motivation is to be judged based on the way the suspension was announced, then the finding of retaliatory animus is overwhelming. *See id.* at 588 ("Prepare for the liberal media meltdown of the year"); Opening Brief at 19-20 (collecting Governor's comments describing the suspension as part of the fight against the "woke mind virus" and punishment for a "leftist politician").[5]

On this record, in sum, the Governor did not prove that he would have suspended Mr. Warren were it not for Mr. Warren's protected speech and associations. *ACLU*, 557 F.3d at 1207. Even if it were procedurally permissible

---

[5] For these reasons, a finding that the Governor was motivated solely by genuine disagreement with Mr. Warren's actual prosecution decisions would fail under any applicable standard of review. Contrary to the Governor's contentions, however, there is authority for this Court to review *de novo* "the defendant's ultimate motivation for acting," Appellee's Brief at 13, when necessary to safeguard protected activity. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1204, 1206-07 (2009) (holding that this Court may resolve "the disputed 'why' facts—the motive facts"—when "motive is the ultimate fact upon which the resolution of the constitutional question depends."); App. 1226 ("The overriding factual issue is why the Governor did it—why he suspended Mr. Warren.").

under *Mount Healthy* for a court to adopt (illegal) reasons different from the ones the defendant pledged to prove, "[j]udges are not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). It is simply not plausible to conclude that Governor DeSantis would have suspended Mr. Warren if he were the Governor's political ally. The Governor's motivations cannot be separated from his animus toward Mr. Warren's speech, his associations, and his political affiliations; the fact that Mr. Warren spoke out about the two "culture war" issues on which the Governor has defined himself; and the political opportunity the Governor saw in "bringing down" the leader of an ideology that the Governor has built his national profile disparaging.[6] App. 1277.

## III. The Governor's Alternative Arguments Are Meritless

The Governor advances a series of alternative arguments that would effectively eliminate any role for the First Amendment in the electoral context.

---

[6] The record includes extensive testimony and evidence about two other critical facts the District Court did not cite. First, Republican state attorneys throughout Florida have issued guidance with exactly the same kind of "presumptions" that the Governor incorrectly labeled "non-prosecution policies." *See e.g.*, App. 984:19-985:6, 798:5-801:25. Second, the Governor took no action against an elected Sherriff—a close political ally—who told his constituents in videotaped comments that he would not enforce an assault-weapons bill. *See id.* at 816:11-817:1, 1005:3-1007:22.

Those positions do not reflect the law, and they need not long detain this Court. *See id.* at 1246-50.

A. **The *Nieves* Probable-Cause Argument Fails on Both the Facts and the Law**

The District Court correctly rejected on both the facts and the law the Governor's reliance on *Nieves v. Bartlett*, 139 S.Ct. 1715, 1723 (2019), for the contention that Mr. Warren was required at the outset to establish the absence of "probable cause" to suspend him under state law.

Based on its extensive review of the record, the District Court found that, in fact, "probable cause to believe that Mr. Warren [had] neglected his duty or was incompetent was absent." App. 1250. Not only were the assertions that Mr. Warren had non-prosecution policies "untrue" and "false," *id.* at. 1243, 1221, but "[a]ny minimally competent inquiry would have confirmed this." *Id.* at 1235. The Governor and his staff "could have easily learned the truth" in any number of ways—including by simply contacting Mr. Warren—but they "made no effort" to find the truth because they "did not wish to know." *Id.* at 1268, 1275-76. The Governor and his office also "knew about" but "chose to ignore" facts that "did not fit the narrative." *See id.* at 1276, 1140:14-1143:23, 1008:22-1009:5. Those factual findings are sound, and this Court's precedents squarely support the District Court's conclusion that this "deficient inquiry and willful ignorance do not

establish probable case." *Id.* at 1247; *see Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004) (concluding that an officer lacks probable cause if he "conduct[s] an investigation in a biased fashion or elect[s] not to obtain easily discoverable facts").

In any event, the District Court also correctly held that *Mount Healthy*, not *Nieves*, applies to Mr. Warren's First Amendment claims. App. 1249-50. As the District Court explained, none of the considerations underlying *Nieves* is present here. *See* App. 1247-50. This is not a criminal proceeding of the kind that the threshold probable-cause requirement has been held to apply; the Governor suspended Mr. Warren from his job. *Id.* at 1248-49. Suspending an elected official, unlike arresting a suspect, is not "a dangerous task that requires making quick decisions in circumstances that are tense, uncertain, and rapidly evolving." *Nieves*, 139 S.Ct. at 1725 (internal quotation marks omitted). Suspension decisions do not require "split-second judgments"; this suspension, for example, was the culmination of a six-month long process. App. 1250, 766:17-22. Unlike arrests, suspensions are exceedingly rare, so probing the decisionmaker's motive when they are challenged would not threaten "overwhelming litigation risks." *Nieves*, 139 S.Ct. at 1723-25 (emphasizing that law enforcement officers make 29,000 arrests per day). And unlike the decision to arrest or prosecute, suspension was not, and could not have been, the product of independent action by multiple

government actors—for example, detectives, arresting officers, and prosecutor. *See Nieves*, 139 S.Ct. at 1723; *Hartman, v. Moore*, 547 U.S. 250, 261-62 (2006). To the contrary, the Florida Constitution gives the Governor—and the Governor alone—the authority to suspend a public officer. Fla. Const. art. IV, § 7(a). Members of the Governor's staff merely gave him advice and assistance in reaching a decision for which he has emphatically claimed sole credit. DeSantis Memoir at 238-39 ("I pulled the trigger and announced Warren's suspension").

## B.    The First Amendment Protects the Speech of Elected Officials

The Governor next advances the remarkable contention that the First Amendment permits him to suspend elected officials based on disagreement with the content or viewpoint of their speech. That is because, the Governor asserts, anything an elected official says about topics within her job responsibility is government speech entirely unprotected by the First Amendment. That is not the law.

The Supreme Court unanimously emphasized just last Term (in a case that the Governor does not even acknowledge) that "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that it was adopted in part to protect the free discussion of governmental affairs." *Houston Cmty. Coll. Sys. v. Wilson*, 142 S.Ct. 1253, 1261 (2022) (internal quotations omitted). For that reason, "[t]he First Amendment surely promises an

elected representative like Mr. [Warren] the right to speak freely on questions of government policy." *Id.* Indeed, "the role that elected officials play in th[e democratic] process 'makes it all the more imperative that they be allowed to freely express themselves.'" *Id.* (quotations omitted). That principle has been part of the fabric of First Amendment law at least since the Supreme Court decided *Wood v. Georgia*, 370 U.S. 375 (1962), and *Bond v. Floyd*, 385 U.S. 116 (1966), which the District Court correctly described as "[t]he leading case involving First Amendment protection of an elected official's job." App. 1251.

The reasons for this principle require little elaboration. "The manifest function of the First Amendment in a representative government requires that [elected officials] be given the widest latitude to express their views on issues of policy." *Bond*, 385 U.S. at 135-36. Such speech enables the basic enterprise of self-governance; only by knowing what an elected official would do on issues within his responsibility can the citizenry cast an informed vote. Whether the speaker is a challenger who hopes to unseat the incumbent or the current occupant of the office who wants voters to reelect him, "[d]ebate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges." *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002) (internal quotations omitted); *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1052-53 (11th Cir. 2022). Indeed, elected officials "have an obligation

to take positions on controversial political questions so that their constituents can be fully informed by them." *Bond*, 385 U.S. at 136-37.

The Governor would topple these pillars of the democratic system on the basis of three arguments, none of which is persuasive.

First, with only a glancing dismissal of *Bond*, the Governor contends that Mr. Warren is a "government employee" whose speech on topics within his purview is subject to the framework of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Appellee's Brief at 36-44. The District Court correctly held, in line with the overwhelming weight of authority, that *Garcetti* and *Pickering* do not control the speech of an elected official like Mr. Warren. App. 163-167, 1258-1261. As Judge Ikuta on the Ninth Circuit recently explained:

> The rationale for allowing the government to restrict the speech of government employees and contractors is not applicable to elected officials. Such elected officials are not speaking as employees of the government, nor does the government need to regulate their speech in order to deliver public services "effectively and efficiently" or to control "daily management functions." An elected official's speech does not interfere with his performance of duties; to the contrary, the speech is a vital component of his duties.

*Boquist v. Courtney*, 32 F.4th 764, 779-80 (9th Cir. 2022) (internal citations omitted). Every other circuit squarely to consider the issue has agreed. *See Phelan*

*v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000); *Rangra v. Brown*, 566 F.3d 515, 522-27 (5th Cir. 2009); *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 177-79 (3d Cir. 2015).[7]  There is no reason for this Court to adopt a different rule, and as the District Court explained, neither *Garcetti* nor *Pickering* would help the Governor in any event, App. 1258-60, 164, including because, as even the Governor acknowledges, "Mr. Warren is not the Governor's employee."  Appellee's Brief at 31.[8]

Second, the Governor and his State *amici* contend that the First Amendment protection set forth in *Bond* "does not apply to non-legislative elected officials" because of the different functions such officials perform.  *Id.* at 40 n.5; Ohio *et al.* Amicus Brief at 21-22.  That would come as a surprise to the Supreme Court, which has applied those protections in cases involving elected officials in both the executive and judicial branch.  Indeed, it was a case involving an elected sheriff, not a legislator, where the Supreme Court confirmed that the "role that elected officials play in our society" requires robust protection for their speech.  *Wood*,

---

[7] The Governor cites as contrary authority a footnote in an Eighth Circuit decision that did not confront the issue.  *Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 n.4 (8th Cir. 2007).

[8] The Governor is incorrect that *Shurtleff v. City of Boston*, 142 S.Ct. 1583 (2022), provides an alternative "three factor[]" "test" to the "three-part government-speech test" in *Garcetti*.  Appellee's Brief at 41.  *Shurtleff* addressed the fundamentally different issue whether the government violates the First Amendment when it excludes certain speakers from a forum.

370 U.S. at 395.  The Supreme Court cited *Bond* approvingly last Term in *Wilson*, which involved another elected official in the executive branch.  142 S.Ct. at 1263. And in *Republican Party of Minnesota v. White* (another case the Governor fails even to mention), the Supreme Court applied First Amendment strict scrutiny to judicial speech restrictions over the dissent's argument that "judges perform a function fundamentally different from that of the people's elected representatives." 536 U.S. at 803 (Ginsburg, J., dissenting).

Third, the Governor contends that any burden on Mr. Warren's speech resulting from his suspension was "incidental" to the State's regulation of conduct: "neglect of duty" and "incompetence."  Appellee's Brief at 44-45.  But the District Court found that Mr. Warren did not engage in such misconduct and that there was no reasonable basis to believe otherwise.  App. 1235 ("The record includes not a hint of misconduct by Mr. Warren"; "[t]his factual issue is not close.").  Regulation of "conduct" therefore provides no excuse for the Governor's retaliation against Mr. Warren's protected activity.[9]

---

[9] For the same reason, the State *amici* address a non-existent case because they base their entire argument on the false premise that Mr. Warren had blanket non-prosecution policies.  Ohio *et al.* Amicus Brief at 13-14.  The District Court found that Mr. Warren did not have any such policies, App. 1235, so this case does not concern "the question whether States may remove local prosecutors who refuse to do their jobs."  Appellee's Brief at 3.  Mr. Warren "was diligently and competently performing the job he was elected to perform."  App. 1235.

### C. Elected State Attorneys Are Not the Governor's Confidential Assistants or Advisors

The Governor contends that he may suspend other elected officials not only because he disagrees with their speech and beliefs, but also because they are members of a different political party. *See* Appellee's Brief at 45-50. In his view, elected state attorneys (and presumably every other elected member of the executive branch) have no constitutional protection for their political associations because, as high-ranking officials with discretion in how to exercise their authority, they are "policymakers" under the "political patronage" exception to the *Elrod-Branti* principle. *Id.*

That contention fundamentally misstates First Amendment law. The relevant question in determining the permissibility of a patronage dismissal is not whether an official "formulates policy," but instead whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980). To state what should be obvious, a state attorney in Florida may effectively perform her duties whether she is a Republican, Democrat, or a member of no party. Such officials are not the Governor's "confidential" aides who must "share his political beliefs and party commitments." *Id.*[10] The people of Florida could have designed such a system,

---

[10] There is, of course, a basic contradiction in the Governor's arguments. If the role of prosecutors is simply to "enforce the law," their party affiliation should

but they chose instead to make the job of state attorney a separately elected "constitutional office" that "is responsible to the electorate of his circuit." *Austin v. State ex rel. Christian,* 310 So. 2d 289, 293-94 (Fla. 1975). Under the Florida Constitution, the Governor may suspend the state attorney only for very narrow and specific reasons, and partisan fealty to the Governor is not one of them.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

---

make no difference. What the Governor really means is that State Attorneys should enforce the laws that align with his political ideology.

## CONCLUSION

The District Court's decision should be reversed and the case remanded for entry of a permanent injunction reinstating Mr. Warren to office.

Dated: April 26, 2023           Respectfully submitted,

**DEBEVOISE & PLIMPTON LLP**

*/s/ David A. O'Neil*

David A. O'Neil
801 Pennsylvania Ave. NW, Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1.      This brief complies with the type-volume limitation of Rule 32(a)(7) of the Federal Rules of Appellate Procedure because it contains approximately 6,490 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Date: April 26, 2023

DEBEVOISE & PLIMPTON LLP

/s/ *David A. O'Neil*

David A. O'Neil

801 Pennsylvania Ave. NW,
Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

*Counsel for Plaintiff-Appellant*
*Andrew Warren*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2023, the foregoing Reply Brief of Plaintiff-Appellant Andrew Warren was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit via the Court's electronic filing system and served on all counsel of record via CM/ECF.

Date: April 26, 2023

DEBEVOISE & PLIMPTON LLP

/s/ *David A. O'Neil*

David A. O'Neil

801 Pennsylvania Ave. NW,
Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

*Counsel for Plaintiff-Appellant*
*Andrew Warren*