No. 23-10459

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| ANDREW H. WARREN, | : | On Appeal from the |
| Plaintiffs-Appellants, | : | United States District Court |
| | : | for the Northern District of Florida |
| v. | : | |
| RON DESANTIS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF FLORIDA, | : | District Court Case No. 4:22-cv-302 |
| | : | |
| Defendant-Appellee. | : | |
| | : | |
| | : | |

**BRIEF OF *AMICI CURIAE* STATES OF OHIO, ALABAMA, ARKANSAS, GEORGIA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, SOUTH CAROLINA, SOUTH DAKOTA, TEXAS, UTAH, VIRGINIA, AND WEST VIRGINIA IN SUPPORT OF *EN BANC* REVIEW**

DAVE YOST
Ohio Attorney General

T. ELLIOT GAISER*
Solicitor General
 *Counsel of Record
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, OH 43215
(614) 466-8980
Thomas.gaiser@ohioago.gov

*Counsel for State of Ohio*

*Additional counsel listed after signature block*

# CERTIFICATE OF INTERESTED PERSONS

The State of Ohio and the other *amici* States certify that, to their knowledge, the Plaintiff-Appellant's Petition for Rehearing *En Banc* contains a complete list (at C-1–C-15) of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1.

# TABLE OF CONTENTS

|  | Page |
|---|---|
| CERTIFICATE OF INTERESTED PERSONS | i |
| TABLE OF CONTENTS | ii |
| TABLE OF AUTHORITIES | iii |
| STATEMENT OF ISSUES, *AMICI* INTEREST, AND SUMMARY OF ARGUMENT | 1 |
| ARGUMENT | 3 |
|     I.   State law defines the power of local prosecutors, including the line between prosecutorial discretion and prosecutorial abdication. | 3 |
|     II.  The First Amendment does not protect from discipline local prosecutors who announce non-prosecution policies. | 8 |
| CONCLUSION | 12 |
| ADDITIONAL COUNSEL | 13 |
| CERTIFICATE OF COMPLIANCE | 14 |
| CERTIFICATE OF SERVICE | 15 |

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Connick v. Myers*,
    461 U.S. 138 (1983) .............................................................................. 9

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ............................................................... 2, 9, 10, 11

*Gun Owners of Am., Inc. v. Garland*,
    19 F.4th 890 (6th Cir. 2021) ................................................................. 6

*Hunter v. Pittsburgh*,
    207 U.S. 161 (1907) .............................................................................. 4

*Lane v. Franks*,
    573 U.S. 228 (2014) ............................................................................ 10

*Puerto Rico v. Sánchez Valle*,
    579 U.S. 59 (2016) ................................................................................ 3

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ................................................................. 9

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013) .............................................................................. 3

*Wayte v. United States*,
    470 U.S. 598 (1985) ......................................................................... 6, 10

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) .................................................................... 1-2, 8, 9

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. X ................................................................................. 3

Cal. Const. art. V, § 13 ............................................................................ 5, 8

Fed. R. Evid. 801 ........................................................................................ 9

Ohio Rev. Code §3.07 ................................................................................ 5

Ohio Rev. Code §3.22 ............................................................................. 4-5

Ohio Rev. Code §309.03 ................................................................................ 4

**Other**

Christopher R. Berry & Jacob E. Gersen, *The Unbundled Executive*,
 75 U. Chi. L. Rev. 1385 (2008) ............................................................... 4

Michael J. Ellis, *The Origins of the Elected Prosecutor*,
 121 Yale L.J. 1528 (2012) ........................................................................ 4

Zachary S. Price, *Faithful Execution in the Fifty States*,
 57 Ga. L. Rev. 651 (2023) .................................................................. 4, 6, 7

# STATEMENT OF ISSUES, *AMICI* INTEREST, AND SUMMARY OF ARGUMENT

With increasing frequency, ideologically motivated prosecutors have pledged not to enforce laws they dislike. At its core, this case asks whether the States may, consistent with the First Amendment, discipline local prosecutors who make non-prosecution pledges. That question is of great significance to the *amici* States. Elected prosecutors, it is worth remembering, are a creation of the States. And while the States have given prosecutors considerable discretion, they have *not* given prosecutors the power to effectively veto state laws by categorically suspending law enforcement. Thus, when prosecutors disregard laws they dislike, they violate their oaths of office, and they abuse the power the public has given them. Indeed, non-prosecution pledges harm the public in several ways. They encourage people to engage in illegal behavior. They confuse people as to what the law really says. Most fundamentally, they frustrate the People's right to have their elected legislators make state law.

This case involves a prosecutor, Andrew Warren, who publicly pledged—using his official title—to refrain from prosecuting abortion-related laws. For two reasons, the First Amendment's Free Speech Clause does not bar the States from disciplining a prosecutor who makes such a pledge. *First*, the Free Speech Clause "does not prohibit" using speech as evidence of misconduct. *Wisconsin v. Mitchell*, 508

1

U.S. 476, 489 (1993). When a state official removes a prosecutor who pledges not to enforce a category of laws, the official punishes not the speech, but the *misconduct* that the speech proves: neglect of duty. *Second*, the First Amendment does not give public employees "a right to perform their jobs however they see fit." *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006). When public employees speak "pursuant to their official duties," the First Amendment "does not insulate their communications from employer discipline." *Id.* at 421.

The panel's decision in this case sets a much different rule. The panel acknowledged that Warren had signed a pledge to refrain from prosecuting people for abortion-related conduct. Op.42. But it reasoned that, because this pledge took place within the "context" of broader advocacy statements about abortion, the pledge itself counted as protected speech. *Id.* That cannot be right. Prosecutors who make non-prosecution pledges will almost always do so within the context of broader statements about their policy beliefs. If such "context" is enough to transmute misconduct into protected speech, then States lose nearly all ability to discipline prosecutors who refuse to do their jobs. In practical effect, the panel's decision grants local prosecutors a constitutional right to veto state laws through public statements. Because no such right exists, the *amici* States urge the full Court's involvement under Appellate Rule 29(b).

# ARGUMENT

To appreciate this case's importance, one must understand the relationship between States and their local prosecutors. The *amici* States begin with that relationship and then turn to the First Amendment.

**I. State law defines the power of local prosecutors, including the line between prosecutorial discretion and prosecutorial abdication.**

**A.** The State's reserved powers include the authority to enact, repeal, and enforce criminal laws. *See* U.S. Const. amend 10; *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016). In entering the Union, the States thus retained authority to decide *what* conduct their criminal laws should prohibit.

The States also retained authority over the structure of their governments. *Shelby County v. Holder*, 570 U.S. 529, 543 (2013). Consequently, the States also get to decide *who* makes criminal laws. Centuries ago, English monarchs claimed some of that power. They said that two royal prerogatives—the dispensing power and the suspending power—allowed them to nullify duly enacted laws. Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution*, 115–17 (2020). Over time, the People determined that the executive ought not wield such power. Since the time of the founding, the Anglo-American view has been that executive officials possess no power to suspend or repudiate laws they dislike. *Id*.

3

Today, the States still uphold that principle of executive power. Several features of state law prove as much. For example, every State but one expressly requires its governor to "ensure faithful execution of the laws." Zachary S. Price, *Faithful Execution in the Fifty States*, 57 Ga. L. Rev. 651, 686 (2023). Several state constitutions go even further, expressly forbidding executive officials from suspending the enforcement of laws. *Id.* at 699.

But governors do not wield the States' executive power alone. Christopher R. Berry & Jacob E. Gersen, *The Unbundled Executive*, 75 U. Chi. L. Rev. 1385, 1399–1401 (2008). Every State established local governments "as convenient agencies for exercising" state power. *Hunter v. Pittsburgh*, 207 U.S. 161, 178 (1907). Relevant here, the people of most States have placed executive power in the hands of both state-level officials and local prosecutors. During the founding era, state officials appointed these local prosecutors. Michael J. Ellis, *The Origins of the Elected Prosecutor*, 121 Yale L.J. 1528, 1530 (2012). But reform efforts eventually led almost every State to make the role of prosecutor an elected office, typically at the county level. *Id.* at 1530 n.3.

Like governors, elected prosecutors are supposed to faithfully execute the law. To this end, prosecutors in Ohio and elsewhere swear oaths to "faithfully discharge all the duties" that state law assigns them. Ohio Rev. Code §309.03; *see also* Ohio

Rev. Code §3.22–23. Of course, elected prosecutors might not abide by their oaths. So States retained supervisory authority. Specifically, many States grant state-level executives supervisory authority over local executive officers (including prosecutors) so as to prevent abuse of power and neglect of duty. Some States empower higher-ranking officials to override the decisions of local prosecutors. California's attorney general, for instance, "shall" step in and "prosecute violations of law," if the law is "not being adequately enforced in any county." Cal. Const. art. V, §13. Other States allow their governors to remove—or initiate removal proceedings against—local prosecutors. As an example, Ohio law requires that the governor initiate removal proceedings if a prosecutor "refuses or willfully neglects to enforce the law or to perform any official duty imposed upon him by law." Ohio Rev. Code §3.07.

In sum, the States created prosecutors, and the States supervise prosecutors—so as to ensure prosecutors do not exceed the limits of executive power.

**B.** But when do the actions of a local prosecutor exceed the limits of executive power? To answer that question, States and their officials must necessarily decide the acceptable boundaries of prosecutorial discretion.

Because criminal codes are lengthy, and because government resources are limited, prosecutors have traditionally received broad discretion to decide "whom

to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985). This discretion is part of the separation of powers, which protects liberty by making imprisonment contingent on "consensus from all three branches"; no one can be deprived of liberty unless the legislature "enact[s] a criminal law," the executive "initiate[s] a prosecution," and the judiciary "adjudicate[s] the case." *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 921 (6th Cir. 2021) (Murphy, J., dissenting).

There is a difference, however, between discretion and abdication. Prosecutorial discretion involves "declining enforcement in particular cases for case-specific reasons." *See* Price, *Faithful Execution in the Fifty States*, 57 Ga. L. Rev. at 666. And since the "full enforcement of every law in every case is impossible and inappropriate," *id.*, such case-by-case discretion accords with the traditional view that prosecutors are "servants of the public will reflected in legislation," *see id.* at 655. Prosecutorial abdication entails what might be called a "prosecutor's veto"—a refusal or reluctance to enforce entire categories of laws, not because of resource constraints or case-specific concerns, but rather because of a disagreement regarding the wisdom of the laws in question. Abdication involves the sort of suspension and dispensing powers that Kings asserted—and Americans long ago rejected. *See* McConnell, *The President Who Would Not Be King* at 115–17. Think of the difference this way: a prosecutor engages in discretion if she refrains from prosecuting a shoplifter who has

6

fallen on hard times; a prosecutor engages in abdication when she publicly signals that *no* shoplifters will be prosecuted.

Abdication is presently in vogue. Recent years have seen a "sudden and unexpected spread" of "nonenforcement policies across the United States." Price, *Faithful Execution in the Fifty States*, 57 Ga. L. Rev. at 673. Through such policies, prosecutors will often pledge not to enforce certain categories of laws. More subtly, some prosecutors announce what laws they will generally or presumptively decline to enforce. Whether blatant or subtle, publicly announced non-prosecution policies undermine the separation of powers. When prosecutors wield an effective veto, they violate their oaths to faithfully execute the law; and they hinder the People's right to determine, either through their elected representatives or by direct initiative, the law that governs their States. Because local prosecutors are creatures of state law, the States may define (1) the circumstances in which non-prosecution policies cross the line from discretion to abdication, and (2) the consequences for crossing the line.

Quite a bit rides on the lawfulness of non-prosecution policies. Such policies encourage people to engage in behavior that lawmakers have prohibited. And, in addition to affecting how people behave, such policies also confuse the public as to "what the law really requires." Price, *Faithful Execution in the Fifty States*, 57 Ga. L. Rev. at 739. Imagine, for example, people who hear their local prosecutor say that

certain laws will not be enforced, only to be prosecuted by the state attorney general (or a prosecutor in another county) for violating the laws in question. *See* Cal. Const. art. V, §13. Worse still, non-prosecution policies risk blocking, or delaying, legislative action in areas where reform is needed. Lawmakers will naturally feel less pressure to fix bad laws if they know prosecutors are not enforcing those laws. Finally, while non-prosecution policies of the moment might align with someone's policy preferences, the above problems have no ideology. If prosecutors have the power to nullify laws they do not like, that means all prosecutors—whether liberal or conservative—get to exercise that power.

**II. The First Amendment does not protect from discipline local prosecutors who announce non-prosecution policies.**

**A.** The above discussion sets the stage for this case's broader significance. If, as the panel insinuated, non-prosecution pledges are easily wrapped in the First Amendment's protections, then States lose much of their ability to supervise an office they created. But, for at least two reasons, the First Amendment's Free Speech Clause does not extend to non-prosecution pledges.

*First*, the right to free speech is not a right to be free from the consequences of misconduct that speech brings to light. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). That is why the First Amendment is not implicated when prosecutors use a defendant's admission in charging a crime. *Id.* at 489–90. Nor is there any

"constitutional problem with using an employer's offensive speech as evidence of motive or intent in a case involving an allegedly discriminatory employment action." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001). Indeed, all litigants, whether governmental or private, may use their opponents' past admissions as evidence against them during litigation. *See* Fed. R. Evid. 801(d)(2).

Applying that principle here, non-prosecution pledges serve as evidence of prosecutorial misconduct. At least in most States, prosecutors act outside their permitted discretion if they fail to faithfully enforce state laws. And non-prosecution pledges naturally prove prosecutors' commitment to neglecting their duties. The prosecutor's speech (the announcement of the pledge) simply serves as evidence of the prosecutor's actual or intended misconduct. As with any other line of work, prosecutors cannot refuse to perform the role that their supervisor (the People, via the State) assigns them and expect to keep their jobs. Nor can they publicly pledge to do a bad job and expect no consequences.

*Second*, the freedom of speech does not entail a right to government employment. *Connick v. Myers*, 461 U.S. 138, 143–44 (1983). To be sure, "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Still, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her

9

freedom." *Id.* at 418. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* Most important here, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Whether employees speak within "the scope of [their] professional duties" is a "practical" inquiry. *Id.* at 424–25. It requires consideration of employees' "ordinary job responsibilities," *Lane v. Franks*, 573 U.S. 228, 237 (2014), along with the degree of "official significance" that attaches to the "expressions made by the speaker," *Garcetti*, 547 U.S. at 422.

Prosecutors who make pledges about how they will handle categories of cases act within the scope of their duties. They therefore lack any First Amendment right to make such pledges. The "ordinary job responsibilities" of local prosecutors, *see Lane*, 573 U.S. at 237, include decisions about "whom to prosecute," *Wayte*, 470 U.S. at 607. Moreover, statements local prosecutors make to the public about which laws they will decline to enforce carry obvious "official significance." *Garcetti*, 547 U.S. at 422. And the fact that local prosecutors are elected officials does not change the analysis. States have chosen to make the position an elected one, but that does

not mean that the position is unsupervised or independent of the State. Rather, States to varying degrees have given statewide officers "control over" these county positions—positions that the States themselves "commissioned or created." *Garcetti*, 547 U.S. at 422.

**B.** The panel, nonetheless, took an expansive view of the extent to which the First Amendment blocks state oversight of local prosecutors. Perhaps most troubling, the panel suggested that surrounding "context" afforded constitutional protections to an unambiguous non-prosecution pledge. *See* Op. 41–42. That is, because Warren's non-prosecution pledge was only "one sentence" in a broader advocacy statement, the First Amendment protected the pledge. *See id.* at 42.

If that is the standard, then States effectively lose their ability to supervise and discipline local prosecutors. Presumably, prosecutors who make non-prosecution pledges will almost always support their pledges with advocacy about their beliefs. Thus, if a non-prosecution pledge takes on the protections afforded to surrounding advocacy, the First Amendment will protect such misconduct as a matter of course.

Tellingly, the enforcement alternatives the panel suggested are unworkable. The panel hinted that, to prove prosecutorial abdication, the State would need to prove that Warren either adopted a formal office policy or refused to prosecute cases he "encountered." *See* Op.12, 36–37. But once Warren openly announced that he

11

would not prosecute abortion-related cases, he signaled to his employees, law enforcement, and the public that he would neglect his duties.  Warren did not need a formal office policy; and it became a near given that he would encounter few if any such cases.

All said, the panel misunderstood the scope of First Amendment protections. The full Court should step in to ensure that Florida and every other State may effectively supervise their prosecutors.

## CONCLUSION

The Court should grant the petition for rehearing *en banc*.

DAVE YOST
Ohio Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Solicitor General
 **Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, OH 43215
(614) 466-8980
Thomas.gaiser@ohioago.gov

*Counsel for the State of Ohio*

# ADDITIONAL COUNSEL

Steve Marshall
Alabama Attorney General

Tim Griffin
Arkansas Attorney General

Christopher M. Carr
Georgia Attorney General

Kris Kobach
Kansas Attorney General

Russell Coleman
Kentucky Attorney General

Liz Murrill
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Andrew Bailey
Missouri Attorney General

Austin Knudsen
Montana Attorney General

Michael T. Hilgers
Nebraska Attorney General

Alan Wilson
South Carolina Attorney General

Marty Jackley
South Dakota Attorney General

Ken Paxton
Texas Attorney General

Sean D. Reyes
Utah Attorney General

Jason Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General

# CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and contains 2,587 words. *See* Fed. R. App. P. 29(b)(4), 35(a)(2).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

/s/ T. Elliot Gaiser
T. Elliot Gaiser
Ohio Solicitor General

# CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2024, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ T. Elliot Gaiser
T. Elliot Gaiser
Ohio Solicitor General
